1  MATTHEW W. GRIMSHAW, #210424
   mgrimshaw@marshackhays.com
2  DAVID A. WOOD, #272406
   dwood@marshackhays.com
3  MARSHACK HAYS WOOD LLP
   870 Roosevelt, Irvine, CA 92620
4  Telephone: 949-333-7777
   Facsimile: 949-333-7778
5
   Proposed Attorneys for Debtor,
6  CADUCEUS PHYSICIANS MEDICAL GROUP,
   a Professional Medical Corporation, dba
7  CADUCEUS MEDICAL GROUP and
   CADUDEUA MEDICAL SERVICES LLC
8

9                       UNITED STATES BANKRUPTCY COURT
10
              CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION
11

12                                          │ Case No. 8:24-bk-11945-TA
13  In re                                   │
                                            │ Chapter 11
14  CADUCEUS PHYSICIANS MEDICAL             │
    GROUP, a Professional Medical Corporation,│ (Jointly Administered with 8:24-bk-11946-
15  dba CADUCEUS MEDICAL GROUP,             │ TA)
                                            │
16              Debtor.                     │ DEBTORS' MOTION FOR ORDER
                                            │ AUTHORIZING USE OF CASH
17  ☒     ALL DEBTORS                       │ COLLATERAL TO CONFIRM THAT ITS
                                            │ SECURED CREDITOR IS ADEQUATELY
18  ☐     Caduceus Physicians Medical Group, dba│ PROTECTED; MEMORANDUM OF
    Caduceus Medical Group, ONLY           │ POINTS AND AUTHORITIES AND
19                                          │ DECLARATIONS  OF DR. GREGG
    ☐     Caduceus Medical Services, LLC,  ONLY│ DENICOLA AND HOWARD GROBSTEIN
20                                          │ IN SUPPORT
                                            │
21                                          │ Hearing:
                                            │ Date:    August 6, 2024
22                                          │ Time:    11:00 a.m.
                                            │ Ctrm:    5B
23                                          │ Place:   411 West Fourth Street
                                            │          Santa Ana, CA  92701
24

25

26  / / /

27  / / /

28

---
MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

# TABLE OF CONTENTS

1.    Summary of Argument ................................................................................................1

2.    Background ...............................................................................................................2

      A.    CPMG ...........................................................................................................2

      B.    The Impact of the COVID 19 Pandemic......................................................2

      C.    Additional Financial Difficulties ................................................................3

      D.    Debtors' Mitigation Efforts.........................................................................3

      E.    Debtors' Assets ...........................................................................................4

      F.    Debtors' Secured Creditors.........................................................................4

      G.    Other Parties With UCC-1 Filings .............................................................7

      H.    Lenders With Unperfected Security Interests .............................................7

      I.    Other first day motions ...............................................................................8

1.    Legal Argument ........................................................................................................8

      A.    The Court may authorize Debtor to use cash collateral................................8

      B.    Secured Lenders are adequately protected...................................................8

      C.    The proposed form of order – FRBP 4001(d)(1)(A) ..................................11

      D.    Required Local Form F4001-2.STMT.FINANCE.......................................11

2.    Conclusion ..............................................................................................................12

Declaration of Gregg DeNicola ............................................................................................13

Declaration of Howard Grobstein..........................................................................................16

      Other Parties With UCC-1 Filings.............................................................................18

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

1

# TABLE OF AUTHORITIES

2 **Cases**

3 *First Federal Bank of California v. Weinstein (In re Weinstein),*

4   227 B.R. 284, 296 (B.A.P. 9th Cir. 1998) ...................................................................... 9

5 *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),*

6   25 B.R. 987, 989-90 n.4 (Bankr. D. Utah 1982) ........................................................... 9

7 *In re Columbia Gas Sys., Inc.,*

8   146 B.R. 114 (Bankr. D. Del. 1992) .............................................................................. 9

9 *In re DBI Housing, Inc.,*

10   2013 Bankr. LEXIS 2146, *10 (Bankr. C.D. Cal. 2013) ............................................ 10

11 *In re Deico Elecs., Inc.,*

12   139 B.R. 945, 947 (B.A.P. 9th Cir. 1992) ..................................................................... 9

13 *In re Kost,*

14   102 B.R. 829, 831-32 (Bankr. D. Wyo 1989) ............................................................. 10

15 *In re Martin,*

16   761 F.2d 472 (8th Cir. 1985) .......................................................................................... 9

17 *In re McGowan,*

18   3 B.R. 241, 243 (Bankr. E.D. Pa 1980) ...................................................................... 10

19 *In re Mellor,*

20   734 F.2d 1396, 1400 (9th Cir. 1984) .................................................................. 8, 9, 10

21 *In re Rodgers Devel. Corp.,*

22   2 B.R. 679, 685 (Bankr. E.D. Va. 1980) .................................................................... 10

23 *In re Shaw Indus., Inc.,*

24   300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) .................................................................. 9

25 *In re Swedeland Dev. Group, Inc.,*

26   16 F.3d 552, 564 (3d Cir. 1994) .................................................................................... 9

27 *In re Tucker,*

28   5 B.R. 180, 183 (Bankr. S.D.N.Y. 1980) .................................................................... 10

*O'Connor,*

    808 F.2d at 1396 ................................................................................................. 9

*United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,*

    484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) ................................... 9

**Statutes**

11 U.S.C. § 363(c)(2)(B) ...................................................................................... 8

11 U.S.C. § 366(b) ............................................................................................... 1

11 U.S.C. §§ 361, 363(e) ..................................................................................... 9

11 U.S.C. §361 ..................................................................................................... 9

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

4887-6608-8371V.1

TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED PARTIES:

Debtors, CADUCEUS PHYSICIANS MEDICAL GROUP, a Professional Medical Corporation, dba CADUCEUS MEDICAL GROUP, ("CPMG") and CADUCEUS MEDICAL SERVICES, LLC ("CMS," and collectively with CPMG, the "Debtors") in the above-captioned case, respectfully submit this motion for an order authorizing it to use cash collateral and determining that its secured creditor is adequately protected ("Motion"), and the declarations of Dr. Gregg DeNicola ("DeNicola Decl.") and Howard Grobstein ("Grobstein Decl."). In support of the Motion, Debtor respectfully represents as follows:

## 1.    Summary of Argument

The Debtors operate a large medical practice in Orange County. Debtors encountered cash flow issues after the insurance company used by a majority of Debtors' patients altered the terms on which it pays the Debtors. These alterations resulted in Debtors' monthly revenue decreasing by approximately $350,000. The Debtors mitigation efforts have blunted the devastating impact of the lost revenue, but Debtors' continue to face challenges. Currently, the Debtors are actively seeking to be acquired by a larger medical practice. These chapter 11 cases are designed to allow the Debtors to consummate such a sale transaction, using the proceeds to pay its creditors.

The Debtors need the ability to use collected as receivables in order to pay its ongoing operating expenses, including payroll, rent, utilities, and supplies. As set forth in the Budget (as defined below), the Debtors anticipate being cash flow positive from the inception of these case. More importantly, the Debtors' budget provides adequate protection payments to its secured creditors.

Thus, the Debtors ask for an order permitting them to use cash collateral in order to operate in the ordinary course of their business, including making the payments contemplated in the Budget.

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

## 2.    Background

### A.    CPMG

Incorporated in California and founded in November 1998 by Dr. Gregg DeNicola, CPMG is a multi-specialty medical group with a wrap-around staff model and is among the largest remaining doctor-owned medical practices in the Orange County service area. DeNicola Decl., ¶7. Currently, CPMG provides medical care at offices in Irvine, Laguna Beach, and Yorba Linda. *Id.* Additionally, CPMG operates various urgent care facilities in Orange County under the tradename PDQ Urgent Care and More. *Id.*

CPMG's current medical staff model count includes 60 licensed providers, consisting of 42 employed primary care and multi-specialty physicians plus 18 contracted providers. *See* DeNicola Decl., ¶8. Additionally, CPMG employs approximately 125 clinical and non-clinical staff involved in day-to-day operations at its various medical offices. *Id*. Among all office locations, CPMG's medical staff provides 125,000 - 130,000 patient visits annually. *Id*.

### B.    The Impact of the COVID 19 Pandemic

The COVID pandemic strained CPMG's financial condition as its costs increased while its revenue decreased. DeNicola Decl., ¶9. First, when businesses across the nation closed, CPMG remained open, expanding its hours of operation to meet the critical care needs of the Orange County community. *Id.* The heavy staffing demands associated with CPMG's expanded hours could only be met by increasing wages. *Id.* In the aggregate, CPMG's labor costs increased by approximately 20%. *Id.*

Concurrently, CPMG's revenue declined for various reasons. DeNicola Decl., ¶10. For example, the number of medical procedures and surgeries performed by CPMG's medical staff decreased significantly. *Id.* Further, a significant number of CPMG's patients transitioned to telehealth visits for less acute care, with such telehealth visits having lower reimbursement rates than in-person visits. *Id.* This combination of increased costs and reduced revenue resulted in losses beginning in calendar year 2021 and continuing each year thereafter. *Id.*

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

## C.    Additional Financial Difficulties

Two other events occurred in late 2022 that negatively impacted CPMG's financial condition. DeNicola Decl., ¶11. First, a short-term cash crunch arose in early November 2022. *Id.* After spending significant time courting a potential buyer, and with a sale transaction scheduled to close shortly thereafter, the buyer abruptly terminated the transaction. *Id.* Shortly thereafter, in connection with the renewal of CPMG's contract with the insurance company used by the majority of its patients for payment of CPMG's medical services, the payment terms were altered significantly. DeNicola Decl., ¶12. As a result, CPMG's revenue decreased by approximately $350,000 per month. *Id.*

## D.    Debtors' Mitigation Efforts

Throughout 2022, CPMG was actively taking steps to mitigate future losses. *See* DeNicola Declaration, ¶13. The two events in November 2022 described above created a financial tsunami for CPMG. *Id.* Thus, in 2023, CPMG's loss mitigation efforts intensified. CPMG laid off employees, which reduced its monthly labor costs by $140,000. *Id.* Through consistent cost-cutting measures and simultaneous efforts to grow revenue, CPMG reduced its operating losses from $240,000 per month at the beginning of 2023 to $150,000 per month by the end of the year. *Id.*

CPMG's mitigation efforts in 2023 included seeking outside investments and exploring sale or merger opportunities. *See* DeNicola Declaration, ¶14. To that end, in July 2023, Caduceus Medical Services, LLC ("CMS") was formed to act as a management services company, and was intended to provide all the non-clinical business support required by CPMG. *Id.* Additionally, a long-term management agreement between CPMG and CMS was signed.[1] *Id.* With this structure in place, CPMG's access to investment funding and potential sale transactions increased significantly

---

[1] Although a management agreement between CPMG and CMS is in place, CPMG did not transfer the relevant assets to CMS. *See* DeNicola Decl., ¶15. Additionally, although it was anticipated that CMS would take over for CPMG as the employer of most of CPMG's staff members, such a transition never occurred. *Id.* In short, even though a new management structure is available because of CMS, it remains dormant. *Id.* The CMS case was filed as a companion to the CPMG case because joining the two in a single transaction increases the value for CPMG and the anticipated buyer can obtain the desired sale order. *Id.*

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

as the formation of CMS allowed CPMG access to funding from people and entities not holding a medical license. *Id*.

CPMG's pursuit of funding or a sale transaction has generated significant interest from parties with active medical practices in Orange County. *See* DeNicola Declaration, ¶16. Although a transaction has not yet been finalized, Debtors anticipate entering into such an agreement, which will form the cornerstone of Debtors' anticipated plan. *Id*.

To ensure that Debtors are prepared for a sale transaction, these chapter 11 cases were filed. *See* DeNicola Declaration, ¶17. Debtors seek an order from this Court authorizing the use of cash collateral until a sale can be consummated. DeNicola Decl., ¶18.

## E.    Debtors' Assets

As of the Petition Date, CPMG's assets include the following:

| Asset | Approx. Value |
|---|---|
| Cash on deposit | $285,000 |
| Accounts receivable | $975,000 |
| Anticipated ERTC refund | $1,884,000 |
| Furniture, fixtures, and equipment | $240,000 |
| **Total** | **$3,384,000** |

As of the Petition Date, CMS had no assets. Grobstein Decl., ¶10.

## F.    Debtors' Secured Creditors

CPMG has four lenders with blanket security interests against all its assets (collectively, "Secured Lenders"). Grobstein Decl., ¶11, Ex. 2. The Debtors seek use of the Secured Lenders' cash collateral. Attached as Exhibit "1" to the Grobstein Declaration is the Debtors' budget for the first 13 weeks of these cases ("Budget"). Grobstein Decl., ¶8. Each lender is adequately protected by an equity cushion, payments in the Budget, or agreement that defer all payments to certain Secured Lenders for a period of time. *Id*.

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

### 1. BMO Harris Bank

Approximately 20 years ago, BMO Harris Bank's ("BMO") predecessor-in-interest—Bank of the West ("BOW")—began making loans to CPMG. Grobstein Decl., ¶¶12-14. Currently, at least four of the loans made by BOW have a remaining balance, with the total owed to BMO being approximately $1,050,000. Grobstein Decl., ¶12.

BMO holds a blanket lien against all of CPMG's assets, including accounts receivable, that was perfected by the filing of a UCC-1 Financing Statement, Filing No. 07-7097322653, on January 3, 2007, and renewed from time to time. Grobstein Decl., ¶13, Ex. 3. BMO's lien is a first-priority lien.

Debtors' Budget proposes monthly adequate protection payments to BMO totaling $16,385. Grobstein Decl., ¶3, Ex. 1, pg. 21-24.

### 2. Backd

On April 2, 2024, Austin Business Finance LLC dba Backd ("Backd") entered into a transaction with CPMG whereby Backd purportedly purchased CMPG's future receivables at a discount. Grobstein Decl., ¶15. The transaction is tantamount to a loan ("Backd Loan"). *Id.* In connection with the Backd Loan, CPMG granted a blanket security interest to Backd, who recorded a UCC-1 Financing Statement, Filing No. U240030443226, on April 3, 2024. Grobstein Decl., ¶15, Ex. 4. Backd's lien is a second-priority lien.

Shortly before the Petition Date, CPMG renegotiated the payment terms of the Backd Loan, with Backd agreeing to defer payments for approximately 16 weeks ("Backd Agreement"). Grobstein Decl., ¶16, Ex. 5, pg. 33-51. As of the Petition Date, Backd was owed approximately $750,000. *Id.*, Ex. 5, pgs. 34-36.

Based on direct negotiations with Backd, the parties agreed that Debtors' Budget will include adequate protection payments to Backd beginning in week 17 of these cases. Grobstein Decl., ¶16.

### 3. LendSpark

On April 2, 2024, LendSpark Corporation ("LendSpark") entered into a Business Loan and Security Agreement with CPMG, whereby LendSpark loaned money to CPMG ("LendSpark Loan").

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

Grobstein Decl., ¶17. In connection with the LendSpark Loan, CPMG granted a blanket security interest to LendSpark, who recorded a UCC-1 Financing Statement, Filing No. U240055864431, on July 11, 2024. Grobstein Decl., ¶17, Ex. 6.  LendSpark's lien is a third-priority lien.

Shortly before the Petition Date, CPMG renegotiated the payment terms of the LendSpark Loan, with LendSpark agreeing to defer payments for approximately 16 weeks ("LendSpark Agreement"). Grobstein Decl., ¶18, Ex. 7, pgs. 54-88. As of the Petition Date, LendSpark was owed approximately $750,000. Grobstein Decl., ¶18, Ex. 7, pgs. 56-59.

Based on direct negotiations with LendSpark, the parties agreed that Debtors' Budget will include adequate protection payments to LendSpark beginning in week 17 of these cases. Grobstein Decl., ¶18.

### 4.    Despierta

In 2022, CPMG entered into negotiations with Rise Health Services, Inc. ("Rise") with the expectation that Rise would acquire CPMG. Grobstein Decl., ¶19. In anticipation of the transaction, an affiliate of Rise—Despierta LLC ("Despierta") loaned CPMG money ("Despierta Loan"). *Id.* The Despierta Loan is evidenced by a Secured Promissory Note, which has been amended from time to time ("Despierta Note"). *Id.* The Despierta Note includes the grant of a security interest in substantially all of CPMG's assets. *Id.*, at ¶20. On July 30, 2024, recorded a UCC-1 Financing Statement, Filing No. U240061296020. *Id.*, at ¶20, Ex. 9.

Shortly before the Petition Date, CPMG negotiated its most recent amendment to the Despierta Note, with Despierta agreeing to defer payments on the Despierta Loan until January 1, 2025. Grobstein Decl., ¶19, Ex. 8, pg. 89-92. As of the Petition Date, Despierta was owed approximately $630,000. Grobstein Decl., ¶19, Ex. 8, pg. 89.

Based on the most recent amendment to the Despierta Note, no payments are due until January 2025. Grobstein Decl., ¶¶21-22. Therefore, the Debtors' Budget will include adequate protection payments to Despierta beginning on January 1, 2025.[2] Grobstein Decl., ¶¶21-22.

---

[2] The Debtors are evaluating the avoidability of Despierta's UCC-1 Financing Statement ("Despierta UCC") under 11 U.S.C. §547. Grobstein Decl., ¶¶21-22 To the extent that the lien arising from the Despierta UCC is avoided under 11 U.S.C. §547 or otherwise, adequate protection payments may

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

### G. Other Parties With UCC-1 Filings

CPMG leases various pieces of equipment for use in its medical practice. Grobstein Decl., ¶23. At least four parties have filed UCC-1 financing statements in connection with leased equipment. *Id.* First, CPMG leases computers from Dell through Dell Financial Services LLC ("Dell") ("Dell Lease"). Grobstein Decl., ¶24. On January 21, 2021, Dell filed a UCC-1 Financing Statement, Filing No. U210017365931, in connection with the Dell Lease. *Id.*, ¶24, Ex. 10. The Budget provides for regular payments on the Dell Lease. Grobstein Decl., ¶¶8 & 25, Ex. 1, pgs. 21-24.

Second, through TIAA Commercial Finance Inc. ("TIAA"), CPMG leases various pieces of obstetric equipment, including ultrasound machines and fetal heart monitors, and other mobile machines needed to care for its patients (collectively, "TIAA Leases"). Grobstein Decl., ¶26. On July 9, 2020, TIAA filed a UCC-1 Financing Statement, Filing No. 20-7804086055, in connection with the TIAA Leases. *Id.*, at ¶26, Ex. 11. The Budget provides for regular payments on the TIAA Leases.[3] Grobstein Decl., ¶¶8 & 28, Ex. 1, pg. 21-24.

Third, through Hologic Capital ("Hologic"), CPMG leases certain pieces of larger machinery ("Hologic Lease"). Grobstein Decl., ¶29. On July 30, 2021, Hologic filed a UCC-1 Financing Statement, Filing No. U210071055719, in connection with Hologic Lease. *Id.*, at ¶29, Ex. 13. The Budget provides for regular payment on the Hologic Lease. Grobstein Decl., ¶¶ 8 & 30, Ex. 1, pg. 21-24.

### H. Lenders With Unperfected Security Interests

Some lenders hold unperfected security interests. Grobstein Decl., ¶¶ 8 & 31, Ex. 2. During 2023, as the Debtors struggled to mitigate the impact of reduced revenue and increased costs, four different shareholders ("collectively, "Shareholders") loaned money to CPMG (collectively, "Shareholder Loans"). *Id.* Each Shareholder Loan is evidenced by a promissory note that grants the

---

not be required. Grobstein Decl., ¶¶21-22.
[3] Some of the equipment leased under the TIAA Leases was manufactured by McKesson, who filed its own UCC-1 Financing Statement on January 1, 2020, Filing No. 20-7755731269. Grobstein Decl., ¶27, Ex. 12.

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

applicable Shareholder a lien against CPMG's assets (collectively, "Shareholder Notes"). *Id.* Each Shareholder failed to perfect the security interest provided in the Shareholder Notes and each such loan will be treated as an unsecured obligation in these proceedings. *Id.*

## I.      Other first day motions

Concurrently with the filing of this motion, Debtors are filing motions to (1) authorize Debtors to maintain its current bank accounts and cash management system; (2) authorize Debtors to pay the pre-petition wages of its employees; and (3) prohibiting utility providers from altering, refusing or discontinuing services.

## 1.    Legal Argument

### A.      The Court may authorize Debtor to use cash collateral

A debtor may use, sell, or lease property of the estate in the ordinary course of business without court approval. 11 U.S.C. §363(c)(1). But a debtor "may not use, sell or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. §363(c)(2); *see, e.g., Secured Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 440 (B.A.P. 9th Cir. 2004).

Here, Debtors seek to use cash collateral to pay the expenses set forth in the Budget attached to this Motion. *See* Grobstein Decl., Ex. X, pg. X.  Debtors submit that payment of the expenses shown in the Budget are within the ordinary course of Debtors' businesses.

### B.      Secured Lenders are adequately protected

To the extent that an entity has a valid security interest in the revenues generated by property of the estate, those revenues constitute "cash collateral" under §363(a). The bankruptcy court can authorize use of said cash collateral under § 363(c)(2)(B) if the court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral. *See e.g., In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). Although the term "adequate protection" is not explicitly defined, §361 provides that when adequate protection is required, it may be provided by:

> (1) Requiring the trustee to make a cash payment or periodic cash
> payments to such entity, to the extent that the … use … under section 363

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

of this title … results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such … use … results in a decrease in the value of such entity's interest in such property; or

(3) Granting such other relief … as will result in the realizing by such entity of the indubitable equivalent in such entity's interest in such property.

11 U.S.C. §361.

Section 361 does not define "interest in property" of which a secured creditor is entitled to adequate protection. But the statute plainly provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in the "value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e). *See e.g., First Federal Bank of California v. Weinstein (In re Weinstein)*, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998); *In re Deico Elecs., Inc.*, 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992); *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 n.4 (Bankr. D. Utah 1982). The phrase "value of such entity's interest" was addressed by the Supreme Court in *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988). *Timbers* instructs that a secured creditor is entitled to adequate protection only against the diminution in the value of the collateral securing the creditor's allowed secured claim. *Id.* at 630 Therefore, where the value of the collateral is not diminishing by its use, sale, or lease, the creditor's interest is adequately protected. Ultimately, what constitutes adequate protection must be decided on a case-by-case basis. *See, In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *O'Connor*, 808 F.2d at 1396; *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003); *In re Columbia Gas Sys., Inc.*, 146 B.R. 114 (Bankr. D. Del. 1992).

Courts recognize that an equity cushion[4] provides adequate protection to a secured creditor. *See In re Mellor*, 734 F.2d 1396 (9th Cir. 1984). There is no minimum amount or percentage of

---

[4] According to *Mellor*, the term "equity cushion" means "the value in the property, above the amount owed to

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

1  equity cushion that constitutes adequate protection, but rather, the adequacy of the cushion depends

2  on the circumstances of each case. *See In re Tucker*, 5 B.R. 180, 183 (Bankr. S.D.N.Y. 1980); *see*

3  *also In re McGowan*, 3 B.R. 241, 243 (Bankr. E.D. Pa 1980) (holding a cushion of 10% is adequate);

4  *In re Kost*, 102 B.R. 829, 831-32 (Bankr. D. Wyo 1989) (providing a survey of cases where 20% or

5  more is considered adequate).

6        The Ninth Circuit has provided guidance as to the amount of an equity cushion that is

7  sufficient. In *Mellor*, the court held that a 20% equity cushion adequately protected the secured

8  creditor. *Mellor*, 734 F.2d at 1400. In doing so, the court cited with approval various cases holding

9  that an equity cushion of 10%-20% is sufficient to protect a creditor. *Id.* at 1401 (citing *In re*

10 *McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% equity cushion protects a

11 creditor) and *In re Rodgers Devel. Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (holding that a

12 15%-20% equity cushion protects a creditor). Moreover, courts in this district understand *Mellor*'s

13 teaching that an equity cushion from 10%-20% is sufficient to adequately protect a creditor. *See,*

14 *e.g.*, *In re DBI Housing, Inc.*, 2013 Bankr. LEXIS 2146, *10 (Bankr. C.D. Cal. 2013) (holding that a

15 16% equity cushion adequately protects a creditor).

