1  MATTHEW W. GRIMSHAW, #210424
   grimshaw@marshackhays.com
2  DAVID A. WOOD, #272406
   dwood@marshackhays.com
3  MARSHACK HAYS WOOD LLP
   870 Roosevelt, Irvine, CA 92620
4  Telephone: 949-333-7777
   Facsimile: 949-333-7778
5
   Proposed Attorneys for Debtors,
6  CADUCEUS PHYSICIANS MEDICAL GROUP,
   a Professional Medical Corporation, dba
7  CADUCEUS MEDICAL GROUP and
   CADUDEUS MEDICAL SERVICES LLC
8

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>CADUCEUS PHYSICIANS MEDICAL GROUP, a Professional Medical Corporation, dba CADUCEUS MEDICAL GROUP,<br><br>      Debtor.<br><br>☒    ALL DEBTORS<br><br>☐    Caduceus Physicians Medical Group, dba Caduceus Medical Group, ONLY<br><br>☐    Caduceus Medical Services, LLC, ONLY | Case No. 8:24-bk-11945-TA<br><br>Chapter 11<br><br>(Jointly Administered with 8:24-bk-11946-TA)<br><br>DEBTORS' MOTION FOR ORDER APPROVING CASH MANAGEMENT PROCEDURES PURSUANT TO 11 U.S.C. §§ 105, 345, AND 363; MEMORANDUM OF POINTS AND AUTHORITIES; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF DR. GREGG DENICOLA AND HOWARD GROBSTEIN IN SUPPORT<br><br>Hearing:<br>Date:   August 6, 2024<br>Time:   11:00 a.m.<br>Ctrm:   5B<br>Place:   411 West Fourth Street<br>           Santa Ana, CA  92701 |

/ / /

/ / /

/ / /

TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED PARTIES:

Debtors, CADUCEUS PHYSICIANS MEDICAL GROUP, a Professional Medical Corporation, dba CADUCEUS MEDICAL GROUP, ("CPMG") and CADUCEUS MEDICAL SERVICES ("CMS," and collectively with CPGM, the "Debtors") in the above-captioned cases, respectfully submit this motion for an order allowing Debtors to maintain one of their pre-petition bank accounts and for approval of other cash management procedures for a limited period of time pursuant to 11 U.S.C. §§ 105, 345, and 363 ("Motion"), and the declarations of Dr. Gregg DeNicola ("DeNicola Decl.") and Howard Grobstein ("Grobstein Decl.").

In support of the Motion, Debtors respectfully represent as follows:

**1.    Summary of Argument**

Typically, a chapter 11 debtor is required to close its pre-petition bank accounts at the commencement a case and open a "Debtor in Possession" account ("DIP Account"). However, courts routinely waive this requirement when, as here, maintaining one or more of the debtor's existing accounts is critical to the debtor's ability to reorganize.

Here, the Debtors operate a medical practice, with various insurance companies (such as Blue Shield and Blue Cross) and governmental agencies (such as Medicare and Medical) paying for a majority of the services rendered to its patients. The payments that Debtors receives from insurance companies and governmental agencies arrive electronically and are deposited into an account the Debtors maintain at BMO Harris Bank, with an account number ending 7522 ("BMO Account"). The process to change the bank account into which such payments from these providers are deposited can be long and arduous. A delay in the receipt of funds due to an attempt to change bank accounts would be detrimental to Debtors' cash flow and their attempts to reorganize. Thus, Debtors seek to maintain use of the BMO Account so that they can continue receiving payments without interruption. The Debtors will promptly transfer to the DIP Account all payments received in the BMO Account.

For these reasons, and those set forth more fully below, the Motion should be granted.

## 2. Background

### A. CPMG

Incorporated in California and founded in November 1998 by Dr. Gregg DeNicola, CPMG is a multi-specialty medical group with a wrap-around staff model and is among the largest remaining doctor-owned medical practices in the Orange County service area. *See* DeNicola Decl., ¶7. Currently, CPMG provides medical care at offices in Irvine, Laguna Beach, and Yorba Linda. *Id*. Additionally, CPMG operates various urgent care facilities in Orange County under the tradename PDQ Urgent Care and More. *Id.*, at ¶7.