16       Here, each of the Secured Lenders is protected by an equity cushion. Debtors' assets have a

17 value of at least $3.3 million. Grobstein Decl., ¶9.  First, BMO holds a first-priority lien against

18 Debtors' assets and is owed approximately $1.05 million. *Id.*, at ¶12. Thus, the equity cushion

19 protecting BMO is approximately 200%. Nonetheless, the Budget provides for regular monthly

20 payments to BMO in the amount of approximately $16,385. *Id.*, at ¶8, Ex. 1, pgs. 21-24.

21       Second, Backd holds a second-priority lien against Debtors' assets and is owed

22 approximately $750,000. Grobstein Decl., ¶¶15-16, Ex. 5, pg. 33-36. The equity cushion protecting

23 Backd is approximately 88%. Further, in accordance with the recently negotiated Backd Agreement,

24 the Budget will provide for regular payments on the Backd Loan beginning in week 17. Grobstein

25 Decl., ¶16, Ex. 5, pgs. 33-36.

26

27 _____

28 the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the
property during the time the automatic stay remains in effective." 734 at 1400 n.2.

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

4887-6608-8371V.1

1   Third, LendSpark holds a third-priority lien against Debtors' assets and is owed

2   approximately $750,000. Grobstein Decl., ¶¶17-18, Ex. 7, pgs. 54-57. The equity cushion protecting

3   LendSpark is approximately 25%. Further, in accordance with the recently negotiated LendSpark

4   Agreement, the Budget will provide for regular payments on the LendSpark Loan beginning in week

5   17. Grobstein Decl., ¶18, Ex. 7 pgs. 54-57.

6   Fourth, Despierta holds a fourth-priority lien against Debtors' assets and is owed

7   approximately $630,000. Grobstein Decl., ¶¶19-21, Ex. 8, pg. 89. Despierta's lien was perfected on

8   July 30, 2024, and is preemptively avoidable under 11 U.S.C. §547. Grobstein Decl., ¶20, Ex. 9; 11

9   U.S.C. §547. As such, Despierta may not entitled to adequate protection payments and maybe

10  treated as an unsecured creditors. Regardless, if adequate protections payments are required (and

11  they may not be), under the Despierta Note no payments are due until January 2025. Grobstein

12  Decl., ¶19, Ex. 8, pg. 89.

13  Moreover, although not required, Dell, TIAA, and Hologic are adequately protected. Indeed,

14  under the Budget, Dell, TIAA, and Hologic will receive lease payments according to the terms of the

15  underlying obligations. Grobstein Decl., ¶8, Ex. 1, pgs. 21-24.

16  Finally, the Shareholders are not entitled to adequate protection. To the best of the Debtors

17  knowledge, the Shareholders failed to perfect the security interest provided to each of them in the

18  Shareholder Notes. Grobstein Decl., ¶¶11 & 31, Ex. 2. Accordingly, the Shareholders will be treated

19  as unsecured creditors in these proceedings.

20  **C.    The proposed form of order – FRBP 4001(d)(1)(A)**

21  Rule 4001(d)(1)(A) of the Federal Rules of Bankruptcy Procedure requires that a motion for

22  the authority to use cash collateral or for approval of a cash collateral agreement be accompanied by

23  a proposed form of order. The proposed form of order is attached to this Motion as Exhibit "14."

24  Thus, the Debtors have complied with the FRBP.

25  **D.    Required Local Form F4001-2.STMT.FINANCE**

26  As required by Local Bankruptcy Rule 4001-2(a), the Debtors will be filing the required

27  local form for approval of the use of cash collateral.

28

## 2.    Conclusion

The Debtors request that the Court enter an order as follows:

(1) Authorizing, on an interim basis pending final hearing on notice to creditors, the Debtors' immediate use of any cash collateral pursuant to the proposed budget attached as Exhibit "1," to the Grobstein Decl., with a 10% variance;

(2) Determining that the Secured Creditors and all other secured creditors (to the extent there are any) are adequately protected; and

(3) Setting a final hearing on this Motion.

Dated:  August 2, 2024              CADUCEUS PHYSICIANS MEDICAL GROUP,
                                    A PROFESSIONAL MEDICAL CORPORATION,
                                    DBA CADUCEUS MEDICAL GROUP AND
                                    CADUCEUS MEDICAL SERVICES, LLC

                                    By: _____
                                        HOWARD GROBSTEIN
                                        Chief Restructuring Officer

Dated:  August 2, 2024              MARSHACK HAYS WOOD LLP

                                    By: ___/s/ David A. Wood_____
                                        MATTHEW W. GRIMSHAW
                                        DAVID A. WOOD
                                        PROPOSED ATTORNEYS FOR
                                        CADUCEUS PHYSICIANS MEDICAL
                                        GROUP, A PROFESSIONAL MEDICAL
                                        CORPORATION, DBA CADUCEUS
                                        MEDICAL GROUP AND CADUCEUS
                                    MEDICAL SERVICES, LLC

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371 V.1

# Declaration of Gregg DeNicola

I, GREGG DENICOLA, declare as follows:

1.      I am an individual over 18 years of age and competent to make this Declaration.

2.      If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.      The facts set forth below are true of my personal knowledge.

4.      I am a medical doctor and the co-Chief Executive Officer of CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION dba CADUCEUS MEDICAL GROUP ("CPMG"). I am also a Manager of CADUCEUS MEDICAL SERVICES, LLC ("CMS"). I am also a medical doctor.

5.      I make this Declaration in support of Debtor's motion for an order authorizing it to use cash collateral and determining that its secured creditor is adequately protected ("Motion").

6.      All terms not defined herein are used as they are defined in the Motion.

7.      In November 1998, I incorporated CPMG, which operates as a multi-specialty medical group with a wrap-around staff model and is among the largest remaining doctor-owned medical practices in the Orange County service area. Currently, CPMG provides medical care at offices in Irvine, Laguna Beach, and Yorba Linda. Additionally, CPMG operates various urgent care facilities in Orange County under the tradename PDQ Urgent Care and More.

8.      CPMG's current medical staff model count includes 60 licensed providers, consisting of 42 employed primary care and multi-specialty physicians plus 18 contracted providers. Additionally, CPMG employs approximately 125 clinical and non-clinical staff involved in day-to-day operations at its various medical offices. Among all office locations, CPMG's medical staff provides 125,000 - 130,000 patient visits annually.

9.      The COVID-19 pandemic strained CPMG's financial condition as its costs increased while its revenue decreased. When businesses across the nation closed, CPMG remained open, expanding its hours of operation to meet the critical care needs of the Orange

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

County community. The heavy staffing demands associated with CPMG's expanded hours could only be met by increasing wages. In the aggregate, CPMG's labor costs increased by approximately 20%.

10.    Concurrently, CPMG's revenue declined for various reasons. For example, the number of medical procedures and surgeries performed by CPMG's medical staff decreased significantly. Further, a significant number of CPMG's patients transitioned to telehealth visits for less acute care, with such telehealth visits having lower reimbursement rates than in-person visits. This combination of increased costs and reduced revenue resulted in losses beginning in calendar year 2021 and continuing each year thereafter.

11.    Two other events occurred in late 2022 that negatively impacted CPMG's financial condition. First, a short-term cash crunch arose in early November 2022. After spending significant time courting a potential buyer, and with a sale transaction scheduled to close shortly thereafter, the buyer abruptly terminated the transaction.

12.    Second, in connection with the renewal of CPMG's contract with the insurance company used by the majority of its patients for payment of CPMG's medical services, the payment terms were altered significantly. As a result, CPMG's revenue decreased by approximately $350,000 per month.

13.    Throughout 2022, CPMG was actively taking steps to mitigate future losses. The two events in November 2022 described above created a financial tsunami for CPMG. Thus, in 2023, CPMG's loss mitigation efforts intensified. CPMG laid off employees, which reduced its monthly labor costs by $140,000. Through consistent cost-cutting measures and simultaneous efforts to grow revenue, CPMG reduced its operating losses from $240,000 per month at the beginning of 2023 to $150,000 per month by the end of the year.

14.    CPMG's mitigation efforts in 2023 included seeking outside investments and exploring sale or merger opportunities. To that end, in July 2023, Caduceus Medical Services, LLC ("CMS") was formed to act as a management services company, and was intended to provide all the non-clinical business support required by CPMG. Additionally, a long-term

1  management agreement between CPMG and CMS was signed. With this structure in place,

2  CPMG's access to investment funding and potential sale transactions increased significantly as

3  the formation of CMS allowed CPMG access to funding from people and entities not holding a

4  medical license.

5       15.     Although a management agreement between CPMG and CMS is in place, CPMG

6  did not transfer the relevant assets to CMS. Additionally, although it was anticipated that CMS

7  would take over for CPMG as the employer of most of CPMG's staff members, such a transition

8  never occurred. In short, even though a new management structure is available because of CMS,

9  it remains dormant. The CMS case was filed as a companion to the CPMG case because joining

10  the two in a single transaction increases the value for Debtor and the anticipated buyer can obtain

11  the desired sale order.

12       16.     CPMG's pursuit of funding or a sale transaction has generated significant interest

13  from parties with active medical practices in Orange County. Although a transaction has not yet

14  been finalized, Debtors anticipate entering into such an agreement, which will form the

15  cornerstone of Debtors' anticipated plan.

16       17.     To ensure that Debtors are prepared for a sale transaction, these chapter 11 cases

17  were filed. Such a transaction is necessary to ensure that Debtors' creditors are paid.

18       18.     Debtors seek an order form this Court authorizing the use of cash collateral until

19  a sale can be consummated.

20       I declare under penalty of perjury that the foregoing is true and correct. Executed on August

21  2, 2024.

22

23                      GREGG DENICOLA

24

25

# Declaration of Howard Grobstein

I, HOWARD GROBSTEIN, declare as follows:

1.    I am an individual over 18 years of age and competent to make this Declaration.

2.    If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.    The facts set forth below are true of my personal knowledge.

4.    I am a co-founder and partner of Grobstein Teeple LLP ("GT").

5.    I am the Chief Restructuring Officer ("CRO") of CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, dba CADUCEUS MEDICAL GROUP ("CPMG") and CADUCEUS MEDICAL SERVICES, LLC ("CMS," and collectively with CPMG, "Debtors") in the above-captioned cases.

6.    I make this Declaration in support of Debtors' motion for an order authorizing it to use cash collateral and determining that its secured creditor is adequately protected ("Motion").

7.    All terms not defined herein are used as they are defined in the Motion.

## **<u>Budget</u>**

8.    Attached hereto as Exhibit "1" is a true and correct copy of Debtors' proposed budget for the first 13 weeks of these cases.

## **<u>Debtors' Assets</u>**

9.    As of the Petition Date, CPMG's assets include the following:

| <u>Asset</u> | <u>Approx. Value</u> |
|---|---|
| Cash on deposit | $285,000 |
| Accounts receivable | $975,000 |
| Anticipated ERTC refund | $1,884,000 |
| Furniture, fixtures, and equipment | $240,000 |
| **Total** | **$3,384,000** |

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

4887-6608-8371V.1

10.     As of the Petition, CMS had no assets.

**Debtors' Secured Creditors**

11.     I obtained a list of the UCC-1 Financing Statements recorded against CPMG from the California Secretary of State's website, a true and correct copy of which is attached hereto as Exhibit "2."

**BMO Harris Bank**

12.     Bank of the West ("BOW") made a series of loans to CPMG (collectively, "BOW Loans"). The current balance owed under the BOW Loans is approximately $1,050,000.

13.     BOW recorded a UCC-1 Financing Statement to secure repayment of the BOW Loans, a true and correct copy of which is attached hereto as Exhibit "3."

14.     I am informed and believe that BMO Harris Bank is the successor in interest to Bank of the West.

**Backd**

15.     On April 2, 2024, Austin Business Finance LLC dba Backd ("Backd") entered into a transaction with CPMG, whereby Backd purportedly purchased CMPG's future receivables at a discount. The transaction is tantamount to a loan ("Backd Loan"). In connection with the Backd Loan, CPMG granted a blanket security interest to Backd. I am informed and believe that Backd recorded a UCC-1 Financing Statement to secure repayment of the Backd Loan, a true and correct copy of which is attached hereto as Exhibit "4."

16.     Shortly before the Petition Date, together with Debtors' management, I renegotiated the terms of the Backd Loan ("Revised Backd Loan"). A true and correct copy of the Revised Backd Loan documents is attached hereto as Exhibit "5." Under the Revised Backd Loan, no payments are due for the first 16 weeks of these cases.

**LendSpark**

17.     On April 2, 2024, LendSpark Corporation ("LendSpark") entered into a Business Loan and Security Agreement with CPMG, whereby LendSpark loaned money CPMG ("LendSpark Loan"). In connection with the LendSpark Loan, CPMG granted a blanket security

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

1  interest to LendSpark. I am informed and believe that LendSpark recorded a UCC-1 Financing

2  Statement to secure repayment of the LendSpark Loan, a true and correct copy of which is

3  attached hereto as Exhibit "6."

4      18.    Shortly before the Petition Date, together with Debtors' management, I

5  renegotiated the terms of the LendSpark Loan ("Revised LendSpark Loan"). A true and correct

6  copy of the Revised LendSpark Loan documents is attached hereto as Exhibit "7." Under the

7  Revised LendSpark Loan, no payments are due for the first 16 weeks of these cases.

8  ## Despierta

9      19.    In 2022, CPMG entered into negotiations with Rise Health Services, Inc. ("Rise")

10 with the expectation that Rise would acquire CPMG. In anticipation of the transaction, an

11 affiliate of Rise—Despierta LLC ("Despierta")— loaned CPMG money ("Despierta Loan"). The

12 Despierta Loan is evidenced by a Secured Promissory Note, which has been amended from time

13 to time ("Despierta Note"). A true and correct copy of the most recent amendment to the

14 Despierta Note is attached hereto as Exhibit "8."

15     20.    The Despierta Note includes the grant of a security interest in substantially all of

16 CPMG's assets. On July 30, 2024, recorded a UCC-1 Financing Statement, Filing No.

17 U240061296020, a true and correct copy of which is attached hereto as Exhibit "9."

18     21.    Based on the most recent amendment to the Despierta Note, no payments are due

19 until January 2025. Therefore, the Debtors' Budget will include adequate protection payments to

20 Despierta beginning on January 1, 2025.

21     22.    The Debtors are evaluating the avoidability of the UCC-1 Financing Statement

22 filed by Despierta.

23 ## Other Parties With UCC-1 Filings

24     23.    CPMG leases various pieces of equipment for use in its medical practice. At least

25 four parties have filed UCC-1 financing statements in connection with leased equipment.

26     24.    First, CPMG leases computers from Dell through Dell Financial Services LLC

27 ("Dell") ("Dell Lease"). Dell recorded a UCC-1 Financing Statement in connection with the Dell

28

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

4887-6608-8371V.1

Lease, a true and correct copy of which is attached hereto as Exhibit "10."

25.     The Budget provides for regular payments on the Dell Lease.

26.     Second, through TIAA Commercial Finance Inc. ("TIAA"), CPMG leases various pieces of obstetric equipment, including ultrasound machines and fetal heart monitors, and other mobile machines needed to care for its patients (collectively, "TIAA Leases"). TIAA recorded a UCC-1 Financing Statement in connection with the TIAA Leases, a true and correct copy of which is attached hereto as Exhibit "11."

27.     Additionally, some of the equipment leased under the TIAA Leases was manufactured by McKesson, who filed its own UCC-1 Financing Statement, a true and correct copy of which is attached hereto as Exhibit "12."

28.     The Budget provides for regular payments on the TIAA Leases.

29.     Third, through Hologic Capital ("Hologic"), CPMG leases certain pieces of larger machinery ("Hologic Lease"). Hologic recorded a UCC-1 Financing Statement in connection with Hologic Lease, a true and correct copy of which is attached hereto as Exhibit "13."

30.     The Budget provides for regular payment on the Hologic Lease.

## **Lenders With Unperfected Security Interests**

31.     Certain lenders hold unperfected security interests. During 2023, as the Debtors struggled to mitigate the impact of reduced revenue and increased costs, four different shareholders ("collectively, "Shareholders") loaned money to CPMG (collectively, "Shareholder Loans"). Each Shareholder Loan is evidenced by a promissory note that grants the applicable Shareholder a lien against CPMG's assets (collectively, "Shareholder Notes"). Each Shareholder failed to perfect the security interest provided in the Shareholder Notes and each such loan will be treated as an unsecured obligation.

32.     Attached hereto as Exhibit "14" is a true and correct copy of the proposed cash collateral order.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 2, 2024.

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
4887-6608-8371V.1

1



2

HOWARD GROBSTEIN

3

4

5

4890-6166-1139, v. 2

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

4887-6608-8371V.1

**EXHIBIT 1**

**Caduceus Physicians Medical Group**
13 Week Cash Budget
Petition Date: 8/1/2024

as of 8/1/2024

| | Notes | Petition Date 8/1/2024 | | | | | Weekly Post-Petition Cash Budget as Forecasted | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 8/2/2024 | 2 8/9/2024 | 3 8/16/2024 | 4 8/23/2024 | 5 8/30/2024 | 6 9/6/2024 | 7 9/13/2024 | 8 9/20/2024 | 9 9/27/2024 | 10 10/4/2024 | 11 10/11/2024 | 12 10/18/2024 | 13 10/25/2024 |
| Cash on Hand - Beginning of Week | | - | 416,056 | 535,711 | 142,277 | 367,821 | 265,733 | 433,791 | 125,804 | 240,950 | 342,250 | 120,162 | 310,476 | 463,896 | 208,181 | 482,383 |
| **Sources of Cash:** | | | | | | | | | | | | | | | |
| Chiron Sublease Rent | A | | 4,655 | | | | | 4,655 | | | | 4,655 | | | |
| IV Infusion Rent | A | | 500 | | | | | 500 | | | | 500 | | | |
| Concierge Club monthly payments | A | | | | | | | | | | | | | | |
| EFTS, Credit, Checks, Cash | A | | | | | | | | | | | | | | |
| HCP Capitation | A | | 45,000 | | | | | | | | | | | | |
| Monarch Capitation | A | | | | 14,000 | | | 14,000 | | | | 14,000 | | | |
| Prospect Capitation | A | | | 225,000 | 225,000 | 218,250 | 218,250 | 218,250 | 218,250 | 218,250 | 218,250 | 218,250 | 218,250 | 218,250 | 218,250 |
| CHOC Capitation | A | | | | | 100,000 / 54,000 | | | | 54,000 | 100,000 | | | 54,000 | |
| UPI Capitation | A | | | | 8,700 | | 8,400 | | 8,700 | | 8,400 | | | | |
| Careion Capitation | A | | | | | 1,100 | | | | | 1,100 | | | | |
| Prop 56 | A | | 70,000 | | 70,000 | | 70,000 | | | | 70,000 | | | | |
| **Total Sources of Cash:** | | $ 120,155 | $ 225,000 | $ 317,700 | $ 373,350 | $ 296,650 | $ 223,405 | $ 240,950 | $ 305,310 | $ 327,750 | $ 293,405 | $ 232,250 | $ 342,260 | $ 218,250 |
| **Uses of Cash:** | | | | | | | | | | | | | | | |
| Credit Card Collection Fees and Phinessia | A | | 20,000 | | | | | 20,000 | | | 20,000 | | | |
| Insurance | | | | | | | | | | | | | | | |
| Medical Insurance - ADP | A | | | 32,000 | | | | | 32,000 | | | | 32,000 | | |
| D&O Insurance | A | | | | | 7,071 | | | | | 7,071 | | | 7,071 | |
| CNA Property Insurance | A | | | 1,994 | | | | | 1,994 | | | | 1,994 | | |
| Malpractice | A | | | | | 28,000 | | | | | 28,000 | | | | 28,000 |
| Malpractice - Hall and Ponzio | A | | | | | | | | 5,200 | | | | | |
| Medical Supplies | | | | | | | | | | | | | | | |
| McKesson - medical supplies | A | | | 12,200 | | | | 12,200 | | | | 12,200 | | | |
| Merck & Co - vaccines for pediatrics | A | | | 7,000 | | | | 7,000 | | | | 7,000 | | | |
| Pfizer - vaccines | A | | | 5,000 | | | | 5,000 | | | | 5,000 | | | |
| Sanofi - vaccines for pediatrics | A | | | 14,000 | | | | 14,000 | | | | 14,000 | | | |
| Radiation Detection | A | | | 200 | | | | 200 | | | | 200 | | | |
| Spectrum Gas Products | A | | | 1,300 | | | | 1,300 | | | | 1,300 | | | |
| ASD Healthcare - Amerisourcebergen - IUDs | A | | | 12,000 | | | | 12,000 | | | | 12,000 | | | |
| Genzyme Biosurgery | A | | | 1,300 | | | | 1,300 | | | | 1,300 | | | |
| Fireside Pharmacy - Amex required charge | A | | | | | | | | | | | | | | |
| Technology | | | | | | | | | | | | | | | |
| Greenway Health - CMR Licensing | A | | | 21,000 | | | 21,000 | | | | 21,000 | | | 21,000 | |
| BBHealth Tech | A | | | 1,750 | | | 1,750 | | | | 1,750 | | | | |
| CyraCom International, Inc. | A | | | 25 | | | 25 | | | | 25 | | | | |
| DeliverHealth Solutions LLC | A | | | 121 | | | 121 | | | | 121 | | | | |
| Diagnostic Monitor Software | A | | | 1,500 | | | 1,500 | | | | 1,500 | | | | |
| RadInfo | A | | | 186 | | | | 186 | | | | 186 | | | |
| NextGen EMR | A | | | 9,500 | | | | 9,500 | | | | 9,500 | | | |
| TechMD - IT | A | | | | | | | | | | | | | | |
| Office Expenses | | | | | | | | | | | | | | | |
| Office Expenses - Amex | A | | | | 5,000 | | | | | 5,000 | | | | 5,000 | |
| Office Supplies | A | | | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| Quadient Finance - postage | A | | | 1,000 | | | 1,000 | | | | 1,000 | 1,000 | | | |
| Quadient Finance - leasing | A | | | 325 | | | | | | | | | | | |
| Dell Computer Lease | A | | | 6,355 | | | | | | | | | | | |

Prepared by Grobstein Teeple LLP

EXHIBIT 1, PAGE 21

# Caduceus Physicians Medical Group
## 13 Week Cash Budget
### Petition Date: 8/1/2024

**Weekly Post-Petition Cash Budget as Forecasted**

| | Notes | Petition Date 8/1/2024 | 1 — 8/2/2024 | 2 — 8/9/2024 | 3 — 8/16/2024 | 4 — 8/23/2024 | 5 — 8/30/2024 | 6 — 9/6/2024 | 7 — 9/13/2024 | 8 — 9/20/2024 | 9 — 9/27/2024 | 10 — 10/4/2024 | 11 — 10/11/2024 | 12 — 10/18/2024 | 13 — 10/25/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hologic Lease | A | - | - | 1,135 | - | - | - | 1,135 | - | - | - | 1,135 | - | - | - |
| Canon - lease | A | - | - | 1,600 | - | - | - | - | - | - | - | - | - | - | - |
| Canon - usage | A | - | - | 1,200 | - | - | 595 | - | - | - | - | 595 | - | - | - |
| Storage | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Storage - old furniture | A | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CompuGroup - medical record storage | A | - | - | 185 | - | - | 185 | - | - | - | - | 185 | - | - | - |
| Docu-Trust - medical record storage | A | - | - | 295 | - | - | 295 | - | - | - | - | 295 | - | - | - |
| Office Ally - medical record storage | A | - | - | 72 | - | - | 72 | - | - | - | - | 72 | - | - | - |
| Medical Chart Shredding - Iron Mountain | A | - | - | 120 | - | - | 120 | - | - | - | - | 120 | - | - | - |
| Marketing - cc required | A | - | 500 | 10,000 | - | - | 10,000 | - | - | - | - | 10,000 | - | - | - |
| Prof Billing Services of SoCal | A | - | - | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Payroll | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll Expenses | A | - | - | 351,991 | - | 328,297 | - | 331,991 | - | 328,297 | - | - | 331,991 | - | 328,297 |
| Payroll Officers Expenses | A | - | - | 35,250 | - | 55,250 | - | 55,250 | - | 55,250 | - | - | 55,250 | - | 55,250 |
| Payroll Taxes - All | A | - | - | 44,279 | - | 33,184 | - | 44,279 | - | 33,184 | - | - | 44,279 | - | 33,184 |
| Professionals - Special Counsel | L | - | - | - | - | - | - | 12,500 | - | - | - | - | - | - | - |
| Rent Expense | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Yorba Linda Main | B | - | - | - | - | - | - | - | - | - | - | 25,750 | - | - | - |
| Yorba Linda PT | B | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Yorba Linda TI Loan | B | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Yorba Linda Urgent Care | B | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Irvine | C | - | - | 7,500 | - | - | - | 7,500 | - | - | - | 7,500 | - | - | - |
| Laguna Beach | D | - | - | 12,000 | - | - | - | 12,000 | - | - | - | 12,000 | - | - | - |
| Aquatic Environments - pond maintenance (Koi) | A | - | - | - | - | - | 400 | - | - | - | - | 400 | - | - | - |
| Mileage - Selene Aguilar | A | - | - | - | - | - | 500 | - | - | - | 500 | - | - | - | 500 |
| Specialists Pre-petition Payments | E | - | - | - | - | 13,479 | - | - | - | 13,479 | - | - | - | 13,479 | - |
| Specialists | F | - | - | - | 64,513 | - | 77,778 | - | - | 64,513 | 77,778 | - | - | - | 77,778 |
| Utility Expense | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| AT&T | A | - | - | - | - | 208 | - | - | - | - | 208 | - | - | - | 208 |
| Nextiva | A | - | - | - | - | 7,700 | - | - | - | - | 7,700 | - | - | - | 7,700 |
| SoCal Edison | A | - | - | - | - | - | 9,800 | - | - | - | - | 9,800 | - | - | - |
| Professional Communications Messaging | A | - | - | 1,800 | - | - | - | 1,800 | - | - | - | 1,800 | - | - | - |
| Spectrum/Charter | A | - | - | - | 106 | - | - | - | - | 106 | - | - | - | - | - |
| United States Trustee Quarterly Fees | G | - | - | - | - | - | - | - | - | - | - | - | - | 22,000 | - |