CPMG's current medical staff model count includes 60 licensed providers, consisting of 42 employed primary care and multi-specialty physicians plus 18 contracted providers. *See* DeNicola Decl., ¶8. Additionally, CPMG employs approximately 125 clinical and non-clinical staff involved in day-to-day operations at its various medical offices. *Id*. Among all office locations, CPMG's medical staff provides 125,000 - 130,000 patient visits annually. *Id*.

### B. The Impact of the COVID-19 Pandemic

The COVID pandemic strained CPMG's financial condition as its costs increased while its revenue decreased. DeNicola Decl., ¶9. First, when businesses across the nation closed, CPMG remained open, expanding its hours of operation to meet the critical care needs of the Orange County community. *Id.*, at ¶9. The heavy staffing demands associated with CPMG's expanded hours could only be met by increasing wages. *Id.*, at ¶9. In the aggregate, CPMG's labor costs increased by approximately 20%. *Id.*, at ¶9.

Concurrently, CPMG's revenue declined for various reasons. For example, the number of medical procedures and surgeries performed by CPMG's medical staff decreased significantly. *Id.*, at ¶10. Further, a significant number of CPMG's patients transitioned to telehealth visits for less acute care, with such telehealth visits having lower reimbursement rates than in-person visits. *Id.*, at ¶10. This combination of increased costs and reduced revenue resulted in losses beginning in calendar year 2021 and continuing each year thereafter. *Id.*, at ¶10.

### C. Additional Financial Difficulties

Two other events occurred in late 2022 that negatively impacted CPMG's financial condition. DeNicola Decl., ¶11. First, a short-term cash crunch arose in early November 2022. After spending significant time courting a potential buyer, and with a sale transaction scheduled to close shortly thereafter, the buyer abruptly terminated the transaction. *Id.*, at ¶11. Shortly thereafter, in connection with the renewal of CPMG's contract with the insurance company used by the majority of its patients for payment of CPMG's medical services, the payment terms were altered significantly. *Id.*, at ¶12. As a result, CPMG's revenue decreased by approximately $350,000 per month. *Id.*, at ¶12.

### Mitigation Efforts

Throughout 2022, CPMG was actively taking steps to mitigate future losses. DeNicola Decl., ¶13. The two events in November 2022 described above created a financial tsunami for CPMG. *Id.*, at ¶13. Thus, in 2023, CPMG's loss mitigation efforts intensified. *Id.*, at ¶13. CPMG laid off employees, which reduced its monthly labor costs by $140,000. *Id.*, at ¶13. Through consistent cost-cutting and simultaneous efforts to grow revenue, CPMG reduced its operating losses from $240,000 per month at the beginning of 2023 to $150,000 per month by the end of the year. *Id.*, at ¶13.

CPMG's mitigation efforts in 2023 included seeking outside investments and exploring sale or merger opportunities. DeNicola Decl., ¶14. To that end, in July 2023, CMS was formed to act as a management services company, and was intended to provide all the non-clinical business support required by CPMG. *Id.*, at ¶14. Additionally, a long-term management agreement between CPMG and CMS was signed.[1] *Id.*, at ¶14. With this structure in place, the Debtors' access to investment funding and potential sale transactions increased significantly as the formation of CMS allowed the Debtors access to funding from people and entities not holding a medical license. *Id.*, at ¶14.

---

[1] Although a management agreement between CPMG and CMS is in place, CPMG did not transfer the relevant assets to CMS. DeNicola Decl., ¶15. Additionally, although it was anticipated that CMS would take over for CPMG as the employer of most of CPMG's staff members, such a transition never occurred. *Id.*, at ¶15. In short, even though a new management structure is available because of CMS, it remains dormant. *Id.*, at ¶15. The CMS case was filed as a companion to the CPMG case because joining the two in a single transaction increases the value for Debtor and the anticipated buyer can obtain the desired sale order. *Id.*, at ¶15.