/// continued on next page

as of 8/1/2024

Prepared by Grobstein Teeple LLP

as of 8/1/2024

# Caduceus Physicians Medical Group
## 13 Week Cash Budget
### Petition Date: 8/1/2024

**Weekly Post-Petition Cash Budget as Forecasted**

| | Notes | Petition Date 8/1/2024 | 1 8/2/2024 | 2 8/9/2024 | 3 8/16/2024 | 4 8/23/2024 | 5 8/30/2024 | 6 9/6/2024 | 7 9/13/2024 | 8 9/20/2024 | 9 9/27/2024 | 10 10/4/2024 | 11 10/11/2024 | 12 10/18/2024 | 13 10/25/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adequate Protection Payments** | | | | | | | | | | | | | | | |
| BMO Sloan | H | - | - | - | 5,818 | - | - | - | - | 5,818 | - | - | - | 5,818 | - |
| BMO Loan | H | - | - | - | 6,109 | - | - | - | - | 6,109 | - | - | - | 6,109 | - |
| BMO Loan | H | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| BMO LOC | H | - | - | - | 4,458 | - | - | - | - | 4,458 | - | - | - | 4,458 | - |
| Rise Health | I | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lendspark | I | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Back'd | I | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TIAA/McKesson - 42127238 | I | - | - | - | 2,038 | - | - | - | - | - | - | - | - | - | - |
| TIAA/McKesson - 42179932 | I | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TIAA/McKesson - 42258174 | J | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TIAA/McKesson - 42258174 | J | - | - | - | 1,209 | - | - | - | - | 1,209 | - | - | - | 1,209 | - |
| TIAA/McKesson - 20458381 | J | - | - | - | 655 | - | - | - | - | 655 | - | - | - | 655 | - |
| **Total Uses of Cash** | | $ - | $ 500 | $ 618,434 | $ 92,156 | $ 475,439 | $ 128,591 | $ 531,392 | $ 61,444 | $ 527,399 | $ 137,436 | $ 140,184 | $ 487,765 | $ 68,048 | $ 554,167 |
| **Net Cash Inflow (Outflow)** | | | $ 119,655 | $ (393,434) | $ 225,544 | $ (102,089) | $ 168,059 | $ (307,987) | $ 179,506 | $ (185,149) | $ 190,314 | $ 153,221 | $ (255,515) | $ 274,202 | $ (335,917) |
| **Cash on Hand - End of Week (EOW)** | | $ 416,056 | $ 535,711 | $ 142,277 | $ 367,821 | $ 265,733 | $ 433,791 | $ 125,804 | $ 305,310 | $ 120,162 | $ 310,476 | $ 463,696 | $ 208,181 | $ 482,383 | $ 146,466 |
| | | | | | | | | | | | | | | | |
| **Total Accrued Administrative Expenses - BOW** | | $ - | $ - | $ 45,000 | $ 72,500 | $ 97,500 | $ 120,000 | $ 128,500 | $ 142,000 | $ 155,500 | $ 181,500 | $ 210,000 | $ 241,000 | $ 282,000 | $ 323,000 |
| Patient Care Ombudsman | | | 10,000 | 7,500 | 5,000 | 2,500 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Special Counsel | | | - | - | - | - | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Debtor Counsel | K | | 20,000 | 10,000 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 10,000 | 15,000 | 15,000 | 25,000 | 25,000 | 25,000 |
| Debtor CRO and FA | K | | 15,000 | 10,000 | 10,000 | 10,000 | 2,500 | 2,500 | 2,500 | 10,000 | 7,500 | 10,000 | 10,000 | 10,000 | 10,000 |
| **Total Accrued Administrative Expenses - EOW** | | $ - | $ 45,000 | $ 72,500 | $ 97,500 | $ 120,000 | $ 128,500 | $ 142,000 | $ 155,500 | $ 181,500 | $ 210,000 | $ 241,000 | $ 282,000 | $ 323,000 | $ 359,000 |

as of 8/1/2024

## Caduceus Physicians Medical Group
**NOTES - 13 Week Cash Budget**
**Petition Date: 8/1/2024**

A: Amounts determined during numerous discussions and meetings with management and officers of the company. The revenues are only expected to slightly decrease after reducing the work force by $100,000 in early July.

B: Rent: Yorba Linda - Pursuant to a new deferral agreement, the 13 week cash flow projects a 2 month deferral of the new rent terms, 75% deferral for months 3 and 4, 50% deferral for months 5 and 6, then 0% deferral after month 6. During the 13 weeks of this cash projection, 25% of rent being due in October is shown.

C: Rent: Irvine - New lease terms project a 50% monthly rent payment for the months of August, September, October, and November. Therefore, only 50% of the current monthly rent will be paid during the first 13 weeks of the bankruptcy.

D: Rent: Laguna Beach - The current monthly burden of $12,000 is shown.

E: Specialists - the Specialists are physicians that are vital to the revenue stream of the business.

F: Specialists pre-petition payments - since the Specialist physicians are vital to the revenue stream of the business, Caduceus will be seeking for the Court to approve pre-petition amounts owed to the Specialists in order to retain their relationship.

G: Office of the United States Trustee quarterly fees are due on the 21st month following a calendar quarter. A $22,000 UST payment due on October 21, 2024 is estimated.

H: Adequate assurance payment: BMO - the 13 week cash flow anticipates a monthly full burden payment to BMO pursuant to current loan terms.

I: Adequate assurance payment: Rise, Lendspark, and Back'd - recent term negotiations with these creditors provide for deferral of payment obligations that exist beyond the first 13 weeks of the case. As such, the creditors are listed here, but do not have any impact on cash during the first 13 weeks of the case.

J: Adequate assurance payment: TIAA/McKesson - The company leases equipment from McKesson that is financed by TIAA. Acct 42127238 is for a Siemens lab equipment that the company will reject. Acct 42175932 termed in June 2024. Accts 42259174 and 20458381 will be paid in the ordinary course for the first 13 weeks of the case.

K: Administrative costs will accrue, however the projections demonstrate that they will not deplete cash flow during the first 13 weeks of the case and will be paid upon confirmation.

L: Special counsel post-petition retainer of $12,500 in order to help facilitate the terms of a medical practice sale within the bankruptcy.

DRAFT - SUBJECT TO CHANGE AS ADDITIONAL
INFORMATION BECOMES AVAILABLE
Prepared by Grobstein Teeple LLP

EXHIBIT 1, PAGE 24

**EXHIBIT 2**

7/31/24, 3:19 PM                                    Search | California Secretary of State



EXHIBIT 2, PAGE 25

7/31/24, 3:19 PM

Search | California Secretary of State

Business | **UCC**

| Home | | | | |
|------|------|------|------|------|
| | UCC > | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION - YORBA LINDA, CA | 167533075603 | BLUE STR CAPITAL, HUNTING BEACH, C |

**CADUCEUS PHYSICIANS MEDICAL GROUP, A CALIFORNIA PROFESSIONAL CORPORATION - YORBA LINDA,, CA**

| | | | | |
|------|------|------|------|------|
| Search | UCC > | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION - YORBA LINDA, CA | 207804086055 | TIAA COMMER FINANCE PARSIPPA |

| *Debtor Name* | CADUCEUS PHYSICIANS MEDICAL GROUP, A CALIFORNIA PROFESSIONAL CORPORATION |
|---|---|
| *Debtor Address* | 18200 YORBA LINDA BLVD, SUITE 111, YORBA LINDA,, CA 92886 |
| *Secured Party Name* | DESPIERTA, LLC, A DELAWARE LIMITED LIABILITY COMPANY |
| *Secured Party Address* | 244 BISCAYNE BOULEVARD N 4903, MIAMI, FL  33132 |

| Forms | UCC > | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION - YORBA LINDA, CA | U240055864431 | CORPORA SERVICE COMPAN REPRESE - SPRINGI |
|------|------|------|------|------|

View History          Request Access

| Help | UCC > | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION - YORBA LINDA, CA | 187660753528 | WELLS FA BANK, N. LINCOLN IL |
|------|------|------|------|------|
| | UCC > | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION - YORBA LINDA, CA | U210071055719 | HOLOGIC CAPITAL A PROGRAM LAGE LAN FINANCIAL SERVICES WAYNE, F |
| | UCC > | CADUCEUS PHYSICIANS MEDICAL GROUP, A CALIFORNIA PROFESSIONAL CORPORATION - YORBA LINDA,, CA | U240061296020 | DESPIERT A DELAW. LIMITED LIABILITY COMPAN MIAMI, FI |
| | UCC > | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION - YORBA LINDA, CA | 167543817214 | BLUE STR CAPITAL, HUNTING BEACH, C |

1

© 2024 CA Secretary of State

EXHIBIT 2, PAGE 26

**EXHIBIT 3**

# UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
UCC DIRECT SERVICES
2727 ALLEN PARKWAY
HOUSTON, TX 77019
USA

DOCUMENT NUMBER: 10957570002
FILING NUMBER: 07-7097322653
FILING DATE: 01/03/2007 09:58
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

OR | **1a. ORGANIZATION'S NAME**
CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION

| **1b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|

| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| 18200 Yorba Linda Boulevard #409 | Yorba Linda | CA | 92886 | USA |

| **1d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **1e. TYPE OF ORGANIZATION** | **1f. JURISDICTION OF ORGANIZATION** | **1g. ORGANIZATIONAL ID#, if any** |
|---|---|---|---|---|
| | | Corporation | CA | C2041116  ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

OR | **2a. ORGANIZATION'S NAME**

| **2b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|

| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|

| **2d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **2e. TYPE OF ORGANIZATION** | **2f. JURISDICTION OF ORGANIZATION** | **2g. ORGANIZATIONAL ID#, if any** |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

OR | **3a. ORGANIZATION'S NAME**
BANK OF THE WEST

| **3b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|

| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| 3021 Yorba Linda Blvd. | Fullerton | CA | 92831 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**
All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

☐ **6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable]** | **7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]** ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**
CA-0-22965267-00664

**FILING OFFICE COPY**

Page 2

## UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT |
|---|

OR

**9a. ORGANIZATION'S NAME**
CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|
| | | |

**10. MISCELLANEOUS:**

DOCUMENT NUMBER: 10957570002
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

OR

**11a. ORGANIZATION'S NAME**

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

OR

**12a. ORGANIZATION'S NAME**

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.**

**14. Description of real estate:**

**16. Additional collateral description:**

supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

**15. Name and address of RECORD OWNER of above-described real estate
(if Debtor does not have a record interest):**

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

**FILING OFFICE COPY**

EXHIBIT 3, PAGE 28

U210062961224

B0409-0944 07/07/2021 12:51 PM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File #: U210062961224

Date Filed: 7/7/2021

| Submitter Information: | |
|---|---|
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

| Amendment Action Information: | |
|---|---|
| Initial Financing Statement File Number | 077097322653 |
| Date Filed | 01/03/2007 |
| Amendment Action | Continuation |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | BANK OF THE WEST |
|---|---|

Optional Filer Reference Information:
81349351

EXHIBIT 3, PAGE 29

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Gisella Melendez
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CT LIEN SOLUTIONS
2727 ALLEN PARKWAY
HOUSTON, TX 77019
USA

**DOCUMENT NUMBER:** 56212730002
**FILING NUMBER:** 16-75353245
**FILING DATE:** 07/07/2016 07:47

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
07-7097322653

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement.

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record.     ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a and 7b and item 7c     ☐ ADD name: Complete item 7a or 7b, and item 7c     ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | |
|---|---|
| OR | 6a. ORGANIZATION'S NAME |

| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | |
|---|---|
| OR | 7a. ORGANIZATION'S NAME |
| | 7b. INDIVIDUAL'S SURNAME |
| | INDIVIDUAL'S FIRST PERSONAL NAME |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME |
|---|---|
| OR | BANK OF THE WEST |

| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

**10. OPTIONAL FILER REFERENCE DATA:**
CA-0-54710784-51814565

FILING OFFICE COPY

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Gisella Melendez
800-331-3282

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CT LIEN SOLUTIONS
2727 ALLEN PARKWAY
HOUSTON, TX 77019
USA

DOCUMENT NUMBER: 29548090002
FILING NUMBER: 11-72759135
FILING DATE: 07/07/2011 09:16
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
07-7097322653

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

**3.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c

**6. CURRENT RECORD INFORMATION:**

OR | **6a. ORGANIZATION'S NAME**
---|---

| **6b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

OR | **7a. ORGANIZATION'S NAME**
---|---

| **7b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **7c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| | | | | |

| **7d. SEE INSTRUCTIONS** | ADD'L DEBTOR INFO | **7e. TYPE OF ORGANIZATION** | **7f. JURISDICTION OF ORGANIZATION** | **7g. ORGANIZATIONAL ID#, if any** ☐ NONE |
|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this amendment.

OR | **a. ORGANIZATION'S NAME**
BANK OF THE WEST
---|---

| **b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

**10. OPTIONAL FILER REFERENCE DATA**
CA-0-28958920-45739708

FILING OFFICE COPY

**EXHIBIT 4**




U240030443226



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U240030443226 |
| Date Filed: 4/3/2024 |

B2633-8840 04/03/2024 4:43 PM Received by California Secretary of State

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | 18200 YORBA LINDA BOULEVARD, SUITE 111 YORBA LINDA, CA 92886 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| C T CORPORATION SYSTEM, AS REPRESENTATIVE | 330 N BRAND BLVD, SUITE 700 ATTN: SPRS GLENDALE, CA 91203 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
To secure the prompt and complete payment, performance and observance of all of the Obligations under any and/or all Agreement(s) between the Debtor and the Secured Party, the Debtor hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to the Secured Party, a Lien upon, and security interest in (the "Security Interest"), all of its right, title and interest in, to and under all of its assets and property, including, without limitation, the below mentioned items, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, Debtor (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from or to, Debtor (all of which being hereinafter collectively referred to as the "Collateral"): (i) all Accounts; (ii) all Chattel Paper; (iii) all contracts; (iv) all Documents; (v) all Equipment; (vi) all Fixtures; (vii) all General Intangibles; (viii) all Goods; (ix) all Instruments; (x) all Inventory; (xi) all Investment Property; (xii) all money, cash or cash equivalents; (xiii) all Intellectual Property; (xiv) the Bank Account and all deposits therein, including all money, cash or cash equivalents therein; and to the extent not otherwise included in any of the foregoing, all Proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing items mentioned above.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
98227377

EXHIBIT 4, PAGE 32

**EXHIBIT 5**

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com   Fax: (512) 233-2812

### FUTURE RECEIVABLES SALE AGREEMENT

This **FUTURE RECEIVABLES SALE AGREEMENT** ("Agreement") dated _____4/2/2024_____ ("Effective Date") , is made by and between Austin Business Finance, LLC, a Texas limited liability company ("Purchaser"),
CADUCEUS PHYSICIANS MEDICAL GROUP,
A PROFESSIONAL MEDICAL CORPORATION
_____,
with a business address of:
18200 Yorba Linda Blvd Suite 111 Yorba Linda, CA 92886
_____
("Merchant"), and
Gregg Antony Denicola
_____
(whether one or more, the "Guarantor").

**NOW THEREFORE the Parties hereto agree as follows: NATURE OF AGREEMENT AND COMMENCEMENT:**

1.1    In consideration of the payment of the Purchase Price specified below, Purchaser purchases from Merchant, and Merchant sells to Purchaser, the Merchant's future accounts and contract rights arising from the sale of goods or rendition of services to Merchant's customers, including payments received from the use by Merchant's customers of any Payment Device (as defined herein) to purchase Merchant's products and/or services that are processed by Merchants' card processor (collectively, "Future Receivables") up to the Amount Sold. Merchant agrees to pay the Remittance Amount to Purchaser on every Debit Order Processing Day until Purchaser receives the Amount Sold plus the Administration Fee and any other fees due hereunder. "Payment Device" includes credit cards, charge cards, debit cards, prepaid cards, benefit cards, or any other type of payment card as well as any virtual payment card or any electronic payment device. All capitalized terms not otherwise defined in this Agreement shall have the defi itions ascribed to them in paragraph 2 below, or if not defined in paragraph 2 below, the definitions ascribed to them in the Addendum 1, Standard Terms and Conditions, which are an integral part of the Agreement and are incorporated herein by reference as if set forth herein verbatim.

1.2    Merchant agrees to remit the Amount Sold of Future Receivables to Purchaser by receiving customer payments into a designated bank account approved by Purchaser (the "Approved Account"), and paying Purchaser through an ACH debit of the Approved Account each day or week, as applicable, excluding Saturdays, Sundays and federal holidays (each a "Debit Order Processing Day") an amount of cash equal to the Remittance Amount, as such may vary from time to time in accordance with Sections 1.3 and 1.4 of this Agreement. Merchant shall continue to pay the Remittance Amount from Future Receivables on each Debit Order Processing Day until Merchant has remitted to Purchaser the full Amount Sold plus the Administration Fee and any other fees and charges due hereunder.

1.3    Modification of Remittance Amount by Purchaser. The Remittance Amount may be modified or adjusted from time to time, based on the Merchant sales, with notice to Merchant, such modified amount not to exceed the Specified Percentage of the Merchant's average daily or weekly customer transactions, as applicable, for the preceding fourteen (14) day period (excluding Sundays). For avoidance of all doubt, the calculation of the average daily or weekly customer transaction does not include Sundays or any day that is a federal holiday.

1.4    Modification of Remittance Amount by Merchant. Purchaser and Merchant agree that the initial Remittance Amount has been calculated based on the Specified Percentage of Merchant's average daily or weekly sales, as applicable, for the month preceding the Effective Date of this Agreement (including for purposes of such calculation, any sales tax or other governmental charges collected by Merchant). Merchant may submit a written request to Purchaser for a decrease in the Remittance Amount based on a decrease in Merchant's average daily or weekly sales for the preceding month. In connection with any such written request from Merchant, Merchant shall provide Purchaser with bank account statements, sales ledgers, account receivable reports, and any other documents Purchaser may request in its reasonable discretion, to evidence the decrease in Merchant's average daily or weekly sales for the preceding month. If after receipt of Merchant's written notice and supporting documentation, Purchaser determines that Merchant's average daily or weekly sales have decreased in the preceding month, the existing Remittance Amount shall be reduced to reflect the product of the Specified Percentage and Merchant's average daily or weekly sales, as applicable, as reflected in the supporting documentation. In such case, the revised Remittance Amount shall take effect within three (3) business days of Purchaser's determination. Merchant shall have the ability to request a change in the Remittance Amount once every month. Any downward adjustment to the Remittance Amount under this Section 1.4 is subject to a subsequent increase in the Remittance Amount pursuant to (and in accordance with) Section 1.3 based on Merchant's sales. A restructuring or renegotiation of this contract, not subject to the terms of section 1.4, may require the payment of an additional fee relative to the contractual factor rate.

1.5    Purchaser purchases the Future Receivables free and clear of all claims, liens or encumbrances of any kind

GAD      MDH                                              XM

EXHIBIT 5, PAGE 33

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com   Fax: (512) 233-2812

whatsoever. Merchant agrees that this Agreement applies to Merchant's entire right, title and interest in the Future Receivables up to the Amount Sold.

1.6    The Administration Fee shall be deducted from the Payment to Merchant as defined in section 2.10.

1.7    The Agreement will commence on the date and time Merchant accepts the offer of Purchaser, by signing the agreement and will terminate on the date that the Amount Sold plus the Administration Fee has been paid and settled in full by the Merchant.

**2.    Definitions/Additional Charges/ Use of Funds.**

2.1   Purchase Price: $600,000.00

2.2   Amount Sold: $798,000.00

2.3   Administration Fee: $150.00

2.4   Amount sold plus Administration Fee: $798,150.00

2.5   Remittance Amount: $15,346.15

2.6   Number of Payments (as of Effective Date): 52 weeks

2.7   Origination fee: 3.0%

2.8   Estimated settlement payment to existing creditors: $0.00

2.9   Specified Percentage: 3%

2.10  Payment to Merchant: $581,850.00

2.11 Early Payoff of Future Receivables: The cost of future receivables will be reduced based on a percentage that is paid early.

```
If paid off:

i. within the first 26 payments: 25% off of
the remaining cost

*** The cost is defined as the difference
in amount sold minus purchase price.

*** Account must be in good standing at the
time of payoff for the discounted rate to
be applied.
```

2.12 Lack of Notice of Insufficient Funds Fee: $35.00 (per incident with lack of notice)

2.13  Rejected ACH / Blocked ACH / Default Fee: $250.00 When Merchant blocks Approved Account from Purchaser's debit ACH or changes Account without providing adequate notice, cutting Purchaser off from collections. These actions place Merchant in default of this Agreement.

2.14    Bank Change Fee: $50.00. When Merchant requires a change of Approved Account to be debited requiring Purchaser to adjust its systems.

2.15    Purchaser shall debit the Approved Account for the Remittance Amount on a weekly basis until the entire Amount Sold plus the Administration Fee has been paid to Purchaser; provided that Purchaser reserves the right to adjust to daily payment withdrawals if Merchant misses weekly remittances.

NOT A LOAN. Because the parties agree that this transaction is not a loan and Purchaser is purchasing Merchant's accounts at a discount, Purchaser does not charge interest or similar fees. Therefore, the Remittance Amount is not fixed and there is no fixed repayment term. As outlined in Sections 1.3 and 1.4, should Merchant's sales decrease, Purchaser may lower the Remittance Amount accordingly.

3.    Administration Fee: The Administration Fee is a charge to compensate Purchaser for the cost of processing, preparing and completing the transaction documents, together with the cost associated with banking infrastructure setup and the liaison and interaction with third parties as necessary to process and complete the foregoing.

4.    STANDARD TERMS AND CONDITIONS.    The Standard Terms and Conditions that govern this Agreement and all aspects of the subject transactions are attached hereto as Addendum 1 and incorporated herein by reference as if set forth verbatim.

5.    Authorization to Share Processing Data: Merchant hereby authorizes its credit card processor to forward on a daily basis to any third party designated by Purchaser all electronic payment transaction records that its processor processes on its behalf (including, but not limited to, activity on Visa, MasterCard, American Express, Discover, Diners Club, JCB, or ATM Debit Cards and check truncation records).