Main Document    Page 5 of 12

Debtors' pursuit of funding or a sale transaction has generated significant interest from parties with active medical practices in Orange County. DeNicola Decl., ¶16. Although a transaction has not yet been finalized, Debtors anticipate entering into such an agreement, which will form the cornerstone of Debtors' anticipated plan. *Id.*, at ¶¶16-18.

### E. Bank Accounts

Prepetition, the Debtors maintained deposit accounts at both BMO Harris Bank and First Pacific Bank. Grobstein Decl., ¶8. The Debtors are in the process of transitioning funds deposited in its prepetition accounts to a new DIP account. *Id.*, ¶8. Nonetheless, it is imperative that the Debtors retain use of the BMO Account. Indeed, most of the Debtors' revenue comes from payments from major insurance companies and governmental agencies that pay for services rendered to Debtors' patients. *Id.*, at ¶10. Those payments are deposited directly into the BMO Account. *Id.*, at ¶11. If the Debtors were to change the account into which such payments are deposited, it could take months. *Id.*, at ¶12. To ensure that Debtors do not lose revenue as a result of such a delay, the Debtors wish to retain use of the BMO Account. *Id.*, ¶13. The Debtors will transfer all payments deposited in the BMO Account into the DIP Account. *Id.*, ¶¶13-16.

### F. Other first day motions

Concurrently with the filing of this motion, Debtor is filing motions to (1) prohibit utility providers from discontinuing services; (2) authorize Debtor's use of cash collateral; and (3) authorize Debtor to pay the pre-petition wages of its employees and independent contractors.

## 3. Requested Relief

The Debtors seek permission to continue using the BMO Account throughout this case to ensure that their receipt of revenue is not interrupted. Grobstein Decl., ¶¶8-9. Post-petition, the funds deposited in the BMO Account will be transferred once per business day to the DIP Account. *Id.*, ¶¶14-15. All payments by the Debtors will be made from the DIP Account. *Id.*, ¶15. Moreover, the monthly statements for the AR Accounts will be included with the Debtors' monthly operating reports. *Id.*, ¶16.

/ / /

MOTION FOR CASH MANAGEMENT PROCEDURES
4887-6608-8371V.1

Case 8:24-bk-11945-SC    Doc 8    Filed 08/02/24    Entered 08/02/24 13:28:24    Desc
Main Document    Page 6 of 12

## 4. Legal Authority

At the commencement of a chapter 11 case, the debtor typically closes existing bank accounts and opens new account. Allowing the Debtors to continue to utilize the BMO Account is consistent with applicable provisions of the Bankruptcy Code. In particular, 11 U.S.C. § 363(c)(1) authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The authority granted by 11 U.S.C. § 363(c)(1) extends to a debtor in possession's continued use of its customary cash management system and, thus, supports the relief requested. See, e.g., *Charter Co. v. Prudential Ins. Co. Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with section 363(c)(1)) (internal quotation omitted).

To the extent that use of the BMO Account is beyond the ordinary course, such use is permitted by 11 U.S.C. §§ 363(b)(1) and 105(a). Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further provides that the Court may "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a).

Where there is a valid business justification for using property outside of the ordinary course of business, the law presumes that, "in making a business decision the directors of a corporation acted on an informed basis, in good faith[,] and in the honest belief that the action was taken in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotation marks omitted) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Indeed, bankruptcy courts routinely permit chapter 11 debtors, who are trustees, to continue using their existing cash management system, generally treating requests for such relief as a relatively simple matter. See *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); see also *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992) (recognizing that an integrated cash system "allows efficient

5
MOTION FOR CASH MANAGEMENT PROCEDURES
4887-6608-8371V.1

utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash.").

Here, the majority of Debtors' revenue comes from either insurance agencies (such as Blue Cross, Blue Shield) or various governmental agencies (such as Medicare or Medical). Grobstein Decl., ¶10. Payments from these entities are deposited directly into the BMO Account. Grobstein Decl., ¶11. If the Debtors are forced to close the BMO Account and redirect the payments, there may be significant delays in receipt of funds. Grobstein Decl., ¶¶12-17. In turn, such a delay would negatively impact Debtors' ability to reorganize. Grobstein Decl., ¶17.