6.    Sales of Future Receivables/No Debt-Stacking. MERCHANT CANNOT SELL (OR GRANT A SECURITY INTEREST IN) ITS FUTURE RECEIVABLES TO ANYONE ELSE OR ENTER INTO FINANCING ARRANGEMENTS REQUIRINGPERIODIC PAYMENTS DURING THE TERM OF

GAD    MDH                                    XM

EXHIBIT 5, PAGE 34

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458  Email: operations@backd.com  Website: www.backd.com  Fax: (512) 233-2812

THIS AGREEMENT WITHOUT PURCHASER'S PRIOR WRITTEN CONSENT. VIOLATION OF THIS REQUIREMENT WILL RESULT IN AN EVENT OF DEFAULT AND THE ASSESSMENT OF CERTAIN FEES. IN THE EVENT OF A BREACH OF THIS SECTION 6, PURCHASER SHALL BE ENTITLED TO ALL REMEDIES UNDER SECTION 13 OF THE TERMS AND CONDTIONS OF THIS AGREEMENT, INCLUDING THE AUTOMATIC INCREASE OF THE SPECIFIED PERCENTAGE TO 100%, WHICH AMOUNT SHALL BE IMMEDIATELY DUE AND PAYABLE TO PURCHASER.

7.    Guarantors. The below individuals, designated and signing as guarantors (each such signer, a "Guarantor"), hereby assume and, jointly and severally, guarantee the full, complete and timely performance of all of Merchant's obligations under the Agreement (as from time to time amended and modified) in the event that there has been a default by the Merchant under Section 12 of the Terms and Conditions or a violation by the Merchant of any of the representations, warranties and covenants in Section 6 of the Terms and Conditions or other violation of this Agreement. In such instance, Guarantors shall perform under the Agreement including paying or causing to be paid any amounts due that Purchaser would otherwise be entitled to collect from Merchant, under the terms of this Agreement and any amendments or modifications thereto, immediately, upon demand from Purchaser. The obligations personally guaranteed by each Guarantor include, without limitation, the obligations of Merchant to Purchaser hereunder and under any amendments or addenda hereto with respect to additional purchases of Future Receivables and additional Amounts Sold. This guarantee shall be a guarantee of performance and not a guarantee of collection. Purchaser may proceed to enforce its rights against each Guarantor or any other guarantor of Merchant's obligations from time to time, prior to, contemporaneously with or after any enforcement against Merchant or the collateral or without any enforcement against Merchant or the collateral. The obligations of Guarantors are unconditional and absolute and shall remain in full force and effect and without regard to and shall not be released, discharged or in any way affected by (a) any amendment to this Agreement or increase in the Amount

Sold or other additional credit advances to Merchant; (b) any exercise or non-exercise of or delay on exercising any right, remedy, power or privilege under or in respect of this Agreement; (c) any bankruptcy , insolvency, arrangement, composition, assignment for the benefit of creditors, or similar proceeding commenced by or against Merchant or any of its officers, directors or principals; (d) defects in the formation or authority of Merchant; or (e) any other circumstance that might otherwise constitute a legal or equitable discharge of a guarantor or surety. If payment of any sum by Merchant is recovered as a preference or fraudulent conveyance under any bankruptcy or insolvency law, the liability of Guarantors under this guaranty shall continue and remain in full force and effect notwithstanding such recovery. Each Guarantor acknowledges receiving a copy of this Agreement and having read the terms of this Agreement, including, without limitation, the guarantee set forth in this paragraph, and the Guarantor's signature on the Agreement will serve as confirmation that the Guarantor understands all terms and conditions of this Agreement. Each Guarantor agrees that this guarantee is continuing and absolute and that Purchaser may modify or extend the terms of this Agreement, increase the Purchase Price and Amount Sold, or compromise, settle or release any other obligor under this Agreement or release any Collateral without notice or consent by Guarantor and without affecting Guarantor's liability hereunder.

EACH OF THE BELOW PARTIES ACKNOWLEDGES THAT THEY HAVE READ AND AGREE TO ALL OF THE FOREGOING PROVISIONS, AS WELL AS ALL OF THE TERMS AND CONDITIONS ON THE ATTACHED ADDENDUM 1, WHICH IS INCORPORATED HEREIN BY REFERENCE.

THERE ARE NO VERBAL AGREEMENTS BETWEEN THE PARTIES.

**Purchaser: Austin Business Finance LLC**

By: _____  *Xan Myburgh*

Name: Xan Myburgh

Title: CEO

Date: _____    4/2/2024

| Merchant: | CADUCEUS PHYSICIANS MEDICAL GROUP, ~~A PROFESSIONAL~~ MEDICAL CORPORATION | Merchant: | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | Guarantor: | Gregg Antony Denicola |
|---|---|---|---|---|---|
| By: | *Gregg Antony Denicola* | By: | *Michael David Hall* | By: | *Gregg Antony Denicola* |
| Name: | Gregg Antony Denicola | Name: | Michael David Hall | Name: | Gregg Antony Denicola |
| Title: | manager | Title: | secretary(not as merchant or guarantor) | Title: | manager |
| Date: | 4/2/2024 | Date: | 4/2/2024 | Date: | 4/2/2024 |

*GAD*    *MDH*                    *XM*

EXHIBIT 5, PAGE 35

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40

**B Backd**

Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com  Fax: (512) 233-2812

"Merchant" shall mean all Merchants identified on the signature page(s) of this Agreement.

| | | |
|---|---|---|
| Merchant: Caduceus Medical Services, LLC | Merchant: Caduceus Physicians Medical Group Inc | Merchant: _____ |
| By: _Gregg Antony Den  Michael David Hall_ | By: _Gregg Antony Den  Michael David Hall_ | By: _____ |
| Name: Gregg Antony Venhuizen David Hall | Name: Gregg Antony Venhuizen David Hall | Name: _____ |
| Title: manager        secretary | Title: manager or guarantor (not as merchant or guarantor) | Title: (not as merchant or guarantor) |
| Date: 4/2/2024    4/2/2024 | Date: 4/2/2024    4/2/2024 | Date: _____ |

| | | |
|---|---|---|
| Merchant: _____ | Merchant: _____ | Merchant: _____ |
| By: _____ | By: _____ | By: _____ |
| Name: _____ | Name: _____ | Name: _____ |
| Title: _____ | Title: _____ | Title: _____ |
| Date: _____ | Date: _____ | Date: _____ |

| | | |
|---|---|---|
| Merchant: _____ | Merchant: _____ | Merchant: _____ |
| By: _____ | By: _____ | By: _____ |
| Name: _____ | Name: _____ | Name: _____ |
| Title: _____ | Title: _____ | Title: _____ |
| Date: _____ | Date: _____ | Date: _____ |

| | | |
|---|---|---|
| Merchant: _____ | Merchant: _____ | Merchant: _____ |
| By: _____ | By: _____ | By: _____ |
| Name: _____ | Name: _____ | Name: _____ |
| Title: _____ | Title: _____ | Title: _____ |
| Date: _____ | Date: _____ | Date: _____ |

| | | |
|---|---|---|
| Merchant: _____ | Merchant: _____ | Merchant: _____ |
| By: _____ | By: _____ | By: _____ |
| Name: _____ | Name: _____ | Name: _____ |
| Title: _____ | Title: _____ | Title: _____ |
| Date: _____ | Date: _____ | Date: _____ |

GAD    MDH                    XM

EXHIBIT 5, PAGE 36

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com   Fax: (512) 233-2812

**ADDENDUM 1**

**STANDARD TERMS AND CONDITIONS**

1.      Sale. The terms and conditions of this Agreement shall remain in full force and effect until the Amount Sold has been delivered to Purchaser. Merchant and Purchaser agree that this sale and purchase is final and Merchant has no right to repurchase, encumber or resell the Future Receivables or any portion thereof until Purchaser has received the entire Amount Sold plus any other fees payable to Purchaser under this Agreement. Merchant, any individual signing this agreement and Purchaser (each individually referred to herein as "Party" and collectively referred to herein as "Parties") agree that the Purchase Price paid to Merchant is the price paid to purchase Merchant's Future Receivables and that the transaction contemplated by this Agreement is a purchase and sale of the Future Receivables. **THE PARTIES INTEND FOR THIS AGREEMENT TO BE A SALE OF ACCOUNTS, AND HEREBY AGREE THAT THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS NOT A LOAN, A FORBEARANCE OF MONEY LENT OR ANY SIMILAR LOAN OR LENDING TRANSACTION. NONE OF THE PAYMENTS CONTEMPLATED HEREUNDER CONSTITUTE PAYMENTS FOR THE USE, FORBEARANCE, OR DETENTION OF MONEY. ALL TRANSACTIONS CONTEMPLATED HEREBY ARE ACCOUNT PURCHASE TRANSACTIONS AS DEFINED IN SECTION 306.001 OF THE TEXAS FINANCE CODE AND SUBJECT TO SECTION 306.103 OF THE TEXAS FINANCE CODE. THE PURCHASE OF THE ACCOUNTS BY PURCHASER CONSTITUTES AN OUTRIGHT CONVEYANCE BY THE SELLER TO PURCHASER. MERCHANT UNDERSTANDS, AGREES AND REPRESENTS THAT THIS TRANSACTION IS MADE FOR BUSINESS OR COMMERCIAL PURPOSES ONLY.**

2.      Timing, Method of Payment.  Merchant and Purchaser agree that Purchaser shall pay the Purchase Price or any portion thereof to Merchant only at a time, and through a method, acceptable to Purchaser and at Purchaser's sole discretion. Merchant and Purchaser also agree that Purchaser, in its sole discretion, may refuse to pay the Purchase Price or any portion thereof to Merchant and cancel this Agreement at any time prior to the Purchase Price being paid. Prior to paying the Purchase Price, Purchaser may conduct a site inspection and shall conduct a processing trial (the "Processing Trial") to determine whether the Remittance Amount will be correctly processed and/or reported by Merchant's card processor or bank to Purchaser. In the event Purchaser determines to conduct a Processing Trial, Merchant acknowledges and agrees that Purchaser will make its final decision, in its sole and absolute discretion, whether to purchase the Future

Receivables after completion of the Processing Trial. If Purchaser conducts a Processing Trial and determines not to purchase the Future Receivables, any receivables remitted to Purchaser during the Processing Trial shall be returned to Merchant.

3.      Waiver. There shall be effected no waiver by failure on the part of Purchaser to exercise, or delay in exercising, any right under this Agreement, nor shall any single or partial exercise by Purchaser of any right under this Agreement preclude any other future exercise of any right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.      Security Interest. Merchant also consents to and authorizes Purchaser to file a UCC financing statement in the appropriate jurisdiction to perfect the Purchaser's security interest in its collateral, all at Merchant's expense to be reimbursed to Purchaser upon demand. Merchant and Purchaser contemplate future advances. Merchant understands and agrees that if Purchaser and Merchant enter into future agreements, any security interest granted to Purchaser under such future agreements will relate back to this Agreement, and that the Merchant's payment and performance obligations, and the additional collateral granted under such future agreements, shall relate back to, be perfected under, and made a part of any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the additional collateral, and the time of filing of the initial UCC financing statement establishes Purchaser's priority with respect to all future advances.

5.      Fees and Purchaser's Risk.  Merchant agrees that the Administration Fee may be withdrawn from Merchant's bank account immediately upon Purchaser paying Merchant the Purchase Price or deducted from the Purchase Price. Because this transaction is not a loan, Purchaser does not charge any interest, finance charges, points, late fees or similar fees (except as permitted by applicable law in connection with civil judgments). Purchaser is purchasing the Future Receivables at a discount. A returned item fee will be assessed if, for any reason, (a) a check, draft or similar instrument issued by the Merchant or an individual that signs this Agreement is not honored or cannot be processed; or (b) an electronic debit is returned unpaid or cannot be processed. Merchant and any individual that signs this Agreement authorize Purchaser to resubmit returned payments in its discretion. At Purchaser's option, Purchaser will assess this fee the first time a payment is not honored or paid, even if it is later honored or paid following resubmission. Any check, draft or similar instrument may be collected electronically

GRD    MDH                                                      XM

EXHIBIT 5, PAGE 37

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458    Email: operations@backd.com    Website: www.backd.com   Fax: (512) 233-2812

if returned for insufficient or uncollected fund

6.    Merchant's Representations, Warranties and Covenants. Merchant represents, warrants and covenants that as of the Effective Date and during the term of this Agreement (with the exception of clause viii): (i) the Future Receivables are not subject to any claims, charges, liens, restrictions, encumbrances or security interests of any nature whatsoever; (ii) Merchant has not and will not sell or grant a security interest in the Future Receivables to another person or entity; (iii) Merchant will not conduct business under any name other than as disclosed herein, shall not change its business location without the prior written consent of Purchaser, and shall not temporarily close its business for renovations or other purposes; (iv) Merchant will not change or add credit card processors without the prior written approval of Purchaser; (v) Merchant will not take any action to intentionally discourage the use of credit cards, debit cards or other payment cards; (vi) Merchant will not undertake any transaction involving the sale of Merchant, either by an issuance, sale or transfer of ownership interests in Merchant that results in a change in ownership or voting control of Merchant, or by a sale or transfer of substantially all of the assets of Merchant;(vii) Merchant will not voluntarily permit another person or company, including without limitation a franchisor company (if Merchant is a franchisee), to assume or take over the operation and/or control of the Merchant's business or business locations; (viii) As of the date of this agreement, Merchant has not filed a petition for bankruptcy relief and is not currently contemplating closing Merchant's business; (ix) all information provided by Merchant to Purchaser in this Agreement, application, interview with Purchaser or otherwise and all of Merchant's financial statements and other financial documents provided to Purchaser are true and correct and accurately reflect Merchant's financial condition and results of operations; (x) Merchant will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and shall show proof of such insurance upon demand; (xi) Merchant has all permits, licenses, approvals, consents and authorizations necessary to conduct its business and will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes; (xii) Merchant and the person(s) signing this Agreement on behalf of Merchant have full power and authority to enter into and perform the obligations under this Agreement; (xiii) Merchant will provide Purchaser copies of all documents related to Merchant's card processing activity or financial and banking affairs within three (3) days of a request by Purchaser; and (xiv) Merchant will permit Purchaser to conduct a site inspection of Merchant's business, including an inspection of Merchant's credit card terminals, at any reasonable time during the term of this Agreement without notice to Merchant.

7.    Remittance Amount. Irrespective of whether Merchant has identified any deposit account on the signature page of the Agreement, Purchaser may require remittance of the Remittance Amount in one of the following ways, at its option and discretion: (i) directly from Merchant's credit card processor; or (ii) by debiting a deposit account established by Merchant that is approved by Purchaser and for which Merchant has completed the accompanying ACH Authorization Form. Purchaser may decide in its sole discretion which of the methods it will accept for the remittance of the Remittance Amount and will notify Merchant prior to delivering the Purchase Price to Merchant. If Purchaser agrees to accept the remittance of the Remittance Amount directly from the Merchant's card processor, Merchant agrees to enter into an agreement with a card processor acceptable to Purchaser ("Processor") that authorizes Processor to pay the Remittance Amount directly to Purchaser rather than to Merchant until the Amount Sold and all fees incurred hereunder have been forwarded by Processor to Purchaser. This authorization shall be irrevocable, absolute and unconditional. Merchant hereby irrevocably grants Processor the right to hold the Remittance Amount and to pay Purchaser directly (at, before or after the time Processor credits or remits to Merchant the balance of the Future Receivables not sold by Merchant to Purchaser) until the entire Amount Sold plus all fees incurred hereunder have been forwarded to Purchaser. Merchant acknowledges and agrees that Processor may provide Purchaser with Merchant's Payment Device processing history, including without limitation Merchant's chargeback experience and any communications about Merchant received by Processor from a card processing system. Merchant acknowledges that Purchaser does not have any power or authority to control the Processor's actions with respect to the authorization, clearing, settlement and other processing of transactions and that Purchaser is not responsible for the Processor's actions. Merchant agrees to hold Purchaser harmless for the Processor's actions or omissions. If Purchaser agrees to accept the remittance of the Remittance Amount by debiting the Merchant's bank account, Merchant irrevocably authorizes Purchaser or its designated successor or assignee to withdraw the Remittance Amount by initiating a debit via the Automatic Clearing House (ACH) system to the Approved Account. In the event Purchaser withdraws an incorrect amount from the Approved Account, Merchant authorizes Purchaser to credit the Approved Account for the appropriate

EXHIBIT 5, PAGE 38

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com   Fax: (512) 233-2812

amount. For any Approved Account, Merchant agrees to complete all necessary forms to establish the Approved Account, including the ACH Authorization Form. Merchant acknowledges and agrees that any funds deposited into the Approved Account by Merchant's card processor will remain in the Approved Account until the Remittance Amount is withdrawn by Purchaser and then the remaining funds, minus any amount required to maintain the minimum balance for the Approved Account, will be forwarded to Merchant's Bank Account. If the Approved Account requires a minimum account balance, Purchaser may, in its sole discretion, fund the required minimum balance for the Approved Account out of the Purchase Price.

8.      Miscellaneous. This Agreement shall be binding upon Merchant and inure to the benefit of Purchaser, its successors and assigns. This Agreement constitutes the entire Agreement between the Parties, and no representations, agreements, or understandings of any kind, either written or oral, shall be binding upon the parties unless expressly contained herein. This Agreement is a complete and exhaustive statement of the terms of the parties' agreement, which may not be explained or supplemented by evidence of consistent or inconsistent additional terms or contradicted by evidence of any prior or contemporaneous agreement. The Parties may change any of the terms of this Agreement or amend this Agreement but any such changes or amendments shall not be effective unless they are in writing and signed by all Parties. If any of the provisions of this Agreement are determined to be invalid, illegal or unenforceable in any respect, the remaining provisions shall not be affecte in any manner. All Parties hereby acknowledge having the full power and authority to enter into and perform the obligations under this Agreement. The Parties agree to execute such further and additional documents, instruments, and writings as may be necessary, proper, required, desirable, or convenient for the purpose of fully effectuating the terms and provisions of this Agreement. The information submitted by Merchant as part of its application for this transaction is hereby incorporated into and made a part of this Agreement. The signatures to this Agreement may be evidenced by facsimile copies or other digital or electronic means reflecting the Party's signature hereto, and any such copy or signature shall be sufficie as if it were an original signature.  This Agreement may be executed in one or more counterparts.

9.      Indemnity/Limitation of Liability. Merchant will indemnify, defend and hold Purchaser harmless from and against any and all direct and third party suits, costs, causes of action, judgments, complaints, orders, and

claims, including without limitation reasonable attorney's fees, arising from this Agreement or any agreement signed in connection herewith, or any claim that Merchant has breached this Agreement or that any representation, warranty, or statement Merchant has made is not accurate in any respect (collectively, the "Claims"). Purchaser will notify Merchant of any claim for indemnity hereunder, select counsel of Purchaser's choice, and Merchant will promptly pay all defense costs and satisfy any judgments relating to the Claims.      MERCHANT AGREES THAT REGARDLESS OF ANY CLAIMS MERCHANT MAY HAVE AGAINST PURCHASER, MERCHANT'S SOLE REMEDY WILL BE AN ACTION AT LAW FOR ACTUAL MONEY DAMAGES THAT WILL NOT EXCEED THE GREATER OF (I) THE AMOUNT OF FUNDS OVERPAID TO PURCHASER OR (II) $1,000. AND THAT MERCHANT WILL NOT BE ENTITLED TO AND HEREBY WAIVES ANY AND ALL CLAIMS FOR, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, LOST PROFITS, STATUTORY, OR SPECIAL DAMAGES OF ANY KIND. IF MERCHANT FILES AN ACTION AGAINST PURCHASER AND THE MATTER IS DISMISSED OR PURCHASER PREVAILS IN THE MATTER, MERCHANT AGREES TO PAY ALL OF PURCHASER'S ATTORNEY'S FEES AND COSTS INCURRED IN THE MATTER. EACH PARTY WAIVES THE RIGHT TO LITIGATE IN COURT OR ARBITRATE ANY CLAIM OR DISPUTE AS A CLASS ACTION, EITHER AS A MEMBER OF A CLASS OR AS A REPRESENTATIVE.

10.     Governing Law: The Parties hereby agree that this Agreement is made, accepted and performed in Texas, which is Purchaser's principal place of business. This Agreement, all transactions it contemplates, the entire relationship between the Parties, and all claims arising therefrom and including claims involving an Affiliat Entity, whether such claims are based in tort, contract or arise under statute or in equity, shall be governed by and enforced in accordance with: (i) the laws of the State of Texas without regard to principles of conflicts of laws that would require the application of any other law. Affiliat Entity means and includes: (i) any entity or person that at any time has owned or controlled Purchaser or any entity that at any time has been owned or controlled by Purchaser; (ii) any predecessor or successor entities of Purchaser; (iii) any entity or person who at any time owns or holds an equity or security interest in the Future Receivables and the interest was granted by Purchaser; and (iv) all officer directors, owners and employees of Purchaser, its parent company or any Affiliated Entit

11.     Disputes: Governing Law. Purchaser and Merchant (and any individual signing this Agreement) agree that this Agreement is accepted in Texas. This Agreement and all transactions it contemplates, including all issues concerning the validity of the Agreement and any

EXHIBIT 5, PAGE 39

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com  Fax: (512) 233-2812

transactions it contemplates, the construction of its terms, and the interpretation, performance and enforcement of the rights and duties of the Merchant, Purchaser and each individual signatory will be governed by and enforced in accordance with the laws of the State of Texas without regard to principles of conflicts of laws that would require the application of any other law. Without limiting the generality of the foregoing, the Parties agree that the laws of the State of Texas will govern the entire relationship between and among the Parties, including without limitation, all issues or claims arising out of, relating to, in connection with, or incident to this Agreement and any transaction it contemplates, whether such claims are based in tort, contract, or arise under statute or in equity. All litigation, suits, court proceedings and other actions relating to, arising out of or in connection with this Agreement or the transaction that is the subject of this Agreement, whether founded in contract, tort or otherwise, will be submitted to the in personam jurisdiction of the state and federal courts of the State of Texas and the exclusive venue for all such suits, proceedings and other actions will be in Williamson County, Texas. No action may be brought in any other state or jurisdiction. Notwithstanding the foregoing, Purchaser may elect to commence litigation and court proceedings in the state and federal courts of the state in which Merchant is located. The Parties hereby waive any claim against or objection to the in personam jurisdiction and venue in the courts of Williamson County, Texas. The Parties hereby irrevocably waive any objection and any right of immunity on the ground of venue or the convenience of the forum, or to the jurisdiction of such courts or from the execution of judgments resulting therefrom. ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, SUIT, COUNTERCLAIM, CROSS-CLAIM, OR THIRD-PARTY CLAIM BROUGHT BY ANY OF THE PARTIES HERETO ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS AGREEMENT.

12. Events of Default. The following shall be considered defaults under this Agreement:

(i) Merchant's breach of any representation, warranty, agreement, promise or covenant set forth in this Agreement;

(ii) any act or omission by or on behalf of Merchant that has the result of interfering with, or circumventing, the payment to Purchaser of the Amount Sold, including without limitation, adding or changing processors without Purchaser's prior written consent, conducting business under an alternative name, making use of any depository accounts other than the Approved Accounts without Purchaser's prior written consent, encouraging customers to avoid making card payments or other act that results in a material decrease in the monthly number of deposits made and/or processing batches deposited to the Approved Accounts that is disproportionate to any changes in the Future Receivables, or manipulating the use and form of business entities for the purpose of avoiding Business's obligations hereunder;

(iii) Merchant fails to assist Purchaser in maintaining access to electronic bank information for the Approved Accounts or fails to provide Purchaser copies of all documents related to Merchant's credit card processing activity or financial and banking affairs within three (3) days of a request by Purchaser;

(iv) Merchant fails to permit Purchaser or its agents to complete a site inspection, including an inspection of Merchant's credit card processing terminals;

(v) the sale of any of Merchant's assets outside the ordinary course of business without Purchaser's prior written consent;

(vi) any transaction that results in a change of control of Merchant or Merchant's business without Purchaser's prior written consent;

(vii) Merchant becomes subject to any material judgment or garnishment following the date of this Agreement;

(viii) Merchant fails to give notice Purchaser twenty-four hours' advance notice that there will be insufficient funds in the Approved Account such that the Remittance Amount will not be honoured by the Merchant's bank, and Merchant fails to supply all requested documentation and allow for daily monitoring of its bank account;

(ix) Merchant invalidates and/or terminates, or attempts to invalidate and/or terminate any ACH Authorization Form;

(x) Purchaser does not receive the scheduled Remittance Amount payments for more than three consecutive scheduled periods;

(xi) without Purchaser's prior written consent, applying for, or agreeing to, any other cash advance or other financing, including, but not limited to, entering into an agreement to sell, or grant a security interest in, Merchant's accounts, payment intangibles or future receivables or entering into a financing arrangement that requires Merchant to make periodic payments to the lender (including daily, weekly or monthly payments);

GAO   MDH                                    XM

EXHIBIT 5, PAGE 40

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com   Fax: (512) 233-2812

(xii) without Purchaser's prior written consent, granting any other person or entity a security interest in the Merchant's assets, including its accounts, future receivables and payment intangibles; or

(xii) failing to provide Purchaser with online viewing access to Merchant's financial accounts, including, without limitation, deposit accounts and credit card processing accounts, through Decision Logic© or any other online viewing application, within twenty-four (24) hours of Purchaser's written request to Merchant.