Additionally, as part of an order allowing them to maintain the BMO Account, the Debtors request that the Court waive the requirements of Fed. R. Bankr. Proc. 6004(h).

## 5. Conclusion

The Debtors request that this Court enter an order granting the Motion, authorizing Debtor to maintain its current cash management system.

Dated: August 2, 2024

CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, DBA CADUCEUS MEDICAL GROUP AND CADUCEU MEDICAL SERVICES LLC

By: _____
HOWARD GROBSTEIN
Chief Restructuring Officer

Dated: August 2, 2024

MARSHACK HAYS WOOD LLP

By: /s/ David A. Wood
MATTHEW W. GRIMSHAW
DAVID A. WOOD
PROPOSED ATTORNEYS FOR CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION, DBA CADUCEUS MEDICAL GROUP AND CADUCEUS MEDICAL SERVICES LLC

**Declaration of Gregg DeNicola**

I, GREGG DENICOLA, declare as follows:

1. I am an individual over 18 years of age and competent to make this Declaration.

2. If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3. The facts set forth below are true of my personal knowledge.

4. I am a medical doctor and the co-Chief Executive Officer of CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION dba CADUCEUS MEDICAL GROUP ("CPMG"). I am also a Manager of CADUCEUS MEDICAL SERVICES, LLC ("CMS").

5. I make this Declaration in support of Debtor's Motion for Order Approving Cash Management Procedures Pursuant to 11 U.S.C. §§ 105, 345, and 363.

6. All terms not defined herein are used as they are defined in the Motion.

7. In November 1998, I incorporated CPMG, which operates a multi-specialty medical group with a wrap-around staff model and is among the largest remaining doctor-owned medical practices in the Orange County service area. Currently, CPMG provides medical care at offices in Irvine, Laguna Beach, and Yorba Linda. Additionally, CPMG operates various urgent care facilities in Orange County under the tradename PDQ Urgent Care and More.

8. CPMG's current medical staff model count includes 60 licensed providers, consisting of 42 employed primary care and multi-specialty physicians plus 18 contracted providers. Additionally, CPMG employs approximately 125 clinical and non-clinical staff involved in day-to-day operations at its various medical offices. Among all office locations, CPMG's medical staff provides 125,000 - 130,000 patient visits annually.

9. The COVID-19 pandemic strained CPMG's financial condition as its costs increased while its revenue decreased. When businesses across the nation closed, CPMG remained open, expanding its hours of operation to meet the critical care needs of the Orange County community. The heavy staffing demands associated with CPMG's expanded hours could only be met by increasing wages. In the aggregate, CPMG's labor costs increased by

approximately 20%.

10. Concurrently, CPMG's revenue declined for various reasons. For example, the number of medical procedures and surgeries performed by CPMG's medical staff decreased significantly. Further, a significant number of CPMG's patients transitioned to telehealth visits for less acute care, with such telehealth visits having lower reimbursement rates than in-person visits. This combination of increased costs and reduced revenue resulted in losses beginning in calendar year 2021 and continuing each year thereafter.

11. Two other events occurred in late 2022 that negatively impacted CPMG's financial condition. First, a short-term cash crunch arose in early November 2022. After spending significant time courting a potential buyer, and with a sale transaction scheduled to close shortly thereafter, the buyer abruptly terminated the transaction.

12. Second, in connection with the renewal of CPMG's contract with the insurance company used by the majority of its patients for payment of CPMG's medical services, the payment terms were altered significantly. As a result, CPMG's revenue decreased by approximately $350,000 per month.

13. Throughout 2022, CPMG was actively taking steps to mitigate future losses. The two events in November 2022 described above created a financial tsunami for CPMG. Thus, in 2023, CPMG's loss mitigation efforts intensified. CPMG laid off employees, which reduced its monthly labor costs by $140,000. Through consistent cost-cutting measures and simultaneous efforts to grow revenue, CPMG reduced its operating losses from $240,000 per month at the beginning of 2023 to $150,000 per month by the end of the year.