13.     Remedies. In the event Merchant breaches any of the provisions of this Agreement, including but not limited to any representations, warranties and covenants, Purchaser shall be entitled to all remedies available under law, including but not limited to the following: (a) without notice to Merchant, the Specified Percentage shall equal 100%, and the full uncollected Amount Sold plus all unpaid fees and charges (including legal fees) due hereunder shall become due and payable immediately; (b) Purchaser shall be entitled to recover from Merchant all Collection Costs (as defined below); (c) Purchaser shall be entitled to enforce the provisions of any personal guaranty against any guarantor; (d) Purchaser shall be entitled to electronically debit from any of Merchant's or the individual Guarantor signatory's bank accounts via ACH or otherwise all or any portion of the Amount Sold and any assessed fees (including, without limitation, all Collection Costs) or may instruct Merchant's processor to forward to Purchaser all or any portion of such amounts outstanding; (e) Purchaser may exercise any and all remedies available under Article 9 of the Uniform Commercial Code of any applicable jurisdiction as a secured creditor as such applies to the sale of accounts; and (f) Purchaser shall be entitled to exercise any and all other remedies allowed under this Agreement or any other transaction document and as allowed under applicable law. For purposes of this Agreement, "Collection Costs" means any and all costs, including reasonable attorneys' fees and expenses, incurred by Purchaser in connection with the defense, protection, or enforcement of Purchaser's rights under this Agreement, (including, without limitation, in connection with any bankruptcy proceeding), which, at Purchaser's election, may include a collection and default fee of 20% of the Amount Sold.

14.     Attorney's Fees and Costs. In the event Merchant defaults, Purchaser shall be entitled to recover from Merchant and Guarantors all costs of collection, including reasonable attorney's fees and third party collection costs, incurred by Purchaser in connection with the defense, protection or enforcement of Purchaser's rights under this

Agreement (including, without limitation, in connection with any bankruptcy proceeding).

15.     Reporting: By signing this Agreement you authorize Purchaser to obtain a credit report or background report on the Merchant and any individual that signs this Agreement. The report Purchaser obtains may include, but is not limited to, the business' or individuals' credit history or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information Purchaser deems relevant.

16.     Arbitration. If Merchant, Purchaser or any Guarantor requests, the other parties agree to arbitrate all disputes and claims arising out of or relating to this Agreement. If Merchant, Purchaser or any Guarantor seeks to have a dispute settled by arbitration, that party must first send to all other parties, by certified mail, a written notice of intent to arbitrate.  If Merchant, Purchaser or any Guarantor do not reach an agreement to resolve the claim within 30 days after the notice is received, Merchant, Purchaser or any Guarantor may commence an arbitration proceeding with the American Arbitration Association ("AAA") or Judicial Arbitration and Mediation Services, Inc. ("JAMS") forum. Merchant or any Guarantor will promptly reimburse Purchaser for any arbitration filing fee. Merchant or any Guarantor will pay all administration and arbitrator fees.  If the arbitrator finds that either the substance of the claim raised or the relief sought by the party demanding arbitration is improper or not warranted, as measured by the standards set forth in federal rule of procedure 11(b), then the party demanding arbitration will pay these fees only if required by the AAA or JAMS forum rules. Merchant and any Guarantor agree that, by entering into this agreement, they are waiving the right to trial by jury. Merchant or any Guarantor may bring claims against any other party only in their individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.  Further, Merchant and any Guarantor agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific provision dealing with the prohibition on consolidated, class or aggregated claims is found unenforceable, then the entirety of this arbitration clause shall be null and void. This agreement to arbitrate is governed by the Federal Arbitration Act ("FAA") and not by any state law regulating the arbitration of disputes.  This agreement is final and binding except to the extent that an appeal may be made under the FAA.  Any

GAD     MDH     XM

EXHIBIT 5, PAGE 41

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com   Fax: (512) 233-2812

arbitration decision rendered pursuant to this arbitration agreement may be enforced in any court with jurisdiction. The terms "disputes" and "claims" shall have the broadest possible meaning.

**17.      Waiver of consumer rights. In connection with this agreement, Merchant waives its rights, if any, under the deceptive trade practice-consumer protection act, Texas business and commerce code section 17.41 ET seq., a law that gives consumers special rights and protections. After consultation with an attorney of Merchant's own selection, Merchant voluntarily consents to this waiver. Merchant herby acknowledges and agrees that it is not a "consumer" with respect to this agreement and the underlying transaction, and neither this agreement nor any guarantee thereof shall be construed as a consumer transaction. Any amounts paid to Merchant hereunder shall be used for commercial purposes only and not for the purchase of consumer goods or for personal, family or household purposes.**

EXHIBIT 5, PAGE 42

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458  Email: operations@backd.com  Website: www.backd.com  Fax: (512) 233-2812

## ACH AUTHORIZATION AGREEMENT

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Collections (ACH Debits) is part of (and incorporated by reference into) the Future Receivables Sale Agreement defined below. Merchant should keep this important legal document for Merchant's records. Any capitalized term(s) that are not otherwise defined shall retain the same meaning set forth in the Future Receivables Sale Agreement.

This authorization agreement (the ACH Authorization) is entered into pursuant to the Future Receivables Sale Agreement (the "Agreement") dated_____between the undersigned Merchant and Austin Business Finance, LLC (the "Purchaser"). *4/2/2024*

The individual signing this ACH Authorization on behalf of Merchant certifies to Purchaser that he or she is a duly authorized check signer on the financial institution account identified below, that he or she is authorized to enter into this ACH Authorization on behalf of the Merchant, and that the Merchant will be bound by all the terms of this ACH Authorization.

This authorization shall remain in effect until the sooner of (a) such time that Purchaser has received the Amount Sold, plus any applicable fees, under the Agreement, or (b) Purchaser permits Merchant to revoke this ACH Authorization, as evidenced in writing to Merchant.

The undersigned Merchant hereby authorizes Purchaser to initiate debit or credit entries from and to Merchant's Account at the bank specified below. Merchant and Purchaser agree to be bound by the applicable rules set forth by the National Automated Clearinghouse Association. Furthermore, if any such ACH transactions should be returned for insufficient funds, Merchant authorizes Purchaser to reattempt to collect such amounts by ACH, and in any such case, collect a fee as specified in the Agreement. Merchant further agrees that a breach of this ACH Authorization will constitute a breach of the Agreement.

### DISBURSEMENT OF RECEIVABLES SALE PROCEEDS

By signing below, Merchant authorizes Purchaser to disburse the Purchase Price, less the amount of any applicable setup fee, by initiating an ACH credit, wire transfer, or similar means to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to Purchaser) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Future Receivables Sale Agreement.

### COLLECTION OF FUNDS ARISING FROM FUTURE RECEIPTS

By signing below, Merchant authorizes Purchaser to collect amounts Purchaser is entitled to receive under the Agreement by initiating ACH Debits of the Remittance Amount to the Designated Checking Account each business day, weekly or bi-weekly, as applicable pursuant to the Agreement, until Purchaser receives the Amount Sold, and any and all applicable fees and other charges under the Agreement. At the time of execution of the Future Receivables Sale Agreement, the Parties agree that the Remittance Amount shall be debited each business day, weekly or bi-weekly, as applicable pursuant to the Agreement. Merchant acknowledges and agrees that, at the Purchaser's option, the Remittance Amount may change as allowed under the Agreement. Purchaser will debit Merchant's Account in the amount set forth in the Agreement, as may be modified from time to time by agreement of the Parties. Purchaser acknowledges that no prior notification will be provided in advance of debits or credits authorized under the Agreement.

Merchant authorizes Purchaser to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid because Merchant's financial institution was not open or was not able to process ACH transactions. If a transaction is rejected by Merchant's financial institution for any reason other than termination of this authorization, including without limitation insufficient funds, Merchant understands that Purchaser may, at its discretion, attempt to process the transaction again as permitted under the NACHA Rules. Merchant also authorizes Purchaser to initiate ACH entries to correct any erroneous payment transaction. Merchant understands that Merchant is responsible for ensuring that funds arising from Future Receivables of Merchant remain in the Designed Checking Account each day until Purchaser debits the amount to which it is entitled under the Future Receivables Sale Agreement. Merchant agrees to notify Purchaser promptly if there are any changes to the account and routing numbers of the Designated Checking Account. Purchaser is not responsible for any overdrafts, rejected transactions, or other fees that may result from credits or debits initiated under this Authorization Agreement. This authorization is to remain in full force and effect until Merchant has remitted the full amount of the Amount Sold, plus applicable fees and charges, under the Agreement. The origination of ACH transactions to the Designated Checking Account must comply with, and both Merchant and Purchaser agree to be bound by, the provisions of applicable law and the NACHA Rules.

If Merchant's financial institution rejects Purchaser's debits for any reason, Merchant is still responsible for making

*GAD     MDH*                          *XM*

EXHIBIT 5, PAGE 43

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40

 **Backd**

Phone: (+1) 737-256-7458   Email: operations@backd.com   Website: www.backd.com   Fax: (512) 233-2812

timely remittances of the Remittance Amount to Purchaser on each business day, weekly or bi-weekly, as applicable pursuant to the Agreement.

Business Name: **CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION**

### THIRD PARTY APPOINTMENT AND AUTHORIZATION

By signing below, Merchant acknowledges that the Purchaser may, at any time, at Purchaser's sole discretion, and without prior notice, appoint a third party, including but not limited to its wholly owned subsidiaries, (herein referred to as the "Servicing Agent") to perform any, or all, of the actions authorized by the ACH Authorization and the Agreement. Merchant further agrees and acknowledges that Servicing Agent shall have all of the same rights, responsibilities, and authorizations granted to Purchaser by the ACH Authorization and the Agreement.

Signature: _____ *Gregg Antony Denicola*

Name: _____ Gregg Antony Denicola

Title: _____ manager

Date: _____ 4/2/2024

### BUSINESS PURPOSE ACCOUNT

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Below please list all of the Merchant's business checking accounts. Indicate which account you would like the Purchase Price deposited into, and if different and applicable, indicate the account for payments to Purchaser:

⊙ Deposit Funds    ⊗ Withdraw Payments

Bank Name: BMO BANK

Wire Routing No. ████████████

ACH Routing No. ████████████

Account No.: ████████████

Account Type: CHECKING

### PAYMENT AUTHORIZATION

I authorize my bank ("Bank") to debit my account as identified above to the terms stated here. This authorization shall remain in effect until Bank receives from Purchaser written notification of termination.

I will be liable to pay an NSF fee of $25.00 (or the amount allowable by law), which may be automatically debited for each NSF. I represent and warrant that I am authorized to execute this payment authorization for the purpose of implementing this payment plan. I indemnify and hold the Purchaser and the Bank harmless from damage, loss or claim resulting from all authorized actions hereunder.

Payments will be deducted each business day, weekly or bi-weekly, as applicable pursuant to the Agreement, excluding weekends and federal holidays, until full and indefeasible payment of the Amount Sold, plus any applicable fees and charges under the Agreement.

In the event of a default of the agreed upon future receivable contract Purchaser will use this alternative account information to attain payment, and submit the necessary accompanying UCC filings.

⊗ Deposit Funds    ⊙ Withdraw Payments

Bank Name: FIRST PACIFIC BANK

Wire Routing No.: ████████████

ACH Routing No.: ████████████

Account No.: ████████████

Account Type: CHECKING

*GAD    MDH*                    *XM*

**EXHIBIT 5, PAGE 44**

DocuSign Envelope ID: FCA6894F-1E7F-4E38-AD36-107D420D2D40



Phone: (+1) 737-256-7458 Email: operations@backd.com Website: www.backd.com Fax: (512) 233-2812

This Addendum, dated 4/2/2024 _____ (the "Addendum") to the FRSA, between Austin Business Finance LLC, (Backd or lender) and Caduceus Physicaians Medical Group, ("Borrower"), hereby amends and restates the agreement as follows; provisions of the agreement not expressly referenced in this addendum remain unchanged.

Backd authorizes  CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION  ("Merchant") to take additional debt not to exceed 25% APR. The FRSA language forbids stacking of merchant cash advances and selling future receivables more than this arrangement. Backd authorizes Caduceus Medical to arrange traditional debt raising during the duration of the agreement.

Backd also agrees to allow minority shareholding to change and additional equity to be sold not to exceed the majority.

Backd acknowledges Caduceus previous funding arrangement previously made with BMO Harris, and this is not an event of default as it was a prior relationship to this agreement.

Purchaser: Austin Business Finance, LLC
By: _____ *Tucker Sulzberger* _____
Name: Tucker Sulzberger
Title: COO
Date:       4/2/2024

Merchant:  CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION
By: _____ *Gregg Antony Denicola* _____
Name:       Gregg Antony Denicola
Title:       manager
Date:       4/2/2024

Merchant:  CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION
By: _____ *Michael David Hall* _____
Name:       Michael David Hall
Title:       secretary(not as merchant or guarantor)
Date:       4/2/2024

GAD    MDH                                    XM

EXHIBIT 5, PAGE 45

**DocuSign**

## Certificate Of Completion

Envelope Id: FCA6894F1E7F4E38AD36107D420D2D40
Subject: Backd Future Receivables Agreement: CADUCEUS PHYSICIANS MEDICAL GROUP
Source Envelope:
Document Pages: 13                Signatures: 12
Certificate Pages: 6              Initials: 39
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-06:00) Central Time (US & Canada)

Status: Completed

Envelope Originator:
Operations
1949 S I-35 Frontage Rd.
Austin, TX  78741
operations@backd.com
IP Address: 136.41.96.38

## Record Tracking

Status: Original
        4/2/2024 10:29:46 AM

Holder: Operations
        operations@backd.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Operations<br>operations@backd.com<br>Security Level: Email, Account Authentication (None) | **Completed**<br><br>Using IP Address: 136.41.96.38 | Sent: 4/2/2024 11:06:56 AM<br>Viewed: 4/2/2024 11:07:13 AM<br>Signed: 4/2/2024 11:07:16 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 10/4/2023 3:57:11 PM<br>    ID: 41e60cba-ccd3-423f-8f2a-8dc3b5a486b1 | | |
| Gregg Antony Denicola<br>greggdenicolamd@aol.com<br>manager<br>Security Level: Email, Account Authentication (None), Authentication | *Gregg Antony Denicola*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 104.0.222.250 | Sent: 4/2/2024 11:07:24 AM<br>Viewed: 4/2/2024 12:01:05 PM<br>Signed: 4/2/2024 12:05:30 PM |

**Authentication Details**
ID Check:
    Transaction: 31028789358001
    Result: passed
    Vendor ID: LexisNexis
    Type: iAuth
    Recipient Name Provided by: Recipient
    Information Provided for ID Check: Address,
SSN9, SSN4, DOB
    Performed: 4/2/2024 12:00:51 PM

Question Details:
passed   property.purchasedwhen.fake
passed   property.street.in.city.real
passed   vehicle.historical.association.real
failed   person.state.real
passed   property.association.single.real
failed   property.city.real

**Electronic Record and Signature Disclosure:**
    Accepted: 4/2/2024 12:01:05 PM
    ID: 7291dba8-7e20-45a8-a137-fa3277c849c0

| Michael David Hall<br>mdhmd58@caduceusmedical.org<br>secretary(not as merchant or guarantor)<br>Security Level: Email, Account Authentication (None), Authentication | *Michael David Hall*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 104.0.222.250 | Sent: 4/2/2024 12:05:33 PM<br>Viewed: 4/2/2024 12:22:01 PM<br>Signed: 4/2/2024 12:35:25 PM |

**Authentication Details**
ID Check:
    Transaction: 31028789987301
    Result: passed
    Vendor ID: LexisNexis
    Type: iAuth
    Recipient Name Provided by: Recipient
    Information Provided for ID Check: Address,
SSN9, SSN4, DOB
    Performed: 4/2/2024 12:21:49 PM

Question Details:
passed   property.association.single.real
passed   county.lived.single.real
failed   phonenumber.old.real
passed   corporate.association.fake
passed   phonenumber.old.real
passed   property.association.single.real

EXHIBIT 5, PAGE 46

| Signer Events | Signature | Timestamp |
|---|---|---|
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 4/2/2024 12:22:01 PM<br>   ID: 7ab43606-266d-41b5-82d4-08f9a3a8148e | | |
| Xan Myburgh<br>tucker@backd.com<br>CRO<br>Security Level: Email, Account Authentication<br>(None) | *Xan Myburgh*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 136.41.96.38 | Sent: 4/2/2024 12:35:27 PM<br>Resent: 4/2/2024 1:40:04 PM<br>Viewed: 4/2/2024 1:41:35 PM<br>Signed: 4/2/2024 1:42:04 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 4/2/2024 1:41:35 PM<br>   ID: f7f4feb4-b2b5-4a07-b7cb-5392ce57247a | | |
| Tucker Sulzberger<br>tucker@backd.com<br>CRO<br>Security Level: Email, Account Authentication<br>(None) | *Tucker Sulzberger*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 136.41.96.38 | Sent: 4/2/2024 12:35:28 PM<br>Resent: 4/2/2024 1:40:03 PM<br>Viewed: 4/2/2024 1:41:16 PM<br>Signed: 4/2/2024 1:41:25 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 4/2/2024 1:41:16 PM<br>   ID: c51cef1a-6fa9-41e0-849a-d61c36f38ca2 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jodie Jarosik<br>jodie@backd.com<br>Director of Channel Partners<br>Security Level: Email, Account Authentication<br>(None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | **COPIED** | Sent: 4/2/2024 11:07:18 AM<br>Viewed: 4/2/2024 11:16:50 AM |
| Nida Haqqi-Sybille<br>Nida@backd.com<br>Security Level: Email, Account Authentication<br>(None)<br>**Electronic Record and Signature Disclosure:**<br>   Accepted: 10/24/2023 11:44:51 AM<br>   ID: 5583ff7d-2157-4279-9757-e70f827b3fb6 | **COPIED** | Sent: 4/2/2024 11:07:21 AM<br>Viewed: 4/2/2024 11:17:52 AM |
| Business Loans.com<br>larry@businessloans.com<br>Security Level: Email, Account Authentication<br>(None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | **COPIED** | Sent: 4/2/2024 11:07:22 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 4/2/2024 11:06:56 AM |
| Certified Delivered | Security Checked | 4/2/2024 1:41:16 PM |
| Signing Complete | Security Checked | 4/2/2024 1:41:25 PM |
| Completed | Security Checked | 4/2/2024 1:42:04 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |
| **Electronic Record and Signature Disclosure** | | |

EXHIBIT 5, PAGE 48

Electronic Record and Signature Disclosure created on: 5/27/2022 12:57:40 PM

Parties agreed to: Operations, Gregg Antony Denicola, Michael David Hall, Xan Myburgh, Tucker Sulzberger, Nida Haqqi-Sybille

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Austin Business Finance LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

EXHIBIT 5, PAGE 49

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Austin Business Finance LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: operations@backd.com

**To advise Austin Business Finance LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at operations@backd.com and in the body of such request you must state: your previous email address, your new email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Austin Business Finance LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to operations@backd.com and in the body of such request you must state your email address, full name, mailing address, and telephone number.

**To withdraw your consent with Austin Business Finance LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to operations@backd.com and in the body of such request you must state your email, full name, mailing address, and telephone number. . .

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Austin Business Finance LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Austin Business Finance LLC during the course of your relationship with Austin Business Finance LLC.

**EXHIBIT 6**

U240055864431



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only
**-FILED-**

File No.: U240055864431

Date Filed: 7/11/2024

B2880-0080 07/11/2024 6:13 AM Received by California Secretary of State

---

Submitter Information:

Contact Name — CORPORATION SERVICE COMPANY

Organization Name — CORPORATION SERVICE COMPANY

Phone Number — 18008585294

Email Address — SPRFiling@cscglobal.com

Address — 801 ADLAI STEVENSON DR
SPRINGFIELD, IL 62703

---

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | 18200 YORBA LINDA BLVD #111 YORBA LINDA, CA 92886 |

---

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | P.O. BOX 2576 UCCSPREP@CSCINFO.COM SPRINGFIELD, IL 62708 |

---

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
"ALL TANGIBLE AND INTANGIBLE PERSONAL PROPERTY, INCLUDING, BUT NOT LIMITED TO: (A) INVENTORY; (B) EQUIPMENT; (C) INSTRUMENTS, INCLUDING PROMISSORY NOTES; (D) CHATTEL PAPER, INCLUDING TANGIBLE CHATTEL PAPER AND ELECTRONIC CHATTEL PAPER; (E) DOCUMENTS; (F) LETTER OF CREDIT RIGHTS; (G) ACCOUNTS, DEPOSIT ACCOUNTS, INCLUDING HEALTH CARE INSURANCE RECEIVABLES AND CREDIT CARD RECEIVABLES; (H) VEHICLES AND EQUIPMENT; (I) COMMERCIAL CLAIMS ;(J) GENERAL INTANGIBLES, INCLUDING PAYMENT INTANGIBLES AND SOFTWARE AND (K) AS-EXTRACTED COLLATERAL AS SUCH TERMS MAY FROM TIME TO TIME BE DEFINED IN THE UNIFORM COMMERCIAL CODE.; (L) ACCOUNTS RECEIVABLE; (M) GOODS AND THE PROFITS THEREFROM; (N) STOCKS, BONDS, CASH OR CASH EQUIVALENTS, HOUSEHOLD GOODS AND FURNISHINGS, INVESTMENT PROPERTY, NEGOTIABLE INSTRUMENTS; AND (O) RENTS. THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT IS WITHIN THE SCOPE OF ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE STATE WHERE IT IS FILED."

PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO GRANT A SECURITY INTEREST IN THE ABOVE COLLATERAL TO ANY OTHER ENTITY OR SELL ANY OF THE ABOVE COLLATERAL OUTSIDE THE ORDINARY COURSE OF BUSINESS (INCLUDING DEBTOR'S ACCOUNTS, CHATTEL PAPER, AND GENERAL INTANGIBLES AND PROCEEDS THEREOF) OR ENTER INTO ADDITIONAL FINANCING ARRANGEMENTS.ACCORDINGLY, THE ACCEPTANCE OF ANY SECURITY INTEREST IN THE COLLATERAL OR THE PURCHASE OF ANY CURRENT OR FUTURE ACCOUNTS OF DEBTOR BY ANYONE OTHER THAN THE SECURED PARTY IS LIKELY TO CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHTS. IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN ANY OF THE ABOVE COLLATERAL OR PURCHASES ANY ACCOUNT, CHATTEL PAPER OR GENERAL INTANGIBLE OF THE DEBTOR CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

---

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

---

Select an alternate Financing Statement type:

---

Select an additional alternate Financing Statement type:

EXHIBIT 6, PAGE 52

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:

18646 2877 12691

B2880-0081 07/11/2024 6:13 AM Received by California Secretary of State

EXHIBIT 6, PAGE 53

**EXHIBIT 7**

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE



# ** PLEASE READ CAREFULLY **

Dear Borrower, we are glad to welcome you to our unique financing program. The program will go into effect immediately after you return a signed agreement and will continue to be in effect until we receive the full loan repayment Amount according to this agreement.

After we receive the full agreed upon loan repayment amount, we will close off your account and deliver to you a $0 balance letter. In order to assure the maintenance and servicing of your account, please keep our contact information in your contacts for any service or maintenance request:

Please note due to the large number of loan accounts we service; administrative errors may occasionally result in our daily ACH debits. If you believe your account was erroneously debited, you agree to contact us immediately to notify us about the erroneous debits.