14. CPMG's mitigation efforts in 2023 included seeking outside investments and exploring sale or merger opportunities. To that end, in July 2023, Caduceus Medical Services, LLC ("CMS") was formed to act as a management services company, and was intended to provide all the non-clinical business support required by CPMG. Additionally, a long-term management agreement between CPMG and CMS was signed. With this structure in place, CPMG's access to investment funding and potential sale transactions increased significantly as the formation of CMS allowed CPMG access to funding from people and entities not holding a

medical license.

15. Although a management agreement between CPMG and CMS is in place, CPMG did not transfer the relevant assets to CMS. Additionally, although it was anticipated that CMS would take over for CPMG as the employer of most of CPMG's staff members, such a transition never occurred. In short, even though a new management structure is available because of CMS, it remains dormant. The CMS case was filed as a companion to the CPMG case because joining the two in a single transaction increases the value for Debtor and the anticipated buyer can obtain the desired sale order.

16. CPMG's pursuit of funding or a sale transaction has generated significant interest from parties with active medical practices in Orange County. Although a transaction has not yet been finalized, Debtors anticipate entering into such an agreement, which will form the cornerstone of Debtors' anticipated plan.

17. To ensure that Debtors are prepared for a sale transaction, these chapter 11 cases were filed. Such a transaction is necessary to ensure that Debtors' creditors are paid.

18. In turn, such a delay would negatively impact Debtor's ability to reorganize.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 2, 2024.

[Signature to Follow]

GREGG DENICOLA

# Declaration of Howard Grobstein

I, HOWARD GROBSTEIN, declare as follows:

1. I am an individual over 18 years of age and competent to make this Declaration.

2. If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3. The facts set forth below are true of my personal knowledge.

4. I am a co-founder and partner of Grobstein Teeple LLP ("GT").

5. I am the Chief Restructuring Officer ("CRO") of CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICATION CORPORATION, DBA CADUCEUS MEDICAL GROUP ("CPMG") and CADUCEUS MEDICAL SERVICES LLC ("CMS," and collectively with CPMG, the "Debtors") in the above-captioned case.

6. I make this Declaration in support of Debtors' Motion for Order Approving Cash Management Procedures Pursuant to 11 U.S.C. §§ 105, 345, and 363 ("Motion").

7. All terms not defined herein are used as they are defined in the Motion.

8. Pre-petition, the Debtors maintained bank accounts at BMO Harris Bank and First Pacific Bank. The Debtors are in the process of transitioning funds deposited in its prepetition accounts to a new DIP account.

9. The Debtors operate a medical practice, providing medical services and care to their patients. In general, Debtors' patients do not pay directly for the services provided to them. Instead, Debtors' patients utilize benefits provided under health insurance policies as well as government assistance to pay for a majority of their care.

10. Most of the revenue collected by the Debtors comes from large insurance companies, such as Blue Shield and Blue Cross, and governmental agencies that provide healthcare benefits, such as Medicare and MediCal.

11. The payments that Debtors receives from insurance companies and governmental agencies arrive electronically and are deposited into an account the Debtors maintain at BMO Harris Bank, with an account number ending 7522 ("BMO Account").

///

12. The process to change the bank account into which payments from insurance companies and governmental agencies are deposited can be long and arduous. I have attempted to change such an account before. The process took months to complete.

13. The Debtor seeks to continue using the BMO Account to ensure that there is no delay in collecting their receivables as they go through the Chapter 11 process.

14. If the Debtors are permitted to maintain the BMO Account, then I will ensure that, at least once per day, the funds deposited there are transferred to the Debtors' DIP Account.

15. If the Debtors are permitted to maintain the BMO Account, then I will ensure that all payments made by the Debtors during these Chapter 11 proceedings are made out of the DIP Account.

16. If the Debtors are permitted to maintain the BMO Account, then I will also ensure that the monthly statements for the BMO Account are included with Debtors' monthly operating reports.

17. If the Debtors are forced to close the BMO Account and redirect the payments, there may be significant delays in receipt of funds. In turn, such a delay would negatively impact Debtors' ability to reorganize.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 2, 2024.

_____
HOWARD GROBSTEIN