We also require an active point of contact during the duration of the agreement. By providing your contact information below you agree to be contacted in regard to your account during the duration of the agreement.

| REFERRAL/AFFILIATE   DISCLOSURE | | | |
|---|---|---|---|
| Name(s) of Affiliate(s) who arranged this transaction for you:<br><br>Larry Coons | Business Name(s):<br><br>BusinesS Loans | Email Address(es):<br><br>larry@businessloans.com | Phone Number(s):<br><br>848-779-9063 |
| Have there been any other financial products offered to you in conjunction with this financing agreement? Yes or No?<br><br>no | | | |
| If yes, please describe those other financial products (some examples may include but may not be limited to SBA loans, term loans, lines of credit, cash advance, equipment financing, real estate loans, etc.):<br><br>none | | | |
| By signing below, you certify that the above information is true and correct. | | | |
| Owner 1 Signature:<br><br>*Gregg Antony Denicola*<br>CD28B1B28FE14D2... | | Print name:<br><br>GREGG ANTONY DENICOLA | Date:<br><br>4/2/2024 |

**Please contact us to update if your contact information changes.**

Contact Name: GREGG ANTONY DENICOLA  Cell (for text messages): 626-922-4564

Email: greggdenicolamd@aol.com

Emergency secondary contact (*required): ray weaver

Please note all necessary information in regards to reaching you or your staff, in case of a problem:

_____

If we experience any issues with your account and we cannot reach you or your point of contact, we will enforce all legal remedies available to us, under the Agreement. We are always available to assist you with any service request that you may need. In order to prevent any unnecessary interruptions please make sure to call us as soon as any problems with your business arise.

** WE WILL NOT PROCEED WITH FUNDING IF THIS DOCUMENT IS LEFT BLANK **

V1

EXHIBIT 7, PAGE 54

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

# lendspark

### INFORMATION DISCLOSURE FORM
*(All information must be provided in order to release funds)*

| CONTRACTUAL FUNDING INFORMATION | | |
|---|---|---|
| Loan Amount $600,000.00 | | Weekly Remittance $15,346.15 |

| BUSINESS INFORMATION | |
|---|---|
| Legal Business Name: CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | Business DBA: CADUCEUS MEDICAL GROUP |

| Address: 18200 Yorba Linda Boulevard Suite 111 | City: Yorba Linda | State: CA | Zip: 92886 |
|---|---|---|---|

| Business Phone: 714-577-6010 | Business E-Mail: greggdenicolamd@aol.com | Use of Funds: | Time in Business: | Tax ID: 33-0831413 |
|---|---|---|---|---|

| Emergency Contact Info: Name: ray weaver | | Number: 714-646-8010 |
|---|---|---|

List all additional locations associated to business.
on file

Does the company currently have any open/unsatisfied advances? List which companies/balances.
on file

Does the company have any active or pending litigation/ judgements/ liens/ tax obligations?
on file

| Landlord Contact Info: Name: vierergruppe management | | Number: 714-442-0625 |
|---|---|---|

| BANK ACCOUNT INFORMATION (list all accounts below) | | |
|---|---|---|
| Bank name: | Account Number: | Routing Number: |
| BMO BANK N.A. | ▇ | ▇ |
| FIRST PACIFIC BANK | ▇ | ▇ |
| | | |
| | | |

| OFFICERS INFORMATION | | | |
|---|---|---|---|
| Owner 1 - Full Name: GREGG ANTONY DENICOLA | DOB: ▇ | Social Security #: ▇ | Cell Phone #: ▇ |
| Address: ▇ | City: ▇ | State: CA | Zip: ▇ |
| Personal E-mail Address: greggdenicolamd@aol.com | Ownership %: 46.5 | Signature: *Gregg Antony Denicola* | Date: 4/2/2024 |
| Owner 2 - Full Name: MICHAEL DAVID HALL | DOB: ▇ | Social Security #: ▇ | Cell Phone #: ▇ |
| Address: ▇ | City: ▇ | State: CA | Zip: ▇ |
| Personal E-mail Address: mdhmd58@caduceusmedical.org | Ownership %: 22.49 | Signature: *MICHAEL DAVID HALL* | Date: 4/2/2024 |

| CREDIT DISCLOSURE |
|---|
| The above information is warranted to be true and correct. We hereby authorize LendSpark Corporation, its assigns, agents, bank, or financial institution to verify and collect information on us, included but not limited to bank references, trade credit references, and/or commercial credit reports. In compliance with the FAIR CREDIT REPORTING ACT, this is to inform you that you are authorizing this organization and/or its suppliers to obtain a consumer and/or business profile credit report. |

| Owner 1 Signature: *Gregg Antony Denicola* CD08B1026FE14C2... | Print Name: GREGG ANTONY DENICOLA | Date: 4/2/2024 |
|---|---|---|
| Owner 2 Signature: *MICHAEL DAVID HALL* 7165S089719440C... | Print Name: MICHAEL DAVID HALL | Date: 4/2/2024 |

Page 2

V1

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**lendspark**

**BUSINESS LOAN AND SECURITY
AGREEMENT SUPPLEMENT**

This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement, Agreement No.: _3599_. Borrower should keep this important legal document for Borrower's records.

| YOUR LOAN DETAILS | |
|---|---|
| **Borrower:** | CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al. |
| **Lender:** | LENDSPARK CORPORATION |
| **Loan Amount:** | $600,000.00 |
| **Origination Fee:** (Deducted at time of disbursement) | $18,000.00 |
| **Disbursement Amount:** (Loan Amount less Origination Fee) Note that the Disbursement Amount may not be the amount deposited to your Designated Checking Account. The amount that will be deposited to your Designated Checking Account will be reduced by any amounts owed to Lender from a prior loan or used to pay off an amount owed to a third party lender. | $582,000.00 |
| **Weekly Payment Amount:** (Business days only) **Number of Weekly Payments:** (Business days only) **Payment Schedule:** "Business day" means any Monday through Friday except for Federal Reserve holidays. | $15,346.15 52 Weekly |
| **Total Interest Expense:** (Does not include any Fees) | $198,000.00 |
| **Total Repayment Amount:** (Loan Amount plus Total Interest Expense) | $798,000.00 |
| PREPAYMENT, RENEWAL, AND OTHER FEES | |
| **Prepayment:** (See Section 10 of the Business Loan and Security Agreement for specific details) | A "Prepayment Interest Reduction Percentage" (with respect to unpaid interest remaining on this Loan) will be applied to the extent that the Borrower prepays this Loan in whole in accordance with, and subject to, Section 10 of the Business Loan and Security Agreement and the Early Discount Addendum. You should keep in mind that partial prepayments will not reduce the Total Interest Expense. |
| **Renewals:** | Remaining unpaid interest on this Loan will be eligible to be forgiven by Lender if: (i) Borrower is current on its scheduled payments with respect to this Loan and, (ii) while this Loan is outstanding, Borrower enters into a business loan and security agreement for a new qualifying term loan with Lender, a portion of the proceeds of which is used to repay this Loan in whole. |
| **Other Fees:** | Underwriting Fee: $ 0.00 Processing Fee: $18,000.00 |

If you have any questions, please call us at 888-444-7069 (we have support available Monday - Friday 9am - 6pm PT) or email fred@lendspark.com.



_GND_ Initial    _MDH_ Initial

**EXHIBIT 7, PAGE 56**

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**BUSINESS LOAN AND SECURITY
AGREEMENT SUPPLEMENT**

This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement, Agreement No.: 3599 _____. Borrower should keep this important legal document for Borrower's records.

| OTHER FEES (CONT'D) |
| --- |

| Other Fees: | Professional Service Fee: $ |
| | Funding Fee: $ 0.00 |
| | Bank Change Fee: $ 50.00 |
| | Notary Fee: $ 50.00 |
| | Non-Sufficient Funds (NSF) Fee: $ 35.00 |
| | Stopped Payment Fee: $ 150.00 |
| | Default Fee: $ 5,000.00 |
| | Credit Fee: $50.00 |
| | UCC Filing Fee: $ 150.00 |


_Initial    _Initial

V1

EXHIBIT 7, PAGE 57

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

# BUSINESS LOAN AND SECURITY
# AGREEMENT SUPPLEMENT

Business Loan and Security Agreement, Agreement No.: 3599

The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed.

| Loan Amount | Disbursement Amount (minus fees withheld)[1] | Repayment Amount | Term (repaid Weekly) |
|---|---|---|---|
| $600,000.00 | $582,000.00 | $798,000.00 | 12 Months |

| METRIC | METRIC CALCULATION | METRIC EXPLANATION |
|---|---|---|
| **Total Cost of Capital** $216,000.00 | Interest Expense: $198,000.00 Loan Fee: $ Origination Fee: $18,000.00 Other Fees: $ Total Cost of Capital: $216,000.00 | This is the total amount that you will pay in interest or Loan Fees and other fees for the Loan. The amount does not include fees and other charges you can avoid, such as late payment fees and returned payment fees.2 |
| **Annual Percentage Rate (APR)[3]** 65.84% | Your Loan will have  52 Weekly payments of: $15,346.15 **APR:** 65.84% | This is the cost of the Loan -- including total interest or Loan Fees and other fees -- expressed as a yearly rate. APR takes into account the amount and timing of capital  you receive, fees you pay, and the periodic payments you  make. While APR can be used for comparison purposes, it is not an interest rate and is not used to calculate your interest expense or Loan Fee. |
| **Average Monthly Payment** $66,500.00 | Repayment Amount: $798,000.00 Term (in months): ÷  12 Months **Payment:** $66,500.00 | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you  can avoid, such as late payment fees and returned  payment fees.2 The actual repayment frequency for the Loan will be Weekly. This is an estimate for comparison purposes only. |
| **Cents on the Dollar (excluding fees)** 33¢ | Interest Expense or  $198,000.00 Loan Fee: Loan Amount: ÷ $600,000.00 **Cents on the Dollar** *(excluding fees):* 33¢ | This is the total amount of interest or Loan Fee paid per dollar borrowed. This amount is exclusive of fees. |
| Prepayment | Does prepayment of this Loan result in any new fees or charges? | **No** (see "Prepayment" above) |
| | Does prepayment of this Loan decrease the total interest or Loan Fees owed? | **Yes** (see Early Discount Addendum for the interest or fee reduction  amount) |

1 The Disbursement Amount is the amount of capital that a business receives and may be different from the Loan Amount. The Disbursement Amount is net of fees withheld from the Loan Amount. A portion of the Disbursement Amount may be used to pay off any amounts owed from a prior loan or an amount owed to a third party.

2 Your business may incur other fees that are not a condition of borrowing, such as late payment fees, returned payment fees, or monthly maintenance fees. Those fees are not reflected here. See the agreement for details on these fees (see "Other Fees" above).

3 APR should be considered in conjunction with the Total Cost of Capital. APR may be most useful when comparing financing solutions of similar expected duration. APR is calculated here according to the principles of 12 C.F.R. § 1026 (Regulation Z), using 52 payment periods of equal length and 52 payment dates per year for weekly pay products, and 252 payment dates per year for daily pay products.



EXHIBIT 7, PAGE 58

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**BUSINESS LOAN AND SECURITY**
**AGREEMENT SUPPLEMENT**

Business Loan and Security Agreement, Agreement No.: 3599

| CERTAIN DISCLOSURES | |
|---|---|
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine interest charges and fees. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the interest rate up or down based on this risk evaluation. Although Lender believes that its loan process provides expedited turnaround time and efficient access to capital, this loan may be a higher cost loan than loans that may be available through other lenders. |
| **Loan For Specific Purposes Only** | The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification of the Business Loan and Security Agreement. IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to this transaction. |
| **CALIFORNIA CIVIL CODE SECTION 2955.5.** | California Civil Code Section 2955.5(a) provides that "No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property." Borrower acknowledges having received disclosure of the contents of such provision prior to execution of any of the Loan Documents in accordance with California Civil Code Section 2955.5(b). |



_____ Initial   _____ Initial

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**lendspark**

## BUSINESS LOAN AND SECURITY AGREEMENT

**1. INTRODUCTION.** This Business Loan and Security Agreement, Agreement No.: 3599_____ (together with the accompanying Business Loan and Security Agreement Supplement and the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), this "Agreement") governs your business loan ("Loan") made by LendSpark Corporation ("Lender"). Please read it and keep it for your reference. In this Agreement, the words "you", "your" and "Borrower" mean the Borrower identified on the signature page of this Business Loan and Security Agreement. Each Guarantor identified on the signature page of this Business Loan and Security Agreement shall be referred to individually as "Guarantor" and collectively as "Guarantors" in this Agreement. The words "Lender", "we", "us", and "our" mean LendSpark Corporation or its successor(s) and assign(s).

**2. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in California. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until all required security interests have been perfected and Lender has received all required personal guarantees or other documentation.

**3. AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**4. LOAN FOR SPECIFIC PURPOSES ONLY. The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification contained in Section 50 below, and not for any other purposes. In addition, the Loan will not be used for personal, family or household purposes, and Borrower and Guarantors are forever estopped from taking the position that such Loan (including Advances) are or were used for such personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to**

**(i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that** remedy would not have been available had the Loan been made for personal, family or household purposes.

**5. DISBURSEMENT OF LOAN PROCEEDS AND MAINTENANCE OF BORROWER'S BANK ACCOUNT.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain Direct Payments (ACH Debits) in its operating account which is the account that was reviewed in conjunction with underwriting and approval of this Loan (including keeping such account open until the Total Repayment Amount had been completely repaid). Borrower agrees that the Loan made by Lender to Borrower may not be returned except at Lender's sole discretion.

**6. PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). If required by Lender, Borrower further agrees and authorizes Lender or its servicer to collect required payments from a transfer account established pursuant to certain Transfer Account Loan Documentation that will be provided by Lender in connection with this Business Loan and Security Agreement if applicable.

**7. ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), or promptly mail or deliver a check to Lender in the amount of the missed payment or, if offered, make the missed payment by any pay- by-phone or on-line service that Lender may make available from time to time. If Borrower elects to send payments on Borrower's Account by postal mail, then Borrower agrees to send such payments to LendSpark Corporation located at 2554 Gateway Rd., Carlsbad, CA 920091, Attn: Customer Service. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting.


_Initial          _nitial

EXHIBIT 7, PAGE 60

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

## BUSINESS LOAN AND SECURITY AGREEMENT

If Borrower makes an alternative payment on Borrower's Loan by mail or by any pay-by-phone or on-line service that Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**8. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, interest and fees in any manner Lender chooses in Lender's sole discretion it being understood and agreed that any fees and interest will generally be paid during the earlier portion of the term.

**9. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to LendSpark Corporation, 2554 Gateway Rd., Carlsbad, CA 92009, Attn: Customer Service.**

**10. PREPAYMENT.** Borrower may prepay Borrower's Loan in whole on any Business day by paying Lender the sum total of the Total Repayment Amount, any Returned Payment Fees, and any Late Fees, in each case as described in the accompanying Business Loan and Security Agreement Supplement less (i) the amount of any Loan payments made prior to such prepayment and (ii) the product of (x) the percentage identified as the applicable Prepayment Interest Reduction Percentage in the

accompanying Business Loan and Security Agreement Supplement; and (y) the aggregate amount of unpaid interest remaining on the Borrower's Loan as of such date as determined by Lender's records in accordance with Section 8. Borrower may prepay Borrower's Loan in part on any Business day and such payment shall be applied against the Total Repayment Amount, any Returned Payment Fees, and any Late Fees, in each case as described in the accompanying Business Loan and Security Agreement Supplement.

**11. SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, related to the Loan described in this Agreement, whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (or Guarantor, if applicable, pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof:
**(i)** any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper,

(g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods


_Initial    _Initial

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

## BUSINESS LOAN AND SECURITY AGREEMENT

in which Lender is forbidden by law from taking a security interest.

**12. PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and Guarantor each agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.** Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies

and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**15. INSURANCE.** Borrower shall procure and maintain such insurance as Lender may require with respect to the Collateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense. Borrower shall promptly notify Lender of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purpose, with any Lender employees and agents and with the general public. Lender may, but is not required to, use the name of any Borrower and Signatory as a credit in connection with any



_Initial          _Initial

V1

EXHIBIT 7, PAGE 62

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

### BUSINESS LOAN AND SECURITY AGREEMENT

photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**18. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the true and correct legal name of the Borrower is set forth in the application; (v) the

aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business; (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; (x) all information provided by Borrower and/or Guarantor as part of the application process for the Loan was true and complete; (xi) Borrower does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within 6 months of the date hereof; and (xii) Borrower is not presently insolvent within the meaning of the Uniform Commercial Code as well as the United States Bankruptcy Code.

**20. INTEREST AND FEES.** Borrower agrees to pay in full the interest set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

A. <u>Origination Fee:</u> A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B. <u>Returned Payment Fee:</u> A Returned Payment Fee in the amount set forth in the accompanying Business Loan

 _Initial     _Initial

and Security Agreement Supplement if any electronic payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

C. Late Fee: A Late Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if a scheduled payment is not received by Lender as provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement.

Payments made by Borrower hereunder will be applied and allocated between Loan principal, interest and fees in the manner set forth in Section 8.

**21. INTEREST AND FEES EXCEEDING PERMITTED LIMIT.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**22. ONLINE CUSTOMER PORTAL.** When Borrower signs in with Borrower's valid username and password at https://www.lendsaas.com Borrower can obtain information about the Borrower's Loan, such as the outstanding balance, daily transactions and fees. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's username and password to https://www.lendsaas.com with any third party.

**23. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each Guarantor (if any) authorize Lender to obtain business credit bureau reports in Borrower's, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any Guarantor's request, Lender will advise Borrower or Guarantor if Lender obtained a credit report and Lender will give Borrower or Guarantor the credit bureau's name and address. Borrower and each Guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law, including with respect to any Guarantor to consumer credit reporting agencies. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Guarantor acknowledges that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to Guarantor's personal credit file should Guarantor not pay any Obligation pursuant to the guaranty set forth in this Agreement.

**24. ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

## BUSINESS LOAN AND SECURITY AGREEMENT

**25. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**26. TELEPHONE COMMUNICATIONS.** Borrower and Guarantors hereby expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, marketing partners, agents and others calling at Lender's request or on its behalf, at any telephone numbers that Borrower and/or Guarantors have provided or may provide in the future or otherwise in Lender's possession (including any cellular or mobile telephone numbers). Borrower and Guarantor agree that such communications may be initiated using an automated telephone dialing system.

**27. INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**28. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation.

**29. CHANGE IN LEGAL STATUS.** Without Lender's consent, Borrower represents and agrees that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such taxpayer identification number.

**30. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on two consecutive dates due and/or, Borrower fails to pay any Obligations on two consecutive dates due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9-102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower;
(xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or

_Initial      _nitial

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**BUSINESS LOAN AND SECURITY AGREEMENT**

any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or an additional working capital loan without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower;

(xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrowers assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing

member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**31. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. <u>Refrain from Disbursing Loan Proceeds</u>: Lender may refrain from disbursing Borrower's Loan proceeds to Borrower's Designated Checking Account.

B. <u>Debit Amounts Due From Borrower's Accounts:</u> Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

C. <u>Accelerate Indebtedness:</u> Lender may declare the entire Obligations immediately due and payable, without notice to Borrower, as set forth in Section 51.

D. <u>Assemble Collateral:</u> Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after repossession.

E. <u>Sell the Collateral:</u> Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the


_Initial


_Initial

V1

EXHIBIT 7, PAGE 66

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

# BUSINESS LOAN AND SECURITY AGREEMENT

expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

F. Appoint Receiver: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

G. Collect Revenues, Apply Accounts: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

H. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining

on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

I. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

J. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**32. CONSENT TO JURISDICTION AND VENUE.** Subject to Section 33 below, Borrower, Guarantors and Lender each consent to the jurisdiction of the federal and state courts agree that any action or proceeding to enforce or arising out of this Agreement, other than an action or proceeding involving real property collateral, may only be brought in any court of the State of California or in the United States District Court for the District of California, and Borrower and Guarantors waive personal service of process. Borrower, Guarantors and Lender each waive any objections, including *forum non conveniens*, to the bringing of any such proceeding in such jurisdictions.

**33. ARBITRATION.** To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, the parties (Borrower, Guarantors and Lender) hereby agree that the claim or dispute shall be, at the election of any party within thirty (30) days after the claim or dispute arises, resolved by mandatory binding arbitration in California. The parties agree that the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement. The arbitrator shall be chosen in accordance with the procedures of JAMS, and shall base the award on applicable California law. The parties agree that the arbitration shall be conducted by a single arbitrator. Judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above. The



_Initial        _Initial

## EXHIBIT 7, PAGE 67

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

## BUSINESS LOAN AND SECURITY AGREEMENT

parties further agree that the costs of the arbitration shall be divided equally between them. Each party may pursue arbitration solely in an individual capacity, and not as a representative or class member in any purported class or representative proceeding. The arbitrator may not consolidate more than one person's or entity's claims, and may not otherwise preside over any form of a representative or class proceeding. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

**34. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**35. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. LendSpark Corporation (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain at one of its offices in the United States a copy of each assignment agreement delivered to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all purposes of this

Agreement, notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to LendSpark Corporation (in its capacity as Servicer) or the applicable successor servicer (if any). This Section 35 shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)

(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations).

**36. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties, having had the opportunity to consult counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**37. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**38. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notice to Lender will be deemed received by Lender at address sent forth in Section 47 by U.S. mail, postage prepaid, first class mail; in person; by registered mail; by certified mail; by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower will deemed given when sent to Borrower's last known address or electronic mail address in Lender's records for this Loan.

**39. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may

 _Initial   _Initial

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

## BUSINESS LOAN AND SECURITY AGREEMENT

provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers),at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals.

**40. GOVERNING LAW.** Subject to Section 32 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) California law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws.

**41. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (*e.g.*, a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party

with whom the modification, renewal or extension is made).

**42. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by e-mail.

**43. JURY TRIAL WAIVER AND CLASS ACTION WAIVER.** To the extent not prohibited by applicable law, Borrower, Guarantors and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

THE PARTIES HERETO (LENDER, BORROWER AND GUARANTORS) WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

IN THE EVENT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY CONTROVERSY, DISPUTE OR CLAIM DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) (EACH, A "CLAIM") AND THE WAIVER SET FORTH IN THE PRECEDING PARAGRAPH IS NOT ENFORCEABLE IN SUCH ACTION OR PROCEEDING, THE PARTIES HERETO AGREE AS FOLLOWS:


_Initial          _Initial

V1

EXHIBIT 7, PAGE 69

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

# BUSINESS LOAN AND SECURITY AGREEMENT

1. WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN PARAGRAPH 2 BELOW, ANY CLAIM WILL BE DETERMINED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1. THE PARTIES INTEND THIS GENERAL REFERENCE AGREEMENT TO BE SPECIFICALLY ENFORCEABLE IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638. EXCEPT AS OTHERWISE PROVIDED IN THE LOAN DOCUMENTS, VENUE FOR THE REFERENCE PROCEEDING WILL BE IN THE STATE OR FEDERAL COURT IN THE COUNTY OR DISTRICT WHERE VENUE IS OTHERWISE APPROPRIATE UNDER APPLICABLE LAW.

2. THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A GENERAL REFERENCE PROCEEDING: (A) JUDICIAL OR NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY, (B) EXERCISE OF SELF-HELP REMEDIES (INCLUDING, WITHOUT LIMITATION, SET-OFF), (C) APPOINTMENT OF A RECEIVER AND (D) TEMPORARY, PROVISIONAL OR ANCILLARY REMEDIES (INCLUDING, WITHOUT LIMITATION, WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS OR PRELIMINARY INJUNCTIONS). THIS GUARANTY DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (A) - (D) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO A REFERENCE PROCEEDING PURSUANT TO THIS GUARANTY.

3. UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE. IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN TEN (10) DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY MAY REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B).

4. ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS, A COURT REPORTER WILL BE USED AND THE REFEREE WILL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

5. THE REFEREE MAY REQUIRE ONE OR MORE PREHEARING CONFERENCES. THE PARTIES HERETO SHALL BE ENTITLED TO DISCOVERY, AND THE REFEREE SHALL OVERSEE DISCOVERY IN ACCORDANCE WITH THE RULES OF DISCOVERY, AND MAY ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE IN PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA. THE REFEREE SHALL APPLY THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH APPLICABLE STATE AND FEDERAL LAW. THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING, WITHOUT LIMITATION, MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT. THE REFEREE SHALL REPORT HIS DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

6. THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED IN A GENERAL REFERENCE PROCEEDING PURSUANT HERETO WILL BE DECIDED BY A REFEREE AND NOT BY A JURY.

**44. CONFIDENTIALITY.** Borrower shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

**45. ENTIRE AGREEMENT.** The accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject


_Initial        _Initial

Page 17

V1

EXHIBIT 7, PAGE 70

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**BUSINESS LOAN AND SECURITY
AGREEMENT**

matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**46. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic or fax transmission shall be treated in all respects as original signatures.

**47. CUSTOMER SERVICE CONTACT INFORMATION.** If you have questions or comments about your Loan, you may contact us by (i) e-mail at fred@lendspark.com, (ii) telephone at 888-444-7069 or (iii) mail 2554 Gateway Rd., Carlsbad, CA 92209 Attn: Customer Service.

**48. GRANT OF LICENSE TO USE LENDSAAS PLATFORM.** Subject to Borrower's compliance with this Agreement and the Terms of Use for the LendSaaS Platform, Lender grants Borrower a nonexclusive, revocable, non-transferable, non-sublicenseable, limited right and royalty-free license to use the LendSaaS Platform, effective solely during the term of the Loan and so long as an Event of Default has not occurred. The license granted to Borrower is personal, and no rights hereunder may be transferred by Borrower without the express written approval of Lender. Lender may terminate the license granted hereunder without notice at any time after an Event of Default has occurred.

**49. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understood and agreed to be bound by its terms. Each person signing or affirming below certifies that each person is signing on behalf of the Borrower and/or in the capacity indicated below the signer's name (and if Borrower is a sole proprietorship, in the capacity of the owner of such sole proprietorship) and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Borrower.

Use of Proceeds Certification

As referred to in Section 4, by signing or affirming below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for purchasing or acquiring specific products or services, for the following purposes only:

- specified merchandise
- insurance (but not self insurance programs)
- services or equipment
- inventory or other specified goods
- loans to finance specified sales transactions
- public works projects or educational services (e.g., training)


_Initial


Initial

**EXHIBIT 7, PAGE 71**

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

## BUSINESS LOAN AND SECURITY AGREEMENT

**50. GUARANTOR WAIVERS.** The following waivers apply to any corporate co-debtor, which shall guaranty the debt of each other co-debtor: (a) Guarantor hereby waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (i) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower; (ii) If Lender forecloses on any real property collateral pledged by the Borrower:

(A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

(b) Guarantor hereby waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(c) Without limiting the generality of the foregoing, Guarantor hereby expressly: (i) waives any and all rights of subrogation, reimbursement, indemnification and contribution and any other rights and or defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code; (ii) waives any rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by Lender;

(iii) waives any rights or defenses Guarantor may have in because the Borrower's note or other obligation is secured by real property or an estate for years, including, but limited to, any rights or defenses based upon, directly or indirectly, the application of Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure to the Borrower's note or other obligation; (iv) waives any and all, rights, defenses and/or benefits which might otherwise be available to it under California Civil Code Sections 2809, 2810, 2819, 2839, 2845 and 3433; and (v) California Code of Civil Procedure Sections 580a, 580b, 580d and 726, or any similar statutes of other states.

(d) Guarantor agrees that Lender may do any of the following without affecting the enforceability of the guaranty given by Guarantor or the other loan documents: (i) take or release additional security for any obligation in connection with the loan documents; (ii) discharge or release (by judicial or nonjudicial foreclosure, acceptance of a deed in lieu of foreclosure or otherwise) any person or persons liable under the loan documents; (iii) accept or make compositions or other arrangements or file or refrain from filing a claim in any bankruptcy proceeding of Borrower, any guarantor of Borrower's obligations under the loan documents or any pledgor of collateral for any person's obligations to Lender; and (iv) credit payments in such other pledgor of collateral for any person's obligations to Lender or any other person in connection with the Loan.

(e) Guarantor acknowledges that it has had an opportunity to review the loan documents. Guarantor agrees to keep itself informed of all material aspects of the financial condition of Borrower and of the performance of Borrower to Lender and agrees that Lender has no duty to disclose to Guarantor any information pertaining to Borrower or any security for the obligations of the Borrower under the loan documents.

(f) During the continuance of an Event of Default, Lender may elect to foreclose nonjudicially the lien of the deed of trust and, if such right has arisen, to also exercise its rights under this Guaranty. Guarantor acknowledges that its right to seek reimbursement from Borrower for any amounts paid by it to Lender under this Guaranty will be eliminated if Lender elects to so foreclose the lien of the deed of trust in accordance with such Deed of Trust. Nevertheless, Guarantor waives any such right to reimbursement and agrees that a nonjudicial foreclosure by Lender of the deed of trust will not affect the enforceability of the loan documents on Guarantor. In order to further effectuate such waiver, Guarantor hereby agrees that it waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure of the lien of the deed of trust, has destroyed its rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the Code of Civil Procedure or otherwise.

(g) Guarantor agrees that Lender's right to enforce this Guaranty is absolute and is not contingent upon the validity or enforceability of any of the loan documents against Borrower or any other person. Guarantor waives all benefits and defenses it may have under California Civil Code Section 2810 and agrees that Lender's rights under this Guaranty shall be enforceable even if Borrower or had no liability at the time of execution of the loan documents or later ceases to be liable.



_____ Initial    _____ Initial

V1

EXHIBIT 7, PAGE 72

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**BUSINESS LOAN AND SECURITY AGREEMENT**

(h) Guarantor waives all benefits and defenses it may have under California Civil Code Section 2809 and agrees that Lender's rights under the loan documents will remain enforceable even if the amount secured by the loan documents is larger in amount and more burdensome than that for which Borrower is responsible. The enforceability of the Guaranty against Guarantor shall continue until all sums due under the loan documents have been paid in full and shall not be limited or affected in any way by any impairment or any diminution or loss of value of any security or collateral for Borrower's obligations under the loan documents, from whatever cause, the failure of any security interest in any such security or collateral or any disability or other defense of Borrower or any guarantor of Borrower's obligations under the loan documents, any Guarantor are not due and owing or have been paid in full or (y) all sums payable under the loan documents have been indefeasibly paid in full;

(i) Guarantor waives all benefits and defenses it may have under California Civil Code Sections 2845, 2849 and 2850, including, without limitation, the right to require Lender to (i) proceed against Borrower, any guarantor of Borrower's obligations under the loan documents, any other pledgor of collateral for any person's obligations to Lender or any other person in connection with the Loan, (ii) proceed against or exhaust any other security or collateral that Lender may hold, or (iii) pursue any other right or remedy for Borrower's benefit, and agree that Lender may exercise its rights under this Guaranty or may foreclose against any real property securing the Loan without taking any action against Borrower, any guarantor of Borrower's obligations under the loan documents, any pledgor of collateral for any person's obligations to Lender or any other person in connection with the Loan, and without proceeding against or exhausting any security or collateral Lender holds.

(j) Guarantor waives any rights or benefits it may have by reason of California Code of Civil Procedure Section 580a, or other applicable law, which could limit the amount which Lender could recover in a foreclosure of any collateral securing the Loan to the difference between the amount owing under the loan documents and the fair value of such collateral or interests sold at a nonjudicial foreclosure sale or sales of any other real property held by Lender as security for the obligations of Borrower under the loan documents.

(k) Guarantor, as a guarantor or surety, waives diligence and all demands, protests, presentments and notices of protest, dishonor, nonpayment and acceptance of the loan documents.

(l) This Guaranty shall be effective as a waiver of, and Guarantor hereby expressly waives:

(i) any and all rights to which Guarantor may otherwise have been entitled under any suretyship laws in effect from time to time, including any right or privilege, whether existing under statute, at law or in equity, to require Lender to take prior recourse or proceedings against any collateral, security or person whatsoever;

(ii) ) any rights of sovereign immunity and any other similar and/or related rights;

(iii) any defenses generally available to guarantors under the laws of the State of California or otherwise;

(iv) ) any defense based upon any legal disability or other defense of Borrower or any guarantor of Borrower's obligations or by reason of the cessation or limitation of the liability of Borrower from any cause other than that (x) the obligations guaranteed by

(v) any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower or any principal of Borrower or any defect in the formation of Borrower or any principal of Borrower;

(vi) any defense based upon the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or Guarantor;

(vii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(viii) any defense based upon Lender's election, in any proceeding instituted under the United States Bankruptcy Code, of the application of Section 1111(b)(2) of the United States Bankruptcy Code or any successor statute;

(ix) any defense based upon any borrowing or any grant of a security interest under Section 364 of the United States Bankruptcy Code;

(x) the benefit of any statute of limitations affecting the liability of Guarantor hereunder or the enforcement hereof, including, without limitation, any rights arising under Section 359.5 of the California Code of Civil Procedure. Guarantor agrees that the payment of all sums payable under the loan documents or any part thereof or other act which tolls any statute of limitations applicable to the loan documents shall similarly operate to toll the statute of limitations applicable to Guarantor's liability hereunder. Without limiting the generality of the foregoing or any other provision hereof, Guarantor expressly waives for the benefit of Lender to the extent permitted by law any and all rights and defenses which might otherwise be available to Guarantor under California Civil Code Sections 2899 and 3433 or any similar law of California or of any other state or of the United States.

(m) Guarantor hereby also waives (i) any defense based upon Lender's failure to disclose to Guarantor any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay all sums payable under the loan documents; (ii) any right of subrogation, any right to enforce any remedy which Lender may have against Borrower and any right to participate in, or benefit from, any security for the loan documents now or hereafter held by Lender; and (iii) presentment, demand, protest and notice of any kind.



_Initial                    _Initial

V1

EXHIBIT 7, PAGE 73

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

## BUSINESS LOAN AND SECURITY AGREEMENT

Guarantor agrees that the payment of all sums payable under the loan documents or any part thereof or other act which tolls any statute of limitations applicable to the loan documents shall similarly operate to toll the statute of limitations applicable to Guarantor's liability hereunder. Without limiting the generality of the foregoing or any other provision hereof, Guarantor expressly waives to the extent permitted by law any and all rights and defenses which might otherwise be available to Guarantor under California Civil Code Sections 2787 to 2855 inclusive (subject to Section 1.9 of this Guaranty) and Chapter 2 of Title 14, 2899 and 3433 and under California Code of Civil Procedure Sections 580a, 580b, 580d and 726, or any of such sections.

(n) Guarantor agrees that it is bound to the payment of all guaranteed obligations, whether now existing or hereafter accruing as fully as if such guaranteed obligations were directly owing to Lender by Guarantor. Guarantor further waives any defense arising by reason of any disability or other defense (other than that (x) the guaranteed obligations are not due and owing or have been paid in full or (y) all sums payable under the loan documents have been indefeasibly paid in full) of Guarantor or by reason of the cessation from any cause whatsoever of the liability of Guarantor in respect thereof.

(o) Guarantor hereby also waives (i) any rights to assert against Lender any defense (legal or equitable), set off, counterclaim, or claim which Guarantor may now or at any time hereafter have against Guarantor or any other party liable to Lender; (ii) any defense, set off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the guaranteed obligations or any security therefor; and (iii) any defense Guarantor has to performance hereunder, and any right Guarantor has to be exonerated, provided by Sections 2819, 2821, 2822, 2825, 2839 or 2853 of the California Civil Code, or otherwise, including, without limitation, arising by reason of: any claim or defense based upon an election of remedies by Lender; the impairment or suspension of Lender's rights or remedies against Guarantor; the alteration by Lender of the guaranteed obligations; any discharge of Guarantor's obligations to Lender by operation of law as a result of Lender's intervention or omission; or the acceptance by Lender of anything in partial satisfaction of the guaranteed obligations. Guarantor acknowledges and agrees that, as a result of the foregoing sentence, Guarantor is knowingly waiving in advance a complete or partial defense to this Guaranty arising under California Code of Civil Procedure Sections 580d or 580a and based upon Lender's election to conduct a private non-judicial foreclosure sale.

(n) Guarantor agrees that it is bound to the payment of all guaranteed obligations, whether now existing or hereafter accruing as fully as if such guaranteed obligations were directly owing to Lender by Guarantor. Guarantor further waives any defense arising by reason of any disability or other defense (other than that (x) the guaranteed obligations are not due and owing or have been paid in full or (y) all sums payable under the loan documents have been indefeasibly paid in full) of Guarantor or by reason of the cessation from any cause whatsoever of the liability of Guarantor in respect thereof.

(o) Guarantor hereby also waives (i) any rights to assert against Lender any defense (legal or equitable), set off, counterclaim, or claim which Guarantor may now or at any time hereafter have against Guarantor or any other party liable to Lender; (ii) any defense, set off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the guaranteed obligations or any security therefor; and (iii) any defense Guarantor has to performance hereunder, and any right Guarantor has to be exonerated, provided by Sections 2819, 2821, 2822, 2825, 2839 or 2853 of the California Civil Code, or otherwise, including, without limitation, arising by reason of: any claim or defense based upon an election of remedies by Lender; the impairment or suspension of Lender's rights or remedies against Guarantor; the alteration by Lender of the guaranteed obligations; any discharge of Guarantor's obligations to Lender by operation of law as a result of Lender's intervention or omission; or the acceptance by Lender of anything in partial satisfaction of the guaranteed obligations. Guarantor acknowledges and agrees that, as a result of the foregoing sentence, Guarantor is knowingly waiving in advance a complete or partial defense to this Guaranty arising under California Code of Civil Procedure Sections 580d or 580a and based upon Lender's election to conduct a private non-judicial foreclosure sale.

(p) This Guaranty is intended to be cumulative of any rights of Lender under California Code of Civil Procedure Sections 564, 726.5 and 736 and under California Civil Code Section 2929.5. Guarantor hereby waives any restrictions or limitations which such statutes may imposed on the liability of Guarantor or Lender's rights or remedies under this Guaranty.

(p) This Guaranty is intended to be cumulative of any rights of Lender under California Code of Civil Procedure Sections 564, 726.5 and 736 and under California Civil Code Section 2929.5. Guarantor hereby waives any restrictions or limitations which such statutes may imposed on the liability of Guarantor or Lender's rights or remedies under this Guaranty.



_Initial    _Initial

V1

EXHIBIT 7, PAGE 74

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE



**AUTHORIZATION AGREEMENT FOR
DIRECT DEPOSIT (ACH CREDIT) AND
DIRECT PAYMENTS (ACH DEBITS)**

**This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSMENT OF LOAN PROCEEDS.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the checking account indicated herein (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Borrower represents that Borrower is the owner of the Designated Checking Account.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower agrees to, and hereby,  enrolls in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in  such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated  checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**Provisional Payment.** Credit given by us to you with respect to an automated clearing house ("ACH") credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making to you via such entry (i.e. the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**Notice of Receipt of Entry.** Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statement we provide to you.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law. Borrower agrees to be bound by NACHA rules of the Electronic Payments Association. Borrower agrees to provide to Lender at all times, "Live Contemporaneous Access" to all of its bank accounts in order for Lender to evaluate Borrower's compliance with the Agreement, and for collections in the Event of Default ("Borrower's Accounts"). "Live Contemporaneous Access" shall be defined as: Borrower, at all times and including but not limited to, providing Lender with accurate login information necessary to access all of Borrower's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens. Borrower shall provide notice to Lender in the event Borrower makes any changes to the Designated Checking Account, including in the event Borrower closes the Designated Checking Account.


_Initial


_Initial

V1

EXHIBIT 7, PAGE 75

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**SIGNATURE  PAGE**

# lendspark

| | |
|---|---|
| Routing Number: | Account Number: |

Tax ID:            33-0831413

By:            *Gregg Antony Denicola*
            (Signature)

Name:            GREGG ANTONY DENICOLA, MD, Manager (and as Borrower and Guarantor)

Date:            4/2/2024

V1

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**SIGNATURE  PAGE**

# lendspark

Routing Number: ▬▬▬▬ _____ Account Number: ▬▬▬▬ _____

Tax ID: ▬▬▬▬ _____

By: _____ *Gregg Antony Denicola* _____
       (Signature)

Name: GREGG ANTONY DENICOLA, MD, Manager (and as Borrower and Guarantor)

Date: 4/2/2024

V1

**EXHIBIT 7, PAGE 77**

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

SIGNATURE   PAGE



# Signature Page

Borrower affirms that it has read and understood the terms and conditions of, consents to, and agrees to be bound by, the Business Loan and Security Agreement, Agreement No.: ___3599___ the accompanying Business Loan and Security Agreement Supplement, and the accompanying Authorization Agreement for Direct Deposit (ACH Credits) and Direct Payments (ACH Debits).

**By:**  Gregg Antony Denicola
CD2861926FE14D2...
(Signature)

Name: GREGG ANTONY DENICOLA, MD, Manager (and as Borrower and Guarantor)

Date: 4/2/2024

LENDSPARK CORPORATION

For Lender's Use Only: This Agreement has been received  and accepted by Lender in California after being signed by Borrower.

By: B346349C23B54AC...
(Signature)

Salman Vakil
(Name)

Date: 4/2/2024

V1

EXHIBIT 7, PAGE 78

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

**SIGNATURE PAGE**



# Signature Page

Borrower affirms that it has read and understood the terms and conditions of, consents to, and agrees to be bound by, the Business Loan and Security Agreement, Agreement No.: __3599__ the accompanying Business Loan and Security Agreement Supplement, and the accompanying Authorization Agreement for Direct Deposit (ACH Credits) and Direct Payments (ACH Debits).

**By:** MICHAEL DAVID HALL
_(Signature)_

Name: MICHAEL DAVID HALL, MD, Secretary (and not as a Borrower or Personal Guarantor)

Date: 4/2/2024

LENDSPARK CORPORATION

For Lender's Use Only: This Agreement has been received and accepted by Lender in California after being signed by Borrower.

By: _____
_(Signature)_

Salman Vakil
_(Name)_

Date: 4/2/2024

EXHIBIT 7, PAGE 79

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

     **Stacking Prohibited Addendum**

This addendum is made of as of __04/01/2024__ (the "Addendum") to the Business Loan and Security Agreement, Agreement No.: __3599__ between LendSpark Corporation (the "Lender") and __CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et__ (the "Borrower") dated __04/01/2024__ (the "Agreement").

Whereas, Lender desires to add a Stacking Prohibited as follows; Borrower shall not enter into any cash advance that relates to or involves its Future Receipts, or any loan agreement, with any party other than Lender on such loan is greater than ten percent (10%) for the duration of this Agreement; notwithstanding the foregoing, the following shall be excluded from the foregoing prohibition in all events: (a) bank loans; (b) bank financing arrangements; and
(c) any other financing arrangement, that enables Borrower to pay the Total Repayment Amount to Lender and the Total Repayment Amount is paid to Lender in conjunction with the closing of such financing prior to the release of any funds to the Borrower. Lender may share information regarding this Agreement with any third party in order to determine whether Borrower is in compliance with this provision.

Borrower agrees to this Stacking Prohibited addendum to the Agreement, and fully understands that breach of the Stacking Prohibited provision shall constitute an Event of Default.

By signing this Addendum, Borrower agrees and fully understands that in the event Borrower breaches the Stacking Prohibited provision, Lender fully reserves its rights to immediately exercise its rights at law and equity as provided in the Agreement and impose an additional fee equaling ten (10) percent of the Loan Amount.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

Borrower:   CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al.

Agreed to by:   *Gregg Antony Denicola*   (Signature),   its: __MD, Manager (and as Borrower and Guarantor)__
                CD2891B26FE14D2...                                (Title)

Print Owner's Name:   GREGG ANTONY DENICOLA

Borrower:   CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al.

Agreed to by:   *MICHAEL DAVID HALL*   (Signature),   its: __MD, Secretary (and not as a Borrower or Personal Guarantor)__
                716E5088719440C...                              (Title)

Print Owner's Name:   MICHAEL DAVID HALL

Lender:   LENDSPARK CORPORATION

Agreed to by:   *[signature]*   (Signature), its: __President__
                B346349C23B54AC...

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

# lendspark

**Borrower Definition Addendum to the Business Loan and Security Agreement, Agreement No.: 3599 dated: 04/01/2024**.

**Lender and Borrower hereby agree that "Borrower" is defined as follows:**

Business Name:   CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION d/b/a CADUCEUS MEDICAL GROUP

Address:   18200 Yorba Linda Boulevard Suite 111, Yorba Linda, CA 92886

Tax ID:   33-0831413


Business Name:   Caduceus Medical Services, LLC

Address:   18200 Yorba Linda Boulevard Suite 111, Yorba Linda, CA 92886

Tax ID:   202357617438


Borrower:   CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al.

Agreed to by:   *Gregg Antony Denicola*   (Signature), its:   MD, Manager (and as Borrower and Guarantor)
CD2881B28FE14D2...   (Title)

Print Owner's Name:   GREGG ANTONY DENICOLA


Borrower:   CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al.

Agreed to by:   *MICHAEL DAVID HALL*   (Signature), its:   MD, Secretary (and not as a Borrower or Personal Guarantor)
716E5088719440C...   (Title)

Print Owner's Name:   MICHAEL DAVID HALL


LENDER:   LENDSPARK CORPORATION

Agreed to by:   [signature]   (Signature), its:   President
B346349C23B54AC...   (Title)

EXHIBIT 7, PAGE 81

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE



**Early Discount Addendum**

This addendum is made as of 04/01/2024 (the "Addendum") to the Business Loan and Security Agreement, Agreement No.: 3599 between **LendSpark Corporation** (the "Lender") and **CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al.** (the "Borrower") dated 04/01/2024 (the "Agreement").

Lender and Borrower are sometimes referred to herein collectively as the "Parties" and each as a "Party". Whereas, the Parties desire to add certain terms to the Agreement.

In consideration of the above promises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, do hereby agree and add terms to the Agreement as follows:

Total Repayment Amount shall be defined as: 25% off the remaining cost of the current balance if Borrower delivers the Total Repayment Amount within 50% of the term of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Notwithstanding the above, if an Event of Default occurs pursuant to the Agreement, Borrower forfeits Borrower's rights pursuant to this Addendum.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

Borrower: CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al. _____ (Print)

Agreed to by: *Gregg Antony Denicola* (Signature), its: MD, Manager (and as Borrower and Guarantor) (Title)

Print Owner's Name: GREGG ANTONY DENICOLA

Borrower: CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al. _____ (Print)

Agreed to by: *MICHAEL DAVID HALL* (Signature), its: MD, Secretary (and not as a Borrower or Personal Guarantor) (Title)

Print Owner's Name: MICHAEL DAVID HALL

Lender: LendSpark Corporation

Agreed to by: _____ (Signature), its: President (Title)

DocuSign Envelope ID: CD3E4997-F7C4-48F1-B115-4A2FB27644EE

# lendspark

## ADDENDUM TO BUSINESS LOAN AND SECURITY AGREEMENT, AGREEMENT NO.: 3599

This Addendum, dated 04/01/2024 (the "Addendum") to the Business Loan and Security Agreement, Agreement No.: 3599 effective date 04/01/2024 (the "Agreement"), between LENDSPARK CORPORATION ("LendSpark" or "Lender") and CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al. ("Borrower"), hereby amends and restates the Agreement as follows, with any sections or provisions of the Agreement not expressly referenced in this Addendum remaining unchanged from the Agreement:

Lender agrees that no personal liability shall attach to MICHAEL DAVID HALL under the Agreement.

Lender authorizes Borrower to take additional debt not to exceed 25% APR. The Agreement language forbids stacking of merchant cash advances and selling future receivables more than this arrangement. Lender authorizes Borrower to arrange traditional debt raising during the duration of the agreement.

Lender also agrees to allow minority shareholding to change and additional equity to be sold not to exceed the majority.

Lender acknowledges Borrower's previous funding arrangement previously made with BMO Harris, and this is not an event of default as it was a prior relationship to this agreement.

IN WITNESS WHEREOF, each of the undersigned has executed this Addendum as of the date first written above. All other guarantors remain in the agreement.

Borrower: __CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al.__

Agreed to by: __Gregg Antony Denicola__ (Signature), its __MD, Manager (and as Borrower and Guarantor)__ (Title)

Print Name: __GREGG ANTONY DENICOLA__

Borrower: __CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, et al.__

Agreed to by: __MICHAEL DAVID HALL__ (Signature), its __MD, Secretary (and not as a Borrower or Personal Guarantor)__ (Title)

Print Name: __MICHAEL DAVID HALL__

Guarantor: __GREGG ANTONY DENICOLA__

Agreed to by: __Gregg Antony Denicola__ (Signature), Its __MD, Manager (and as Borrower and Guarantor)__ (Title)

Lender: __LENDSPARK CORPORATION__

Agreed to by: _____ (Signature), Its __President__ (Title)

EXHIBIT 7, PAGE 83

**DocuSign®**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: CD3E4997F7C448F1B1154A2FB27644EE | | Status: Completed |
| Subject: Complete with DocuSign: Caduceus Medical Group Contract | | |
| Source Envelope: | | |
| Document Pages: 30 | Signatures: 24 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 40 | Funding Department |
| AutoNav: Enabled | | 2554 Gateway Rd |
| EnvelopeId Stamping: Enabled | | Carlsbad, CA  92009 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | funding@lendspark.com |
| | | IP Address: 76.32.96.149 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Funding Department | Location: DocuSign |
|     3/26/2024 11:54:50 AM |     funding@lendspark.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Gregg Antony Denicola<br>greggdenicolamd@aol.com<br>Security Level: Email, Account Authentication<br>(None), Access Code | *Gregg Antony Denicola*<br>CD2881B28FE14D2... <br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 104.0.222.250 | Sent: 3/26/2024 12:07:08 PM<br>Resent: 3/27/2024 9:17:09 AM<br>Resent: 4/1/2024 4:14:45 PM<br>Viewed: 4/2/2024 10:06:34 AM<br>Signed: 4/2/2024 10:18:55 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/2/2024 10:06:34 AM<br>  ID: e778cf7c-051f-4697-95cd-3c96c5aa75d3 | | |
| MICHAEL DAVID HALL<br>mdhmd58@caduceusmedical.org<br>Security Level: Email, Account Authentication<br>(None), Access Code | *MICHAEL DAVID HALL*<br>716E5088719440C... <br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 104.0.222.250 | Sent: 4/2/2024 10:18:57 AM<br>Viewed: 4/2/2024 10:36:06 AM<br>Signed: 4/2/2024 10:42:22 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/2/2024 10:36:06 AM<br>  ID: 16f6b3d7-c71a-444d-9263-ded752a60a4f | | |
| Salman Vakil<br>salman@lendspark.com<br>President<br>Security Level: Email, Account Authentication<br>(None) | [signature]<br>B346349C23B54AC... <br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 68.4.87.120<br>Signed using mobile | Sent: 4/2/2024 10:42:25 AM<br>Viewed: 4/2/2024 11:07:58 AM<br>Signed: 4/2/2024 11:08:09 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 10/23/2023 2:07:07 PM<br>  ID: 88a9e918-5fb5-48fc-818a-b7baede0703d | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

EXHIBIT 7, PAGE 84

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/26/2024 12:07:08 PM |
| Envelope Updated | Security Checked | 3/27/2024 9:16:41 AM |
| Envelope Updated | Security Checked | 3/27/2024 9:16:41 AM |
| Envelope Updated | Security Checked | 3/27/2024 9:16:41 AM |
| Envelope Updated | Security Checked | 3/27/2024 9:16:41 AM |
| Envelope Updated | Security Checked | 4/1/2024 4:14:37 PM |
| Envelope Updated | Security Checked | 4/1/2024 4:14:37 PM |
| Envelope Updated | Security Checked | 4/1/2024 4:14:37 PM |
| Envelope Updated | Security Checked | 4/1/2024 4:14:37 PM |
| Certified Delivered | Security Checked | 4/2/2024 11:07:58 AM |
| Signing Complete | Security Checked | 4/2/2024 11:08:09 AM |
| Completed | Security Checked | 4/2/2024 11:08:09 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/18/2023 3:55:27 PM
Parties agreed to: Gregg Antony Denicola, MICHAEL DAVID HALL, Salman Vakil

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, LendSpark (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact LendSpark:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: lauren@lendspark.com

**To advise LendSpark of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at lauren@lendspark.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from LendSpark**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to lauren@lendspark.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with LendSpark**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to lauren@lendspark.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify LendSpark as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by LendSpark during the course of your relationship with LendSpark.

**EXHIBIT 8**

## SECOND AMENDMENT TO SECURED PROMISSORY NOTE

This **AMENDMENT TO SECURED PROMISSORY NOTE** (this "Amendment") effective as of as of July 15, 2024 (the "Amendment Date"), is made by and among **Caduceus Physicians Medical Group**, a California professional corporation, as borrower ("Borrower"), and **Despierta, LLC**, a Delaware limited liability company, as lender ("Lender").

### WITNESSETH:

WHEREAS, Borrower and Lender (originally though Rise Health Services, Inc., a Delaware corporation, as predecessor in interest to the Lender) entered into that certain (i) Secured Promissory Note, dated November 2, 2022 (as amended, restated, supplemented, or modified from time to time, the "November Note"), made by Borrower for the benefit of Lender in the principal amount equal to $160,000 and (ii) Secured Promissory Note, dated August 18, 2022 (as amended, restated, supplemented, or modified from time to time, the "August Note" and together with the November Note, the "Notes"), made by the Borrower for the benefit of the Lender in the principal amount equal to $350,000;

WHEREAS, Borrower and Lender, entered into that certain Amendment to the Notes, whereby the maturity date thereto was extended from December 31, 2022 to December 30, 2023; and

WHEREAS, Borrower and Lender have agreed to amend the Notes as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and further valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree as follows:

1.    Definitions.    Capitalized terms not otherwise defined in this Amendment have the respective meanings assigned thereto in the Notes.

2.    Amendment to Notes (Payment Terms).    Subject to the terms and conditions set forth herein, the Notes are hereby amended as follows:

(a)    The definition of Maturity Date is hereby extended to December 31, 2026;

(b)    The aggregate principal amount under both Notes, are hereby consolidates and adjusted to and agreed to be $629,305.56 (the "New Principal Amount"), regardless of how the principal and interest would have been calculated thereunder; and

(c)    The payment schedule for both Notes are hereby consolidated and regardless of the schedule of payments and fees therein, shall be paid as follows:
The New Principal Amount shall be amortized at an interest rate of 10%, and paid over twenty four (24) equal installments of $29,039.26, with the first payment due January 1, 2025 (the "Installment Payments").

3.    Amendment to Notes (Event of Default).    Subject to the terms and conditions set forth herein, the Notes are hereby amended as follows:

Each of the following acts, events or circumstances shall constitute an Event of Default (each an "Event of Default") under the Notes:

(a)     Borrower shall default in the payment when due (in accordance with the terms of the Notes) of any scheduled payment of principal or interest; or

(b)     Borrower fails to commence a voluntary case concerning itself under Title 11 of the United States Code (as amended, supplemented or replaced), on or before ~~July 31, 2024,~~ or such case is dismissed and the Borrower is thereafter no longer subject to an automatic stay.

If an Event of Default occurs, Lender may declare to be immediately due and payable, if prior to December 31, 2024, the New Principal Amount, and if January 1, 2025 or later, the unpaid Installment Payments. Upon a declaration of acceleration, such amount shall become immediately due and payable, following which interest will accrue at the rate of 10% on the principal balance, and Borrower shall be pay all of Lender's cost of collection (including attorney's fees) thereon.

3.     Full Force and Effect of Agreement; No Novation.  Except as hereby specifically amended, modified or supplemented herein, the Notes and the Security Agreement dated November 2, 2022 (the "Security Agreement", and together with the Notes and any amendment or addendum to the Notes and Security Agreement, and any documents and agreements entered into in connection therewith, collectively, the "Loan Documents") are hereby confirmed, affirmed and ratified in all respects and shall be and remain in full force and effect according to their respective terms.  The parties hereto acknowledge and agree that the amendments contained herein do not constitute a novation of the Notes or the other Loan Documents, the security interest and liens granted therein or the indebtedness described therein. The Borrower hereby acknowledges and agrees to the assignment of the Loan Documents from Rise Health Services, Inc. to Despierta, LLC, and that Despierta, LLC is the Lender and successor to (and shall have) all rights, privileges and interests of Rise Health Services, Inc. under the Loan Documents, in all respects.

4.     Entire Agreement.   This Amendment, together with all of the Loan Documents (collectively, the "Relevant Documents"), sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relating to such subject matter.  No promise, condition, representation or warranty, express or implied, not set forth in the Relevant Documents shall bind any party hereto, and no such party has relied on any such promise, condition, representation or warranty.  Each of the parties hereto acknowledges that, except as otherwise expressly stated in the Relevant Documents, no representations, warranties or commitments, express or implied, have been made by any party to the other with respect to the subject matter hereof.

5.     Waiver of Claims.  To induce Lender to enter into this Amendment, Borrower, hereby warrants and represents to Lender that the Notes are not subject to any credits, charges, claims, or rights of offset or deduction of any kind or character whatsoever.  Except for the rights of Borrower expressly granted under the Relevant Documents, to further induce Lender to enter into this Amendment, the Borrower, on behalf of itself, and each of its predecessors, successors, assigns, heirs, beneficiaries, executors, administrators, trustees, creditors, officers, directors, equity holders, employees, representatives, agents and affiliates, hereby fully, finally, forever, and irrevocably releases, remises, acquits, satisfies and forever discharges the Lender and its affiliates, officers, members, managers, directors, shareholders, employees, attorneys, agents, predecessors, successors and assigns, from and against any and all past, present, or future claims, defenses, counterclaims, demands, actions, causes of action, obligations, indebtedness, damages, liabilities, accounts, reckonings, controversies, agreements, promises, suits, choses in action, contracts, covenants, bonds, bills, debts, dues, sums of money, commissions, compensation for services rendered, judgments, and executions, of any kind or nature

2

whatsoever, in law, equity or otherwise, whether known, unknown or hereinafter discovered, liquidated or contingent, foreseeable or unforeseeable, and whether brought in court, arbitration, or administrative, governmental, or regulatory proceedings, or in any other forum, that now or which may hereafter accrue or otherwise acquire, for or by reason of any matter, cause or thing whatsoever (collectively the "Claims"), assigns arising out of events or acts or transactions, which occurred on or before (and including) the Amendment Date.

6.    Reservation of Rights. With the exception of the rights and remedies expressly amended or waived herein, the Lender reserves all rights and remedies under the Loan Documents (as defined below), and applicable law, in equity or otherwise, and shall not indicate agreement on the part of the Lender to further delay or forbear from exercising its rights and remedies. The Lender may, in its sole discretion, exercise such rights and/or remedies at any time or times that the Lender deems such exercise to be in the Lender's best interest irrespective of any discussions with Borrower or any other person concerning this matter. Further, any single or partial exercise of any of the Lender's rights and remedies shall not preclude any other or further exercise of any available rights and remedies. Every right or remedy contained in the Loan Agreement or now or hereafter existing in law or in equity, or by statute or otherwise, shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of the Lender.

7.    Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Amendment by fax or other electronic imaging means (i.e., in ".pdf" or ".tif" format) shall be effective as delivery of a manually executed counterpart of this Amendment.

8.    Governing Law. This Amendment shall be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware. In the event litigation is necessary, (a) such legal action shall be commenced only in a federal or state court of competent jurisdiction located in Wilmington, Delaware, (b) any litigation commenced other than in a federal or state court of competent jurisdiction located in Wilmington, Delaware shall be subject to being dismissed, stayed or having venue transferred to a federal or state court of competent jurisdiction located in Wilmington, Delaware at the option of the party hereto not commencing said litigation, and (c) the parties hereto further waive all objections and defenses to litigation being conducted in a federal or state court of competent jurisdiction located in Wilmington, Delaware, based upon venue or under the doctrine of forum non conveniens.

9.    Enforceability. Should any one or more of the provisions of this Amendment be determined to be illegal or unenforceable as to one or more of the parties hereto, all other provisions nevertheless shall remain effective and binding on the parties hereto.

10.    Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of Borrower and Lender, and their respective successors, legal representatives, and assignees.

11.    Strict Compliance Notice. The Lender hereby notifies the Borrower that the Lender intends to rely upon the strict terms and conditions of the Loan Documents, and the Lender expects that the Borrower will strictly comply with the terms and conditions thereof from and after the date hereof.

[SIGNATURE PAGES FOLLOW]

3

EXHIBIT 8, PAGE 91

**IN WITNESS WHEREOF**, the parties hereto have caused this instrument to be made, executed and delivered by their duly authorized officers as of the day and year first above written.

<u>**BORROWER**</u>:

**Caduceus Physicians Medical Group,**
a California professional corporation

By: _~Gregg Willm~_
Name: _Gregg Deticola_
Title: _CEO_


<u>**LENDER**</u>:

**Despierta, LLC,**
a Delaware limited liability company


By:_____
Name:_____
Title:_____


[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**EXHIBIT 9**



U240061296020



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U240061296020 |
| Date Filed: 7/30/2024 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | BROOKS FERRETT |
| Organization Name | Incorporating Services Ltd. |
| Phone Number | (202) 386-7575 |
| Email Address | bferrett@incserv.com |
| Address | 3500 SOUTH DUPONT HIGHWAY DOVER, DE 19901 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| Caduceus Physicians Medical Group, a California professional corporation | 18200 YORBA LINDA BLVD, SUITE 111 YORBA LINDA,, CA 92886 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| Despierta, LLC, a Delaware limited liability company | 244 Biscayne Boulevard N 4903 Miami, FL 33132 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
Collateral = All of Debtor's right, title and interest in and to the following
property and rights, wherever located, and whether now owned or
hereafter acquired or arising: accounts (including health-care-insurance receivables), inventory, equipment, general
intangibles (including payment intangibles, software, patents, patent applications, trademarks, trademark applications, trade
names, copyrights, copyright applications, service marks, customer lists, goodwill, and all licenses, permits, agreements of
any kind or nature pursuant to which Debtor possesses, uses or has the authority to possess or use property of others),
records, accessions and commingled goods, investment property and commodity accounts, letters of credit, letter-of-credit
rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible
chattel paper), money or other assets of Debtor that now or hereafter come into the possession, custody, or control of
Secured Party or any agent or bailee thereof, and deposit accounts, fixtures, and supporting obligations with respect to any
of the Collateral.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Held in a Trust

Select an alternate Financing Statement type:
A Debtor is a Transmitting Utility

Select an additional alternate Financing Statement type:
Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Not Applicable

Optional Filer Reference Information:

Miscellaneous Information:

Search to Reflect:

☐ Order a Search to Reflect

EXHIBIT 9, PAGE 93

**EXHIBIT 10**

 

U210017365931



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File #: U210017365931

Date Filed: 1/21/2021

B0362-7090 01/21/2021 1:37 PM Received by California Secretary of State

Submitter Information:

| | |
|---|---|
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071
GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | 18200 YORBA LINDA BLVD
YORBA LINDA, CA 92886 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| DELL FINANCIAL SERVICES L.L.C. | MAIL STOP-PS2DF-23
ONE DELL WAY
ROUND ROCK, TX 78682 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
Lessor and Lessee have entered into Agreement Number 001-9038299-001 ("Agreement"). This filing covers only the computer equipment, peripherals, and other equipment (collectively "Equipment") wherever located, financed under and described in the Agreement and all of Lessee's rights, title and interest in and to use any software and services (collectively "Software") financed under and described in the Agreement, along with any modifications or supplements to the Agreement which are incorporated or evidenced in writing and all substitutions, additions, accessions and replacements to the Equipment or Software now or hereafter installed in, affixed to, or used in conjunction with the Equipment or Software and the proceeds thereof together with all payments, insurance proceeds, credits or refunds obtained by Lessee from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to such Equipment, Software or the Agreement.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Lessee/Lessor

Optional Filer Reference Information:
78642678

Page 1 of 1

EXHIBIT 10, PAGE 94

**EXHIBIT 11**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Lien Solutions
800-331-3282

**B. E-MAIL CONTACT AT FILER** (optional)

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)
Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071
USA

**DOCUMENT NUMBER:** 92709450002
**FILING NUMBER:** 20-7804086055
**FILING DATE:** 07/09/2020 08:55

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

---

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | | | | |
| **1b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **1c. MAILING ADDRESS** 18300 YORBA LINDA BLVD | **CITY** YORBA LINDA | **STATE** CA | **POSTAL CODE** 92886 | **COUNTRY** USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | |
| **2b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** TIAA COMMERCIAL FINANCE INC. | | | | |
| **3b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **3c. MAILING ADDRESS** 10 WATERVIEW BLVD. | **CITY** PARSIPPANY | **STATE** NJ | **POSTAL CODE** 07054 | **COUNTRY** USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

**See Attachment(s)**

---

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
CA-0-75812591-59416729

**FILING OFFICE COPY**

EXHIBIT 11, PAGE 95

All items of equipment (and other related assets, including the assets described below) leased or otherwise financed and encumbered pursuant to an agreement between Secured Party and Debtor named above, including all proceeds thereof and substitutions and replacements therefor. All items of personal property described in the attached Asset Description.

# Asset Description for UCC Filing

| Quantity | Asset Description | Make | Model | Serial # |
|---|---|---|---|---|
| 1 | 1, SIEMENS DIMENSION EXL 200 | FUJIFILM | FDR D-EVO SUITE (XCR-RDRM-BKYTW-55F) SIEMENS X-RAY | |
| 1 | 1, ATELLICA CM KIT | MCKESSON | BASIC BULK PACKAGER | |

**EXHIBIT 12**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company
800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
Springfield, IL 62703-4261
USA

**DOCUMENT NUMBER:** 85081100002
**FILING NUMBER:** 20-7755731269
**FILING DATE:** 01/07/2020 10:41

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 18200 YORBA LINDA BLVD, #409 | YORBA LINDA | CA | 92886 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| McKesson Corporation, for itself and as collateral agent for each of its affiliates | | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6651 Gate Parkway | Jacksonville | FL | 32256 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All "equipment," as such terms are defined in Title 8 of the Virginia Uniform Commercial Code in effect on the date hereof, sold by McKesson Corporation or its affiliates to Debtor, including but not limited to, insert general description of products here and those items listed on the attached.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
[175416182]

**FILING OFFICE COPY**

EXHIBIT 12, PAGE 98

**EXHIBIT 13**



U210071055719



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File #: U210071055719

Date Filed: 7/30/2021

Submitter Information:
| | |
|---|---|
| Contact Name | CORPORATION SERVICE COMPANY |
| Organization Name | CORPORATION SERVICE COMPANY |
| Phone Number | 18008585294 |
| Email Address | SPRFiling@cscglobal.com |
| Address | 801 ADLAI STEVENSON DR SPRINGFIELD, IL 62703 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION | 18220 YORBA LINDA BLVD STE 409 YORBA LINDA, CA 928864057 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| HOLOGIC CAPITAL A PROGRAM OF DE LAGE LANDEN FINANCIAL SERVICES | 1111 OLD EAGLE SCHOOL ROAD WAYNE, PA 19087 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
ALL EQUIPMENT LEASED OR FINANCED BY SECURED PARTY TO OR FOR DEBTOR PURSUANT TO SECURED PARTY'S CONTRACT NUMBER 500-50293968, TOGETHER WITH ALL ADDITIONS, ATTACHMENTS, ACCESSORIES AND SUBSTITUTIONS TO OR FOR THE SAME, AND ALL PROCEEDS OF THE FOREGOING. LEASE NUMBER 500-50293968

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION

Page 1 of 1

EXHIBIT 13, PAGE 99

# EXHIBIT 14



MATTHEW W. GRIMSHAW, #210424
grimshaw@marshackhays.com
DAVID A. WOOD, #272406
dwood@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt, Irvine, CA 92620
Telephone: 949-333-7777
Facsimile: 949-333-7778

Proposed Attorneys for Debtor,
CADUCEUS PHYSICIANS MEDICAL GROUP,
a Professional Medical Corporation, dba
CADUCEUS MEDICAL GROUP and
CADUDEUA MEDICAL SERVICES LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

In re

CADUCEUS PHYSICIANS MEDICAL
GROUP, a Professional Medical Corporation,
dba CADUCEUS MEDICAL GROUP,

Debtor.

☒    ALL DEBTORS

☐    Caduceus Physicians Medical Group, dba
Caduceus Medical Group, ONLY

☐    Caduceus Medical Services, LLC,  ONLY

Case No. 8:24-bk-11945-TA

Chapter 11

(Jointly Administered with 8:24-bk-11946-TA)

[PROPOSED] ORDER AUTHORIZING
USE OF CASH COLLATERAL TO
CONFIRM THAT ITS SECURED
CREDITOR IS ADEQUATELY
PROTECTED

Hearing:
Date:    August 6, 2024
Time:    11:00 a.m.
Ctrm:    5B
Place:    411 West Fourth Street
            Santa Ana, CA  92701

/ / /

/ / /

1

1    On August 6, 2024, at 11:00 a.m., a hearing ('Hearing") was held before the Honorable

2  Theodor C. Albert, United States Bankruptcy Judge, regarding CADUCEUS PHYSICIANS

3  MEDICAL GROUP, a Professional Medical Corporation, dba CADUCEUS MEDICAL GROUP,

4  ("CPMG") and CADUCEUS MEDICAL SERVICES, LLC ("CMS," and collectively with CPMG,

5  the "Debtors") motion for an order authorizing it to use cash collateral and determining that its

6  secured creditor is adequately protected ("Motion").[1]

7    Having determined that service of the Motion was proper under the circumstances, and after

8  considering the Motion and all papers in support thereof, the presentation of counsel, and for good

9  cause shown, the Court rules as follows:

10    **IT IS HEREBY FOUND** as follows:

11    1.    On August 1, 2024 ("Petition Date"), Debtor filed a voluntary chapter 11 petition.

12    2.    BMO Harris Bank has a first-priority lien against all Debtor's assets ("BMO Lien"),

13  including its accounts receivable ("Receivables") and other personal property, which constitute

14  BMO's cash collateral ("BMO's Cash Collateral").

15    3.    BMO is protected by a significant equity cushion and will receive adequate protection

16  payments on the terms provided in the Budget.

17    4.    Backd has a lien against Debtor's assets ("Backd Lien"), including its Receivables

18  and other personal property, which constitute Backd's cash collateral ("Backd's Cash Collateral").

19    5.    Backd is protected by a significant equity cushion and has agreed that no payments

20  need to be made to it for a period of 16 weeks.

21    6.    LendSpark has a lien against Debtor's assets ("LendSpark Lien"), including its

22  Receivables and other personal property, which constitute LendSpark's cash collateral

23  ("LendSpark's Cash Collateral").

24    7.    LendSpark is protected by a significant equity cushion and has agreed that no

25  payments need to be made to it for a period of 16 weeks.

26

27

28

---

[1] Capitalized terms not defined in this order have the meaning ascribed to them in the Motion.

1

8.      Despierta has a lien against Debtor's assets ("Despierta Lien"), including its Receivables and other personal property, which constitute Despierta's cash collateral ("Despierta's Cash Collateral," and together with BMO's Cash Collateral, Backd's Cash Collateral, and LendSpark's Cash Collateral, the "Cash Collateral").

9.      Despierta's Lien was perfected less than one week before the Petition Date.

10.     Despierta has agreed that no payments need to be made to it until January 2025.

11.     Debtor has the immediate need for the use of the Cash Collateral to continue its business operations and in order to avoid immediate and irreparable harm.

Based on the foregoing, it is

**HEREBY ORDERED** as follows:

1.      Debtors' immediate use of all Cash Collateral pursuant to the Budget attached as Exhibit "1," to the Grobstein Declaration, with a 10% variance, is authorized on an interim basis pending final hearing on notice to creditors;

2.      BMO is adequately protected based on an equity cushion and the payment provided in the Budget.

3.      Backd is adequately protected based on an equity cushion and its agreement to defer all payments for a period of 16 weeks.

4.      LendSpark is adequately protected based on an equity cushion and its agreement to defer all payments for a period of 16 weeks.

5.      Despierta is adequately protected, to the extent required based on when its lien was perfected, by its agreement to defer all payments to January 2025.

/ / /

/ / /

2

6.      A final hearing on the Motion is scheduled for X, 2024, at 10:00 a.m., Debtor will file a notice of continued hearing, and, may, but is not required to, file a supplement to the Motion by _____, 2024. Any objection to Motion (or supplement thereto) shall be filed on or before _____, 2024. Debtor may file a reply brief to any objection by _____, 2024.

# # #

4891-7972-9108, v. 1

3