MATTHEW W. GRIMSHAW, #210424
grimshaw@marshackhays.com
DAVID A. WOOD, #272406
dwood@marshackhays.com
AARON E. DE LEEST, #216832
adeleest@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt, Irvine, CA 92620
Telephone: 949-333-7777
Facsimile: 949-333-7778

Attorneys for Debtor,
CADUCEUS PHYSICIANS MEDICAL GROUP,
a Professional Medical Corporation, dba
CADUCEUS MEDICAL GROUP and
CADUCEUS MEDCAL SERVICES, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>CADUCEUS PHYSICIANS MEDICAL GROUP, a Professional Medical Corporation, dba CADUCEUS MEDICAL GROUP,<br><br>Debtor.<br><br>☒    ALL DEBTORS<br><br>☐    Caduceus Physicians Medical Group, dba Caduceus Medical Group, ONLY<br><br>☐    Caduceus Medical Services, LLC, ONLY | Case No. 8:24-bk-11945-TA<br><br>Chapter 11<br><br>(Jointly Administered with 8:24-bk-11946-TA)<br><br>DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ORDER: AUTHORIZING SALE OF CERTAIN TANGIBLE AND INTANGIBLE ASSETS ("PURCHASED ASSETS"), USED IN CONNECTION WITH DEBTORS' MEDICAL PRACTICES; (A) OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; (C) SUBJECT TO OVERBID; (D) FOR DETERMINATION OF GOOD FAITH PURCHASER UNDER 11 U.S.C. §363(M); (E) FOR WAIVER OF 14-DAY STAY; AND (F) AMENDING BID PROCEDURES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF HOWARD B. GROBSTEIN IN SUPPORT<br><br>Hearing:<br>Date:    March 18, 2025<br>Time:    11:00 a.m.<br>Ctrm:    5B<br>Place:    411 West Fourth Street<br>            Santa Ana, CA 92701 |

1

TO THE HONORABLE THEODOR C. ALBERT UNITED STATES BANKRUPTCY COURT

JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED

PARTIES:

      Debtors and Debtors-in-Possession, Caduceus Physicians Medical Group, a Professional

Medical Corporation, dba Caduceus Medical Group ("CPMG") and Caduceus Medical Services,

LLC ("CMS," and collectively with CPMG, the "Debtors") respectfully submit this omnibus reply to

(1) BMO ("BMO") Bank National Association's Limited Opposition filed as Dk. No. 272 ("BMO

Limited Opposition"), (2) the opposition filed by Despierta LLC ("Despierta") as Dk. No. 273

("Despierta Opposition"), (3) the opposition filed by Romanov Group LLC as Dk. No. 275

(Romanov Opposition"), and (4) Bates Johnson Building Ltd.'s limited opposition filed as Dk. No.

265 ("BJB Opposition") regarding Debtors' Motion for Order: Authorizing Sale of Certain Tangible

and Intangible Assets Used in Connection With Debtors' Medical Practices; (A) Outside the

Ordinary Course of Business; (B) Free and Clear of Liens, Claims, and Encumbrances; (C) Subject

to Overbid; (D) For Determination of Good Faith Purchaser Under 11 U.S.C. §363(M); (E) For

Waiver of 14-Day Stay; and (F) Amending Bid Procedures; Memorandum Of Points And

Authorities ("Motion").  In support of this reply, Debtors respectfully represents as follows:

## 1.    Summary of Argument and Additional Background[1]

      As set forth in the Motion, Debtors have been actively marketing the Business for sale as an

ongoing concern and are now close to finalizing such a transaction. When Debtors filed the Bid

Procedures Motion and the Bid Order was entered, Debtors did not yet have a Stalking Horse

Bidder.  Thereafter, as set forth in the Motion, Debtors selected Regal as the Stalking Horse Bidder

and Regal's asset purchase agreement is attached to the Motion as Exhibit "4" ("Regal APA").  The

Bid Procedure Motion and Bid Order provided for other Interested Parties to submit a Bid.  One such

Interested Party, VYTL Ventures, LLC ("VYTL") has now done so. A copy of VYTL's asset

purchase agreement ("VYTL APA") is attached as Exhibit "1" to the supplemental Declaration of

Howard B. Grobstein ("Supp. Grobstein Decl.") appended hereto.

---

[1] All terms not defined herein are used as they are defined in the Motion.

1    The basic terms of the VYTL APA are substantially similar to the terms of the Regal APA.

2 The main differences are (1) the assets acquired and (2) the anticipated operations going forward.

3 First, with one notable exception, the assets acquired are the same. Under the Regal APA, Regal is

4 acquiring the Debtors' receivables and excluding the anticipated employee retention tax credit

5 ("ERTC"). Under the VYTL APA, VYTL acquires the ERTC and excludes the Debtors' receivables.

6 Second, whereas Regal anticipates pairing down the Debtors' operations, VYTL does not. As such,

7 VYTL anticipates assuming the Debtors' various real property leases and continuing all operations

8 such that more of the Debtors' doctors, nurses, and staff retain jobs and more of the Debtors'

9 patients will not be moved to other providers.  In an abundance of candor, there are some issues that

10 need to be resolved with the VYTL offer, in light of information that was provided after the

11 submission of the VYTL APA. The Debtors understand that VYTL are in the process of

12 restructuring their bid package, and the Debtors are in active negotiations with VYTL and it's

13 principal regarding alternative structures. Additionally, the Debtors have received a third proposed

14 asset purchase agreement from MyWalletRX ("MyWalletRX APA"), that provides consideration in

15 a form that the Debtors do not believe is sufficient in light of the Regal and VYTL APA. Similar to

16 VYTL, the Debtors are in ongoing negotiations regarding the MyWalletRX APA to determine if the

17 proposed terms can be negotiated to increase the consideration provided therein.

18    As a result, Debtors expect that there may very well be an auction at the hearing on the

19 Motion. The Debtors will update the Court at the hearing on March 18, 2025, as to the status of

20 ongoing discussions.

21    With respect to the objections, none should deter the Court's approval of the Motion.  The

22 decision to sell the Purchased Assets to the highest bidder is in the sound business judgment of

23 Debtors' CRO and should be approved.  To the extent that the ultimate sales price at the auction for

24 the Purchased Assets does not exceed the lien held by BMO, all the junior liens (including the lien of

25 Despierta) would be foreclosed and eliminated  They are also unsecured under 11 U.S.C. § 506(a)

26 and not entitled to payment as secured creditors.  Thus, it is appropriate for the sale of the Purchased

27 Assets to be free and clear of such junior liens pursuant to applicable statutory authority and case

28 law, without any of their liens attaching to the sale proceeds. Accordingly, Debtors request that the

Court grant the Motion, overrule the objections as discussed further herein, conduct an auction at the hearing on the Motion, and approve the sale of the Purchased Assets to the highest bidder free and clear of any and all liens, claims, and encumbrances.

## 2.    Reply to the BMO Limited Opposition[2]

BMO is Debtors' senior secured lender.  BMO will be paid in full based on the opening bid amount of $1,500,000, as reflected in the Motion and Regal APA, and an overbid of $1,650,000, as reflected in the YVTL APA. *See* Motion, pg. 32, and Exhibit "1" hereto.  The payoff amount submitted by BMO in connection with the BMO Limited Opposition confirms BMO is owed $1,198,204.85 through March 31, 2025, plus attorney fees of $53,196.35, for a total of $1,251,401.20.  BMO Limited Opposition, Kandace Brown Decl. ¶ 3 and Christopher Crowell Decl. ¶ 3.  As such, Debtors are at a loss to understand the BMO Limited Opposition or the purpose thereof.  Again, the Motion provides that BMO will be paid in full and the BMO Limited Opposition confirms it.

With respect to the "issues" identified by BMO in relation to the Motion and proposed sale, Debtors responds as follows:

a.    Assets to be sold - the Motion and Bidding Procedures provide the utmost flexibility with respect to the sale of the Purchased Assets and allow for the purchase of any combination thereof.  Motion, pg. 7 and 12.  Here, the Proposed Stalking Horse APA <u>excludes</u> accounts receivable.  Motion, Exhibit 4 pg. 124 and 133.   However, the proposed sale to Regal as reflected in the Regal APA <u>includes</u> accounts receivable, except with respect to any employee retention credit which are excluded.  Motion, Exhibit 5 pg. 139 and 161.

Moreover, BMO, Despierta, and the other objecting parties fail to understand that the Bid Procedure Motion, which, was approved by the various Bid Procedure Order(s), provided that

(1) . . . authorizes the Debtor to enter into the Stalking Horse APA ***on terms to be finalized between the parties*** thereto substantially in the form and substance. . . Bid Procedure

---

[2] To the extent the Despierta Opposition and Romanov Opposition raise similar objections with respect to perceived inconsistencies in the sale terms in the Motion vs. Regal APA, Debtors response is the same as set forth herein.

1  Motion, pg. 7:12-14;

2  (2) The Debtors expressly reserve the right in its business judgment and consideration of

3  overbids. *Id.*, pg. 25:11-19;

4  As there was no stalking horse bidder at the time of the Bid Procedure Motion, it was drafted

5  in a way to allow the Debtors to consider all potential options for sale, for this very reason, various

6  bidders may or may not want different aspects of the Debtors. The Auction will determine the

7  market value for each asset to be sold.

8  b.      Cure costs - the Motion and Proposed Stalking Horse APA provide for Buyer's

9  payment of all cure costs.  Motion, pg. 12, Motion, Exhibit 4 pg. 125.  The Regal APA caps the cure

10  costs at $150,000.  Motion, Exhibit 5 Pg. 140.  Accordingly, any cure costs that exceed the $150,000

11  cap in the Regal APA would need to come from estate funds.  However, because the Regal APA

12  does not include the assumption of the Yorba Linda Leases, Debtors do not expect the cap to be

13  exceeded.  The sale process was designed to be flexible to the interests of proposed purchasers and

14  the Regal APA reflects that.

15  c.      Breakup fee – The $150,000 proposed expense reimbursement and breakup fee

16  provided in the Regal APA are in Debtors' CRO's business judgment reasonable under the

17  circumstances and provided a benefit to the estate.  Supp. Grobstein Decl. ¶¶11-12.  Here, the

18  expense reimbursement and breakup fee are appropriate because Regal,, brought value to the sale

19  process by setting the floor for the auction and committing to the $1,500,000 minimum purchase

20  price for the Purchased Assets.  Further, by conducting its due diligence and negotiating the Regal

21  APA with Debtors, Regal has set the stage for the auction and facilitated Debtors' sale of the

22  Purchased Assets.   Accordingly, under either standard articulated by BMO (the business judgment

23  standard or necessary and benefit to the estate standard), the proposed breakup fee should be

24  approved.  *See AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, LLC* (*In re Tama Beef*

25  *Packing, Inc.)*, 290 B.R. 90, 96-98 (B.A.P. 9th Cir. 2003) (analyzing standards for approval of

26  breakup fee and discussing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

27  *Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)). Furthermore, there is no evidence that the breakup fee

28  chilled bidding and, in fact, Debtors have received an overbid as reflected in the VYTL APA. Again,

1    as disclosed above, the Debtors are in active negotiations with the principal of VYTL to address

2    certain issues with the submitted VYTL APA.

3        d.    Delivery of purchase price – Although the Motion references that the sale proceeds

4    and/or purchase price and any deposit will be delivered to escrow, Debtors do not contemplate a true

5    escrow for this transaction.  Rather the CRO will place any deposits and any sale proceeds into a

6    segregated U.S. Trustee approved debtor-in-possession account.  The sale is free and clear of all

7    liens, claims, and interests and BMO's lien will attach to the sale proceeds with the same validity,

8    priority, and extent that it would have attached to the Purchased Assets.

9    **3.    Reply to the Despierta Opposition**

10       Despierta is a junior out-of-the-money secured creditor.[3] Motion, pg. 34. Despierta takes

11   issue with Debtors' sale of the Purchased Assets because the proposed sale price of $1,500,000, will

12   not be sufficient to pay its secured claim after payment of other senior liens.  Despierta asserts that

13   the Trustee cannot sell free and clear of its interest under 11 U.S.C. § 363(f)(1) and *Pinnacle Rest. at*

14   *Big Sky, LLC v. CH SP Acquisitions (In re Spanish Peaks Holdings II, LLC)*, 872 F.3d 892, 900 (9th

15   Cir. 2017).  Despierta Opposition, pg. 6-7.  Despierta is mistaken because § 363(f)(1) permits a sale

16   free and clear of an interest where "applicable nonbankruptcy law permits sale of such property free

17   and clear of such interest." *See Spanish Peaks*, 872 F.3d at 900. Furthermore, § 363(f)(5) also

18   permits a sale free and clear of an interest where "such entity could be compelled, in a legal or

19   equitable proceeding, to accept a money satisfaction of such interest."  *See In re Urban Commons 2*

20   *W. LLC*, 2025 Bankr. LEXIS 507, *3 (Bankr. S.D.N.Y. 2025) (describing the settled authority about

21   the availability of foreclosure or other enforcement mechanisms under state law satisfying §

22   363(f)(5)).

23       In its opposition, Despierta' relies on the decision of *Dishi & Son v. Bay Condos, LLC*, 510

24   B.R. 696 (S.D.N.Y. 2014) for its argument that *Spanish Peaks* does not apply to sell free and clear of

25   its junior lien.  However, Despierta misses the recent authority criticizing *Dishi*.  In *Urban*

26   *Commons*, not cited by Despierta, the bankruptcy court specifically determined that that the district

27

28

---

[3] Notably, Despierta holds a fourth-priority lien against the Debtors' assets.

1  court's interpretation of §363(f) in *Dishi* was unduly narrow.  *In re Urban Commons 2*, 2025 Bankr.

2  LEXIS 507, *3.  The bankruptcy court in *Urban Commons* goes on to state that "in the ten years

3  since *Dishi* was decided, **no court or commentator has discussed its restrictive interpretation of**

4  **section 363(f)(5)**." (emphasis added) *Id*. The bankruptcy court then went on to hold that

> the Court reads section 363(f)(5) to encompass not any conceivable
> hypothetical proceeding that might compel interest [*13] holders to
> accept a money satisfaction, but only proceedings that might realistically
> be brought in the case before the court if the automatic stay were lifted or
> did not apply. In most cases, this would include either foreclosure
> proceedings or UCC sales.

9  *Id*. *12.  Debtors are seeking the same relief as was permitted by the debtors in *Urban Commons*, to

10  sell free and clear of the out-of-the-money junior liens, and such relief is appropriate under §

11  363(f)(1) and (f)(5).  Moreover, Despierta fails to cite any Ninth Circuit jurisprudence that followed

12  *Dishi*'s analysis.

13         In addition, under 11 U.S.C. § 506(a)(1), a claim is only secured up to the value of the

14  creditor's interest in the property and the remainder of the claim is unsecured. In this case, the value

15  of the Purchased Assets is $1,500,000, subject to the results of the auction. The amount of BMO's

16  first-in-priority lien is close to or exceeds this value. As such, Despierta (and likely all of the other

17  junior liens) is fully unsecured. *Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc. (In re*

18  *Palmdale Hills Prop., LLC)*, 654 F.3d 868, 873 (9th Cir. 2011).[4] While § 506(a)(1) provides a

19  definition of an allowed secured claim, it does not provide a methodology for determining the value

20  of the claim. *Curtis v. LaSalle Nat'l Bank (In re Curtis)*, 322 B.R. 470, 480 (Bankr. D. Mass. 2005).

21  That methodology is provided for under section 506(d), which states that, "[t]o the extent that a lien

22  secures a claim against the debtor that is not an allowed secured claim, such lien is void." See 11

23  U.S.C. § 506(d).  Thus, in addition to the arguments under § 363(f), Despierta's lien should be

24  avoided under § 506(a)(1) and (d).

25         Despierta also opposes the sale on the grounds that the value of the Debtors' assets is unclear

26

27  _____

28  [4] Depending on the ultimate sale price at the auction, it is possible that the second priority lien held
by Austin Business Finance LLC dba Backd is partially "in the money." No other creditors are likely
to enjoy that status.

1   or undetermined.  Despierta Opposition, pg. 7.  Despierta does not articulate what it means by

2   "unclear" or cite any authority for its proposition that Debtors' proposed sale should be delayed.

3   How could it. Debtors' proposed sale itself will determine the value of the Purchased Assets.  As the

4   Court is well aware, when the sale of property is effectuated by an auction with an appropriate

5   number of bidders, "[t]he price achieved by [the] auction is ordinarily assumed to approximate

6   market value." *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*, 325 B.R. 282, 289 (B.A.P.

7   9th Cir. 2005). Moreover, a public auction subject to overbid is an acceptable and common method

8   of determining the market value of assets. *In re Conrad*, 2012 Bankr. LEXIS 2325, at *8 (Bankr.

9   S.D. Cal. 2012) (*citing In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 149 (3d Cir. 1986)).  Here,

10  Debtors are proposing just such an auction.  Motion, pg. 2.

11          Furthermore, evidence of marketing efforts to sell property, including exposing the property

12  to the market and subjecting the proposed sale to overbid procedures, is also a valid method of

13  determining the value of property. *See e.g., Zuercher Tr. of 1999 v. Schoenmann (In re Zuercher Tr.*

14  *of 1999)*, 2016 Bankr. LEXIS 542, at *10-11 (B.A.P. 9th Cir. 2016) (affirming sale of real property

15  and rejecting argument that sale price was too low because of marketing efforts and overbid

16  procedures); *see also Lind v. Spacone (In re Lind)*, 2019 Bankr. LEXIS 2052, at *9-10 (B.A.P. 9th

17  Cir. 2019) (affirming sale of property under 11 U.S.C. § 363(m), even though purchase price was $1

18  million below fair market value because of evidence of reasonable attempts to market property and

19  attract overbidders). Accordingly, the proposed sale at the hearing on the Motion, which is

20  anticipated to be an auction (Motion, pg. 2), coupled with the evidence in the Motion of Debtors'

21  extensive marketing efforts (Grobstein Decl. ¶ 52), are sufficient to establish the value of the

22  Purchased Assets.  There is no reason for anything further.

23          Finally, with respect to Despierta's assertion that it has not received adequate protection

24  payments for February and March 2025, Debtors will tender such payments for those months.

25  However, after the sale Despierta is no longer entitled to any such adequate protection payments as it

26  is an out-of-the-money creditor and it is unsecured.

27

28

**4.      Reply to the Romanov Opposition**

Romanov is Debtors' landlord for its Yorba Linda facility located at 18200 Yorba Linda Blve, Suite 125, consisting of approximately 43,834 square feet. Supp. Grobstein Decl. 14.  Debtors and Romanov are parties to that certain office lease dated October 3, 2019 ("Lease").  Romanov's primary opposition to the sale is that Debtors "have not payed rent post-petition." Romanov Opposition, pg. 5, Romanov Opposition, Setti Decl. ¶ 5.  However, Romanov's assertion is simply false.[5] The Romanov Opposition appears to neglect to inform this Court, that Romanov and Debtors are parties to a deferral agreement dated August 1, 2024.  A copy of the deferral agreement is attached as Exhibit "2" to the Supp. Grobstein Decl.

Pursuant to the deferral agreement the Debtors timely made $206,000 in deferred rent payments and $388,617.70 in other Lease payments, for a total of $594,617.70 in postpetition Lease payments to Romanov's property manager Vierergruppe.  A payment summary is attached as Exhibit "3" to the Supp. Grobstein Decl.  These payments, totaling $594,617.70 in payments made post-petition, is a far cry from the $0.00 that Romanov asserts Debtors paid postpetition.  Romanov's assertion that the Motion should be denied because it has not received any payment is false and not a basis for denial of the Motion.

Romanov also argues that the Motion should be denied because Debtors have not met the requirements for assumption and assignment under § 365(f)(2) and demands evidence of any buyer's willingness to assume the Lease in full and financial ability to perform its obligations in the future.[6] Here, Regal is not interested in assuming the Lease. Accordingly, if a sale to Regal occurs, no analysis of § 365 analysis is necessary.

---

[5] Prior to filing this Reply, counsel for the Debtors contacted counsel for Romanov, and informed him of the August 1, 2024, deferral agreement, and provided the same to him. Counsel for the Debtors have enjoyed working with counsel for Romanov, and do not believe he nor his firm had any knowledge of the August 1, 2024, deferral agreement. Counsel has been a pleasure to work with, and no disparagement should be sent his way. However, the Debtors have serious doubts about the veracity of any statements and/or communications coming directly from Romanov.

[6] Romanov's assertion that the time to assume or reject the Lease has passed is the subject of Debtors' motion to extend the deadline (Dk. No. 253), which is not before the Court and will be set for hearing by Debtors.  Accordingly, Debtors are not addressing that issue in this reply.

However, overbidder VYTL wants to keep the Lease and continue operating out of the leased premises. Supp. Grobstein Decl., Exhibit 1, VYTL APA, pgs. 18-19. VYTL has provided Debtors with its balance sheet demonstrating its financial ability to pay any valid cure costs and continue to perform its obligations under the Lease. Accordingly, Debtors believe that if a sale to VYTL occurs, it has satisfied the requirements for assumption and assignment of the Lease under § 365(b)(3).

Moreover, most, if not all, of any cure cost associated with the assumption of the Lease is subject to a rent deferral agreement the provides for payment of post-petition rent arrearage over a three year period. *See* Grobstein Decl., Ex. 2, pgs. 30-36. Again, Romanov simply failed to provide this Court the correct and actual factual circumstances of their claim. As such, the cure cost, if any, is likely to be minimal.

**5.    Reply to BJB Opposition**

Bates Johnson Building Ltd. is another of Debtors' landlords. The BJB Opposition is not a true opposition, and rather a reservation of rights. Debtors concede that any purchaser wishing to assume the lease between the Debtors and BJB will have to pay the associated cure costs. To the extent necessary, the Debtors will work with buyers and BJB regarding assumption of the subject lease.

**6.    Conclusion**

Based on the foregoing, the Debtors respectfully requests that this Court enter an order granting the Motion, permitting the auction of the Purchased Assets to the highest bidder, and authorizing the sale of the Purchased Assets as is and where-is, free and clear of liens, claims and encumbrances.


Dated:  March 14, 2025                    MARSHACK HAYS WOOD LLP

                                          /s/ David A. Wood
                                    By: _____
                                          MATTHEW W. GRIMSHAW
                                          DAVID A. WOOD
                                          AARON E. DE LEEST
                                          ATTORNEYS FOR CADUCEUS PHYSICIANS
                                          MEDICAL GROUP, A PROFESSIONAL
                                          MEDICAL CORPORATION, DBA
                                          CADUCEUS MEDICAL GROUP AND
                                          CADUCEUS MEDICAL SERVICES LLC

4907-2700-6496, v. 1

### Supplemental Declaration of Howard B. Grobstein

I, HOWARD B. GROBSTEIN, say and declare as follows:

1.    I am an individual over 18 years of age and competent to make this Declaration.

2.    If called upon to testify as to the matters set forth herein, I could and would competently testify thereto.

3.    The facts set forth below are true of my personal knowledge.

4.    I am the Chief Restructuring Officer ("CRO") of Caduceus Physicians Medical Group, a Professional Medical Corporation dba Caduceus Medical Group ("CPMG") and Caduceus Medical Services, LLC ("CMS") (collectively, "Debtors").

5.    I make this Supplemental Declaration in support of Debtors' Debtors' Motion for order authorizing the sale of certain tangible and intangible assets, used in connection with Debtors' medical practices operated at the Debtors' clinic located at 18200 Yorba Linda Boulevard, Suite 111, Yorba Linda, California 92886 (the "Clinic," and the medical practices operated at the Clinic referred to herein as the "Business") and to enter into certain other agreements in connection therewith (the "Transaction"), subject to overbid: (a) outside the ordinary course of business, (b) free and clear of all liens, claims, and interests, (c) for determination of good faith purchaser under 11 U.S.C. § 363(m), and (d) waiver of the 14-day stay period set forth in Bankruptcy Rule 6004(h) ("Motion"). All terms not defined herein are used as they are defined in the Motion.

6.    Debtors have been actively marketing the Business for sale as an ongoing concern and are now close to finalizing such a transaction.

7.    At the time Debtors filed the Bid Procedures Motion and the Bid Order was entered Debtors did not yet have a Stalking Horse Bidder.

8.    Thereafter, Debtors selected Regal as the Stalking Horse Bidder and Regal's asset purchase agreement is attached to the Motion as Exhibit "4" ("Regal APA").

9.    The Bid Procedure Motion and Bid Order provided for other Interested Parties to submit a Bid.  One such Interested Party, VYTL Ventures, LLC ("YVTL") has now done so. A true and correct copy of YVTL's asset purchase agreement ("YVTL APA") is attached as Exhibit "1" hereto.

10.     Debtors now expect an auction at the hearing on the Motion.

11.     I believe in my business judgment that the proposed $100,000 breakup fee and $50,000 proposed expense reimbursement in the Regal APA are reasonable under the circumstances and that having Regal as the provided a benefit to the estate.

12.     The expense reimbursement and breakup fee are appropriate because Regal, as the designated Stalking Horse Bidder, brought value to the sale process by setting the floor for the auction and committing to the $1,500,000 minimum purchase price for the Purchased Assets.

13.     There is no evidence that the breakup fee chilled bidding and, in fact, Debtors have received an overbid as reflected in the YVTL APA.

14.     Romanov Group, LLP ("Romanov") is Debtors' landlord for its Yorba Linda facility located at 18200 Yorba Linda Blvd, Suite 125, consisting of approximately 43,834 square feet.

15.     Debtors and Romanov are parties to that certain office lease dated October 3, 2019 ("Lease").

16.     On or about August 1, 2024, Debtors entered into that certain deferral agreement dated August 1, 2024. I signed the deferral agreement as Debtors CRO. A true and correct copy of the deferral agreement is attached as Exhibit "2" hereto.

17.     Pursuant to the deferral agreement Debtors timely made $206,000 in deferred rent payments and $388,617.70 in other Lease payments, for a total of $594,617.70 in postpetition Lease payments to Romanov's property manager Vierergruppe. A true and correct copy of the payment summary reflecting the Lease Payments is attached as Exhibit "3" hereto.

18.     I am informed and believe that YVTL is seeking to keep the Lease and wants to continue operating out of the leased premises as part of the YVTL APA. Supp. Grobstein Decl., Exhibit 1,

19.     YVTL has provided Debtors with its balance sheet demonstrating its financial ability to pay any valid cure costs and continue to perform its obligations under the Lease.

20.     Accordingly, Debtors believe that if a sale to YVTL occurs, it has satisfied the requirements for assumption and assignment of the Lease under § 365(b)(3).

21.    In my business judgment, I believe there is a strong justification for the sale of the Purchased Assets at auction as requested in the Motion.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 14, 2025.

[*Signature to Be Provided
Prior to Hearing*]

_____
HOWARD B. GROBSTEIN

**EXHIBIT 1**

VYTL Ventures
Victor Oviedo, Managing Partner
848 Brickell Key Drive
Unit 2205
Miami, FL 33131
Attention: Victor Oviedo
Email: victor@stagelightgroup.com
March 10, 2025


Caduceus Medical Group
18200 Yorba Linda Blvd, Suite 250
Yorba Linda, CA


Dear Honorable Judge Theordore C. Albert, The United States Bankruptcy Court Judge, The Office of United States Trustee, and all interested parties,

I am pleased to formally submit my interest as a single investor through VYTL Ventures, an LLC, in acquiring the assets of Caduceus Medical Group, A Professional Medical Corporation (CPMG) and Caduceus Medical Services, LLC (CMS, LLC).  in acquiring the assets of Caduceus Medical Group. As an experienced investor and entrepreneur with a proven track record of building, growing, and scaling businesses, I recognize the significant value that Caduceus Medical Group has established in delivering high-quality patient care. My objective is to ensure the continued growth and success of the organization while strengthening its position in the healthcare industry through strategic investment and innovation.

I first assessed Caduceus Medical Group five years ago when I was considering building a line of urgent care centers. Even then, I recognized the strength of its patient-centered approach and commitment to high-quality care. Today, I remain deeply impressed by Caduceus' ability to serve its 40,000 patients in Orange County, and I am committed to ensuring that this legacy continues. My vision is to build upon Caduceus' reputation as a trusted Orange County institution and grow it into a model for modern healthcare delivery.

With over 25 years of experience in investment, real estate, and brand development, I have successfully built and led multiple businesses, from a $14 billion hedge fund to an award-winning, decade-long conference, and a successful real estate development firm. My ability to anticipate market trends, assemble and manage first-in-class teams, and build profitable ventures during turbulent times aligns with Caduceus Medical Group's need for sustained growth and expansion.

As the founder of Stagelight Group LLC and the current CEO & Director of InvestView, Inc., I have cultivated a diverse investment portfolio and have been directly involved in scaling businesses across various industries. My previous role as a Partner at SkyBridge Capital and Global Head of Business Development & Strategy allowed me to drive expansion, spearhead new business development, and craft successful brand strategies. My background in strategic consulting at Oliver Wyman and investment banking at Donaldson, Lufkin & Jenrette further enhances my ability to guide Caduceus Medical Group toward a future of excellence and innovation.

A key component of this transition will be my collaboration with Dr. Nathaniel DeNicola, the current Chief Medical Officer of Caduceus Medical Group. Dr. DeNicola and I have known each other for nearly a decade through our shared connection at The Wharton School of the University of Pennsylvania. His experience as Chief Medical Officer at Caduceus, as well as his leadership as the Chair of Telehealth for the American College of Obstetricians and Gynecologists (ACOG), brings a wealth of expertise that will be instrumental in shaping the next phase of Caduceus' growth. I look forward to working closely with him to build upon the organization's strengths and expand its capabilities in telehealth and patient care innovation.

As detailed further in the enclosed APA, my purchase offer is a total of $3.15 M. This includes an upfront cash payment of $1.65 M for the bankruptcy sale, excluding accounts receivable, cash-on-hand due to CPMG.  Additionally, upon the Closing of the transaction, a cash infusion in the amount of $1.5 M for the ongoing operating capital needs of the business. This offer excludes any assumption of liabilities of CPMG or CMS,LLC.

In partnership with Dr. DeNicola, we commit to preserving the patient-doctor and other clinical relationships that have been forged over the past 25 years.  I recognize the importance of the loyal Caduceus Medical Group employees and would plan to continue these relationships as well.  As such, CPMG would continue as the operating medical practice entity with Dr. DeNicola serving as the sole shareholder of CPMG. Through the long-term management agreement with CMS, LLC, CMS LLC will serve as the management company providing for all the non-clinical business needs of the medical group. I intend to serve as the sole Manager of CMS, LLC and provide all necessary oversight of the business needs and direction for the companies.

I am prepared to move forward with a structured acquisition process and collaborate with all key stakeholders to ensure a seamless transition. I would welcome the opportunity to discuss my proposal in greater detail and outline my vision for the future of Caduceus Medical Group.

Thank you for your time and consideration. I look forward to your response and the prospect of working together to advance the mission of Caduceus Medical Group.


Sincerely,

*Victor Oviedo*


Victor Oviedo

Managing Partner

AFS Draft
3/14/2025

**ASSET PURCHASE AGREEMENT**

This ASSET PURCHASE AGREEMENT ("Agreement") is entered into as of March 18, 2025, by and among VYTL Ventures, an LLC ("Buyer"), Caduceus Medical Services, LLC, a California limited liability company ("CMS"), and Caduceus Physicians Medical Group, a Professional Medical Corporation, a California professional corporation d/b/a Caduceus Medical Group ("CMG," and collectively with CMS, "Seller").  Buyer, CMS, and CMG may be referred to herein individually as a "party" or collectively as the "parties."

**RECITALS**

A.      Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, certain tangible and intangible assets used in connection with CMG's medical practices operated at CMG's clinics located at: (1) 18200 Yorba Linda Boulevard, Suite 111, Yorba Linda, California 92886; (2) 19742 MacArthur Boulevard, Suite 100, Irvine, CA 92612; and (3) 333 Thalia Street, Laguna Beach, CA 92651 (each, a "Clinic" and collectively, the "Clinics") and in connection with CMS's management of the Clinics (the medical practices operated at the Clinics and CMS's management of the Clinics collectively referred to herein as the "Business") and to enter into certain other agreements in connection therewith (the "Transaction").

B.      Seller filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), jointly administered as Case No. 8:24-bk-11945-TA (the "Bankruptcy Case").  Howard Grobstein is the Bankruptcy Court appointed Chief Restructuring Officer ("CRO") for Seller.

C.      Buyer and Seller intend to effectuate the Transaction contemplated by this Agreement and sale of the Purchased  (defined below) upon approval by the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 9019 (including Section 363 of the Bankruptcy Code) (the "Settlement and Sale Motion").

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

1.      Purchased Assets.  Subject to final approval of the transactions contemplated by this Agreement by the Bankruptcy Court and upon the terms and subject to the conditions contained in this Agreement, Seller shall sell, assign, transfer, convey, and deliver to each Buyer as allocated, and each Buyer as allocated shall purchase from Seller, all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible, wherever located and whether now existing or hereafter acquired (other than the specifically Excluded Assets listed in Exhibit A attached hereto), which are used or held for use on the Closing Date (defined below) by Seller exclusively in connection with the Business (collectively, the "Purchased Assets"), including, without limitation, the following:

A.      all of the tangible personal property owned by Seller and located at the Clinics, including equipment, furniture and office furnishings (the "Personal Property");

B.      all inventories of supplies, drugs, food, janitorial and office supplies, and other disposables and consumables located at the Clinics (the "Inventory");

C.      all of the following to the extent located at the Clinic, legally transferrable, and not subject to prior consent of any third party: operating manuals, forms, files, books, records, and documents with respect to the Clinics, including, without limitation, all patient records, employee records, equipment records, and electronic medical records;

1

EXHIBIT 1, PAGE 17

D.    all of the following to the extent legally transferrable and not subject to prior consent of any third party: the right to use any trademarks, service marks, trademark and service mark registrations and registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know- how, trade secrets and the corporate or company names of the Clinics used in connection with the Business, together with all rights to sue and recover damages for infringement, dilution, misappropriation or other violation or conflict associated with any of the foregoing; and

E.    all of Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Clinics that have been designated by Buyer as a contract to be assumed pursuant to <u>Section 6</u> and listed on <u>Exhibit B</u> hereto (the "<u>Assumed Contracts</u>").

2.    <u>Excluded Assets</u>.  Notwithstanding the foregoing, the Purchased Assets shall not include assets of the Seller that are not primarily used in connection with the operation of the Clinics and those assets identified in <u>Exhibit A</u> attached hereto (collectively, the "<u>Excluded Assets</u>").

3.    <u>Closing Date</u>.  Subject to the satisfaction or waiver of the conditions set forth herein, the consummation of the Transaction, which is subject to approval by the Bankruptcy Court as set forth herein, shall take place within forty-five (45) days following the Bankruptcy Court's approval of the Transaction and the satisfaction or waiver of all other conditions to closing the Transaction as set forth in <u>Section 14</u> (the "<u>Closing</u>"), at [insert location] (or on such other date at such other time and place as the parties shall agree in writing) (the "<u>Closing Date</u>").

4.    <u>Purchase Price</u>.  In consideration of the sale, conveyance, transfer and delivery of the Purchased Assets, and subject to the terms and conditions herein, Buyer agrees to pay an aggregate purchase price for the Purchased Assets of Caduceus Medical Group, LLC ($1.65 million) (the "<u>Closing Consideration</u>") plus the cure costs as described in <u>Section 6</u> and an amount equal to the book value of Inventory as of the Closing Date (the "<u>Inventory Adjustment</u>").  The Inventory Adjustment shall be determined as of the Closing Date and assessed within the thirty (30) day period immediately following the Closing Date.  The sum of the Closing Consideration plus the Inventory Adjustment shall be the "<u>Purchase Price</u>".  The Closing Consideration shall be delivered by Buyer to Seller (or its designee) on the Closing Date by wire transfer to such account(s) as may be designated by Seller.  The Inventory Adjustment shall be delivered by Buyer to Seller (or its designee) within five (5) days of Seller's delivery to Buyer of the computation of the Inventory Adjustment by wire transfer to an account designated by Seller.  For the avoidance of doubt, Buyer is buying Seller's interests in the Purchased Assets free and clear of all liens, claims, and interests pursuant to 11 U.S.C. § 363(f).

5.    <u>Liabilities</u>.  Buyer and Seller each acknowledge and agree that Buyer is purchasing only the Purchased Assets and is not assuming any liabilities of Seller.

6.    <u>Assignment of Contracts</u>.  Pursuant to Section 365 of the Bankruptcy Code, Seller shall assign the contracts and leases listed on <u>Exhibit B</u> hereto effective as of the Closing Date (collectively, the "<u>Designated Contracts</u>") to Buyer.  Buyer shall cause Professional Corporation to assume and accept the Designated Contracts.  Buyer reserves the right to amend <u>Exhibit B</u> to add additional Designated Contracts until the day which is not later than fourteen (14) days prior to the hearing to approve the Settlement and Sale Motion.  Buyer reserves the right to remove Designated Contracts from <u>Exhibit B</u> at any time until the hearing to approve the Settlement and Sale Motion.  Seller shall provide notice to counter-parties to the Designated Contracts of the Seller's intent to assume and assign the Designated Contracts and the proposed cure costs, if any, for such Designated Contracts.  On or before the Closing Date, Buyer shall pay directly to the counter-party all cure costs associated with a Designated Contract that is assumed and assigned pursuant to this Agreement. Buyer hereby agrees to indemnify, defend, and hold harmless Seller and its affiliates from and against any and all liabilities assumed by Professional Corporation or Buyer under any Designated Contract.

AFSDOCS:301368061.1

7.      Real Property.  The parties acknowledge that the Designated Contracts shall include the real property leases associated with the Clinic locations (the "Leases").  Effective on the Closing Date, Buyer shall assume the Leases and shall be responsible for any cure costs associated with the Leases.  Effective on the Closing Date, Seller shall forfeit any right to security deposits under the Leases.  Buyer hereby agrees to indemnify, defend, and hold harmless Seller and their affiliates from and against any and all liabilities under the Leases.  Seller agrees to use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with Buyer in restructuring or terminating the Leases.

8.      Bankruptcy Court Approval.  This Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Buyer acknowledges that the sale to Buyer is subject to overbid and that Seller shall file the Settlement and Sale Motion and request approval of the sale of the Purchased Assets under 11 U.S.C.  § 363(b) and (f), subject to overbid.

9.      Bill of Sale.  On the Closing Date, Buyer and Seller shall enter into a bill of sale in substantially the form set forth on Exhibit C attached hereto.

10.     Disclaimer of Warranties; Release and Waiver of Claims.

A.      THE PURCHASED ASSETS TRANSFERRED TO BUYER WILL BE SOLD BY SELLER AND PURCHASED BY BUYER IN THEIR PHYSICAL CONDITION ON THE CLOSING DATE, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLER INCLUDED IN THE PURCHASED ASSETS, THE ASSUMED LIABILITIES ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS.  ALL OF THE TANGIBLE PURCHASED ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE CLOSING DATE.

B.      Buyer acknowledges that Buyer will be examining, reviewing, and inspecting all matters which in Buyer's judgment bear upon the Purchased Assets, Seller, the Clinic, the business of the Clinic and its value and suitability for Buyer's purposes.  Buyer acknowledges it is relying solely on its own examination, review, and inspection of the Purchased Assets.

C.      Buyer hereby, jointly and severally, releases Seller, Seller's affiliates, and their respective predecessors, successors, corporate parents, subsidiaries, affiliates, present or former trustees, directors, officers, attorneys, agents, and employees from any and all claims, suits, damages, liabilities, costs, losses, interest, or expenses of any kind or nature whatsoever, which have arisen or could arise under this Agreement, the Purchased Assets, or their suitability for any purpose whatsoever.

D.      Buyer acknowledges that the representations and warranties of Seller contained in Section 11 are the sole and exclusive representations and warranties made by Seller to Buyer.

E.      With respect to the claims identified and released pursuant to Sections 10(C) and (D) of this Agreement, Buyer hereby waives and releases any and all rights under Section 1542 of the California Civil Code as said statute pertains to the claims being released hereunder.  California Civil Code Section 1542 reads as follows:

3

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Buyer expressly agrees that this Agreement shall extend and apply to all unknown, unsuspected, and unanticipated damages within the scope of the releases set forth in Sections 10(C) and (D) herein, as well as those that are now disclosed.

11.    Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

A.    Seller has full power and authority to enter into this Agreement, to perform its obligations hereunder and carry out the transactions contemplated herein.  No additional internal consents (other than Bankruptcy Court approval for this Agreement) are required in order for Seller to perform its obligations and agreements hereunder.

B.    Seller has good and marketable title to all of the Purchased Assets, and, subject to Bankruptcy Court approval of the Agreement, is entitled to transfer the Purchased Assets free and clear of any liens or encumbrance or restriction on transfer as set forth in Section 363 of the Bankruptcy Code.

C.    This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Buyer, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable Bankruptcy Court approval and bankruptcy, reorganization, insolvency, moratorium, and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

D.    CMS is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of California.  CMG is a professional medical corporation, duly incorporated, validly existing, and in good standing under the laws of the State of California.  Seller has all necessary power and authority to own, operate, and lease its properties and to carry on its businesses as now conducted.

E.    Neither the execution and delivery by Seller of this Agreement nor the consummation of the transactions contemplated hereby by Seller nor compliance with any of the material provisions hereof by Seller will: (a) violate, conflict with, or result in a breach of any material provision of Seller's articles of incorporation, bylaws, or any other organizational documents of Seller or any contract, lease, or other instrument by which Seller is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority (other than approval from the Bankruptcy Court); (c) violate any law, rule, regulation, or ordinance to which Seller is or may be subject; or (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Seller is subject.

12.    Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as follows:

A.    Buyer has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby.  No additional internal consents are required in order for Buyer to perform its obligations and agreements hereunder.

4

AFSDOCS:301368061.1

B.     This Agreement has been duly and validly executed and delivered by Buyer and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Buyer enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium, and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

C.     Buyer is a professional corporation duly incorporated, validly existing, and in good standing under the laws of the State of California.  Buyer is duly authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

D.     Neither the execution and delivery by Buyer of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Buyer will: (a) violate, conflict with or result in a breach of any material provision of the articles of incorporation, bylaws, or other organizational documents of Buyer or any contract, lease, or other instrument by which Buyer is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority; (c) violate any law, rule, regulation, or ordinance to which Buyer is or may be subject; or (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Buyer is subject.

E.     Buyer acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis, and that Buyer is not relying on any representation or warranty (expressed or implied, oral, or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement.  Buyer further acknowledges that Seller is not making any representations or warranties herein relating to the Purchased Assets or the operation of the Clinic on and after the Closing Date.

13.     <u>Covenants of Buyer and Seller</u>.

A.     Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper, or advisable to consummate and make effective the transactions contemplated by this Agreement.

B.     Seller shall use its reasonable best efforts to cause or obtain the satisfaction of the conditions applicable to Seller specified in <u>Section 14(A) and (C)</u> below.  Buyer shall use its reasonable best efforts to cause or obtain the satisfaction of the conditions applicable to Buyer specified in <u>Section 14(A) and (B)</u> below.

C.     All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including, without limitation, the fees and disbursements of counsel, financial advisors, and accountants, shall be paid by the party incurring such costs and expenses or otherwise as may be determined by the Bankruptcy Court.

D.     Seller shall exercise reasonable efforts to obtain a Sale Order approving this Agreement, subject to its obligations in respect of any better and higher offer for Seller's assets in accordance with the Bankruptcy Code.  For purposes of this Agreement, the term "<u>Sale Order</u>" shall mean an order of the Bankruptcy Court authorizing the settlements proposed herein and sale of the Purchased Assets to Buyer pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 363 of the Bankruptcy Code, consistent with this Agreement and in a form reasonably satisfactory to Buyer.

E.     Seller shall seek an order from the Bankruptcy Court retaining jurisdiction over all matters relating to claims against Seller as debtor solely in the Bankruptcy Court.

5

EXHIBIT 1, PAGE 21

F.    In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall promptly notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of the Sale Order, Seller shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

14.    <u>Conditions to the Obligations of the Parties</u>.

A.    <u>Conditions to Each Party's Obligations</u>. The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following conditions:

(i)    No court or other governmental entity having jurisdiction over Seller or Buyer, or any of their respective subsidiaries, shall have enacted, issued, promulgated, enforced, or entered any law, rule, regulation, executive order, decree, injunction, or other order (whether temporary, preliminary, or permanent) which is then in effect and has the effect of making the transactions contemplated by this Agreement illegal.

(ii)    The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall not have been reversed or subject to any stay. The Sale Order shall be in form and substance acceptable to Buyer in its reasonable discretion.

B.    <u>Conditions to Obligation of Seller</u>. The obligation of Seller to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the condition that Buyer shall have performed in all material respects each of its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date, including payment of the Purchase Price, and each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

C.    <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the condition that Seller shall have performed in all material respects each of its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date, and each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

15.    <u>Termination</u>. This Agreement may be terminated in writing at any time prior to the Closing Date:

A.    By Buyer, if the Closing Date does not occur within forty-five (45) days following the Bankruptcy Court's approval of the Transaction, and such failure is not due to a breach by Buyer; or

B.    By Seller, if the Closing Date does not occur within forty-five (45) days following the Bankruptcy Court's approval of the Transaction, and such failure is not due to a breach by Seller; or

C.    By Buyer or Seller if, before the Closing Date, the other party is in material breach of any representations, warranty, covenant, or agreement contained herein and has not cured the same.

6

AFSDOCS:301368061.1

16.    <u>Notice of Transfer of Custody</u>.  Within thirty (30) days after the Closing Date, Buyer shall provide written notice to the Clinic's patients that their medical records have been transferred to Buyer.

17.    <u>Governing Law</u>.  This Agreement and the agreements executed in connection herewith shall be governed by the laws of the State of California (regardless of the laws that might otherwise govern under applicable principles of conflicts of law of the State of California) as applied by the United States Bankruptcy Court for the Central District of California and as to all matters including, but not limited to, matters of validity, construction, effect, performance, and remedies.

18.    <u>Dispute Resolution</u>.  In the event of any dispute, the United States Bankruptcy Court for the Central District of California, Santa Ana Division, shall be the exclusive forum to resolve such dispute.

19.    <u>Further Assurances</u>.  Each of the parties shall use reasonable efforts to, from time to time at the request of the other party, furnish the other party such further information or assurances, execute and deliver such additional documents, instruments, and conveyances, and take such other actions and do such other things, as may be reasonably necessary to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.

20.    <u>Waiver of Compliance; Consents</u>.  Any failure of Seller on the one hand, or Buyer on the other hand, to comply with any obligation, covenant, agreement or condition herein shall only be waived in writing and signed by Buyer or by Seller, respectively, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits consent by or on behalf of any party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section, unless otherwise specified in such separate section.

21.    <u>Expenses</u>.  Each party will pay its own legal, accounting, and other expenses incurred by such party or on its behalf in connection with this Agreement and the transactions contemplated herein.

22.    <u>Notices</u>.  All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be (a) delivered in person or by courier; (b) mailed by first class registered or certified mail; or (c) delivered by electronic mail transmission, as follows, or to such other address as a party may designate to the other in writing:

If to Seller:                                        If to Buyer:
Caduceus Physicians Medical Group                    VYTL Ventures, LLC
Caduceus Medical Services, LLC                       848 Brickell Key Drive
18200 Yorba Linda Boulevard, Suite 111               Unit 2205
Yorba Linda, CA 92886                                Miami, FL 33131
Attention: Gregg DeNicola, M.D.,                     Attention: Victor Oviedo
Email: Ray@caduceusmedical.org                       Email: victor@stagelightgroup.com

With a copy to:
ArentFox Schiff LLP
Attention: Gayland Hethcoat
555 South Flower Street, 43rd Floor
Los Angeles, CA 90071
Email: gayland.hethcoat@afslaw.com

23.    <u>Miscellaneous</u>.  This Agreement and all of the provisions hereof and the other documents or agreements contemplated hereby shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder or under any of the other documents or agreements contemplated hereby shall be assigned by either party without the written consent of the other party.  This Agreement constitutes

7

AFSDOCS:301368061.1

the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.  Each party has been represented by legal counsel of their choosing.  This Agreement may be executed in separate counterparts, each of which when so executed shall be an original, but all of such counterparts shall together constitute but one and the same instrument.  The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  This Agreement, which term as used throughout includes the Exhibits hereto, embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

24.    <u>No Contingencies</u>.  Except as otherwise set forth in this Agreement, the Transaction is not subject to any contingencies.  Without limitation, the Transaction is not contingent upon Buyer obtaining financing.  Buyer understands and agrees that neither its receipt of a commitment from such a lending institution, its acceptance of such a commitment, nor its satisfaction of any condition set forth in such a commitment shall in any way be a condition of Buyer's obligations under this Agreement.

25.    <u>CRO's Capacity</u>.  Howard Grobstein is signing this Agreement in his capacity solely as the court-appointed CRO of Seller in the Bankruptcy Case.  Nothing contained herein relating to the Purchased Assets or Seller shall in any way impute liability to Howard Grobstein, personally, or as a member of any professional organization, including Grobstein Teeple, LLP or anyone acting on his or their behalf, including but not limited to his counsel, Marshack Hays Wood LLP.

*[Signature page follows]*

8

EXHIBIT 1, PAGE 24

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the Closing Date.

**BUYER:**

VYTL Ventures, an LLC

By:___*Victor Oviedo*_____
Name: Victor Oviedo
Title: Managing Partner

**SELLER:**

Caduceus Medical Services, LLC, a California limited liability company

By:_____
Name:
Title:

Caduceus Physicians Medical Group, a Professional Medical Corporation, a California professional corporation d/b/a Caduceus Medical Group

By:_____
Name:  Howard Grobstein
Title:  Chief Restructuring Officer

[Signature Page to Asset Purchase Agreement]

**EXHIBIT A**

**(Excluded Assets)**

1.  All accounts receivable after the first $200,000 collected owing or to be owed to CMG and arising from medical or healthcare products or services furnished or performed by CMG or any employee, agent, or contractor of CMG prior to the Closing Date, including, without limitation, all charges, payments, copayments, deductibles, and other obligations for the payment of money.

2.  The actual cash balances of Seller, including, without limitation, all deposits in transit but not yet credited, as of the Closing Date.

AFSDOCS:301368061.1

EXHIBIT 1, PAGE 26

**EXHIBIT B**

**(Designated Contracts)**

| # | Agreement | Debtor Party | Counterparty |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

**EXHIBIT C**

**(Bill of Sale)**

THIS BILL OF SALE (this "Bill of Sale"), is entered into as of _____, by Caduceus Medical Services, LLC, a California limited liability company ("CMS") and Caduceus Physicians Medical Group, a Professional Medical Corporation, d/b/a Caduceus Medical Group ("CMG," and collectively with CMS, "Seller") in favor of VYTL Ventures, an LLC ("Buyer") pursuant to that certain Asset Purchase Agreement, dated March 18, 2025 by and among Seller and Buyer ("Agreement"). Capitalized terms used in this Bill of Sale and not defined herein shall have the same meanings as assigned to them in the Agreement.

1.      Conveyance.  For good and valuable consideration, the receipt and adequacy of which Seller hereby acknowledges, Seller hereby sells, assigns, transfers, conveys, grants, bargains, and delivers to Buyer all of Seller's right, title, and interest in and to the Personal Property and Inventory (collectively, "Tangible Assets").  The Tangible Assets shall not include, and Buyer shall not purchase or acquire or otherwise obtain, any right, title or interest in, to, or under any Excluded Assets.

2.      Disclaimer of Warranties.  THE SALE OF THE TANGIBLE ASSETS IS "AS IS" AND WITH ALL FAULTS AND SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO THE TANGIBLE ASSETS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE.  BY ACCEPTING THIS BILL OF SALE, BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR WARRANTY MADE BY SELLER, OR ANY OTHER PERSON ON SELLER'S BEHALF.

3.      Power of Attorney.  Seller hereby appoints Buyer, its successors and assigns, as its true and lawful attorney to act in its name and on its behalf solely with respect to the collection or reduction to possession of any of the Tangible Assets and to execute any documents and instruments and to do all such other acts and things as may be necessary to effectuate the foregoing.  Buyer shall be entitled to retain for its own account any amounts pertaining to the Tangible Assets collected pursuant to the foregoing powers, including any amounts payable as interest with respect thereto.

4.      Incorporation of Agreement.  This Bill of Sale incorporates by reference all of the terms of the Agreement as if each term was fully set forth herein.  In the event of conflict between the terms of the Agreement and the terms of this Bill of Sale, the terms of the Agreement govern and control.

5.      Counterparts.  This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  A signed copy of this Bill of Sale delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have entered into this Bill of Sale as of the date first written above.

**BUYER:**

VYTL Ventures, an LLC

By:_____
Name: Victor Oviedo
Title: Managing Partner

**SELLER:**

Caduceus Medical Services, LLC, a California limited liability company

By:_____
Name:
Title:

Caduceus Physicians Medical Group, a Professional Medical Corporation, d/b/a Caduceus Medical Group

By:_____
Name:  Howard Grobstein
Title:  Chief Restructuring Officer

AFSDOCS:301368061.1

EXHIBIT 1, PAGE 29

**EXHIBIT 2**

## DEFERRAL AGREEMENT

THIS DEFERRAL AGREEMENT (this "Deferral Agreement") dated August 1, 2024 (the "Effective Date"), is made and entered into by and between Romanov Group, LLC, a Delaware limited liability company, as successor in interest to Packing House Yorba Linda LLC, a California limited liability company ("Landlord") and Caduceus Physicians Medical Group, a Professional Medical Corporation, dba Caduceus Medical Group ("Tenant").

### RECITALS

WHEREAS, Landlord and Tenant (or their respective successor-in-interest) are parties to that certain Office Lease dated October 3, 2019 (the "Lease").

WHEREAS, pursuant to the Lease, Tenant is currently leasing from Landlord that certain premises commonly known as 18200 Yorba Linda Blvd, Suite 125, Yorba Linda, CA, containing approximately forty-three thousand eight hundred thirty-four (43,834) square feet ("Premises") as more particularly described in the Lease.

WHEREAS, Landlord and Tenant acknowledge that the Term Commencement Date was August 1, 2021 and that as of August 1, 2024, Tenant is in the thirty-seventh (37th) month of its Lease Term.

WHEREAS, Landlord agrees to provide the Tenant with a deferral of their rent as more particularly described herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Incorporation of Recitals.  The foregoing recitals are true and correct and are incorporated herein by this reference.

2.    Capitalized Terms.  Unless otherwise stated herein, all capitalized terms shall have the meanings defined in the Lease.

3.    Affirmation of Lease Terms.   Except as expressly provided in this Deferral Agreement, the parties hereby reaffirm the Lease and each provision thereof, in its entirety.

4.    Financial Statements.  Upon request of Landlord, Tenant agrees to furnish Landlord copies of Tenant's most recent annual, quarterly and monthly financial statements, audited if available. The financial statements shall be prepared in accordance with generally accepted accounting principles, consistently applied. The financial statements shall include a balance sheet and a statement of profit and loss.

5.    Minimum Monthly Rent Deferral. Notwithstanding anything to the contrary contained in this Deferral Agreement, Landlord shall grant Tenant a deferral on the Monthly Minimum Rent beginning on August 1, 2024 and ending February 28, 2025 (the "Deferral Period") in the amounts set forth below:

DEFERRAL AGREEMENT | 1

| Period | Minimum Monthly Rent Due | Deferred Minimum Rent | Minimum Monthly Rent Due Less Deferred Minimum Rent |
|---|---|---|---|
| August 2024 | $123,291.00 | $123,291.00 | $0.00 |
| September 2024 | $123,291.00 | $123,291.00 | $0.00 |
| October 2024 | $123,291.00 | $97,541.00 | $25,750.00 |
| November 2024 | $123,291.00 | $97,541.00 | $25,750.00 |
| December 2024 | $123,291.00 | $71,791.00 | $51,500.00 |
| January 2025 | $123,291.00 | $71,791.00 | $51,500.00 |
| February 2025 | $123,291.00 | $20,291.00 | $103,000.00 |

The total Minimum Rent deferred shall total six hundred five thousand five hundred thirty-seven dollars ($605,537.00) (the "Deferred Minimum Rent"). Beginning on March 1, 2025 and continuing until February 1, 2028, Tenant shall repay Landlord the Deferred Minimum Rent in thirty-six (36) equal installments in the amount of sixteen thousand eight hundred twenty dollars and 47/100 ($16,820.47) each, which shall be due and payable to Landlord at the same time as the Minimum Monthly Rent. The Tenant shall resume full Minimum Monthly Rent payments pursuant to the Lease starting in March 2025 (the 44th month of the Lease Term), and such Minimum Monthly Rent shall be paid in the amounts set forth in Exhibit C of the Lease. For the avoidance of doubt, any Additional Rent, including but not limited to Tenant's prorated share of real property taxes, common area maintenance and insurance due as part of the Lease shall be due and payable in full during the Deferral Period, and at all times during the Lease Term and any applicable extensions thereof. Notwithstanding anything to the contrary contained herein, if Tenant breaches the terms of this Deferral Agreement or the Lease, then all Deferred Minimum Rent shall become immediately due and payable, and if the breach occurs during the Deferral Period, then all deferments shall be deemed null and void, and all rent due during such period shall also become immediately due and payable. In addition, Tenant's right to Rent Abatement in the amount of eighteen thousand three hundred thirty-three dollars ($18,333.00) during the months of August

DEFERRAL AGREEMENT | 2

2024 to February 2025, which correspond as months 37 to 43 in the Monthly Rent Abatement Schedule, per Exhibit C of the Lease, shall be deemed null and void.

6. **Notices.** Effective as of the date of this Deferral Agreement, any notice address(es) set forth in the Lease for the Tenant under the Lease are hereby deleted and replaced with the following notice address(es) to which any notice, demand, request, approval, consent or other instrument which may be or is required to be given to Tenant or Landlord thereunder shall be delivered to the addresses as follows:

> To Landlord:
> Romanov Group, LLC
> 520 Newport Center Drive, Suite 480
> Newport Beach, California 92660
> Email: miles@continuumanalytics.com
>
> To Tenant:
>
> Caduceus Physicians Medical Group, a Professional Medical Corporation
> Attn:   Dr. Gregg DeNicola
>         Howard Grobstein
>         18200 Yorba Linda Blvd, Suite 111
>         Yorba Linda, California
> Email: greggdenicolamd@aol.com
>        hgrobstein@gtllp.com

Any notice or demand upon the parties shall be in writing and either served personally or sent by registered mail or certified mail, return receipt requested, with postage prepaid, or delivered by a carrier service guaranteeing overnight delivery, charges prepaid, addressed to such party at the above address. Notices or demands shall be effective when delivered or placed in the mail as above specified.

7. **Successors and Assigns.** This Deferral Agreement shall inure to the benefit and be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns; however, this provision shall not authorize any assignment or subletting otherwise prohibited in the Lease.

8. **Full Force and Effect.** Except as set forth in this Deferral Agreement, all terms and provisions of the Lease shall remain in full force and effect.

9. **Governing Law.** This Deferral Agreement shall be governed by and construed in accordance with the laws of the State of California.

10. **Condition Precedent.** This Deferral Agreement shall not be deemed effective for any purpose unless and until Landlord's execution hereof is obtained.

DEFERRAL AGREEMENT | 3

11.  <u>Severability</u>.  Any part, provision, representation or warranty of this Deferral Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to the Deferral Agreement shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Deferral Agreement shall deprive the Landlord of the economic benefit intended to be conferred by this Deferral Agreement, the parties shall negotiate, in good faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Deferral Agreement without regard to such invalidity.

12.  <u>Counterparts.</u>  This Deferral Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same Deferral Agreement t.  Further, counterparts of this Deferral Agreement may be executed and delivered via facsimile or other electronic signature by any of the parties to any other party, and the receiving party may rely on the receipt of such document so executed and delivered.

[SIGNATURE PAGE IMMEDIATELY FOLLOWS]

DEFERRAL AGREEMENT | 4

EXHIBIT 2, PAGE 33

IN WITNESS WHEREOF, the Parties hereto have executed this Deferral Agreement as of the date first above written.

| **LANDLORD:** | **TENANT:** |
|---|---|
| Romanov Group, LLC, | Caduceus Physicians Medical |
| a Delaware limited liability company | Group, a Professional Medical |
| | Corporation, dba Caduceus Medical |
| | Group |

By: _____    By: _____

Name: _____    Name: __Gregg DeNicola__

Its: _____    Its: __Manager__

IN WITNESS WHEREOF, the Parties hereto have executed this Deferral Agreement as of the date first above written.

| **LANDLORD:** | **TENANT:** |
|---|---|
| Romanov Group, LLC,<br>a Delaware limited liability company | Caduceus Physicians Medical Group, a Professional Medical Corporation, dba Caduceus Medical Group |

By: _____         By: _____

Name: __Jason Miller_____         Name: _____

Its: __Manager_____         Its: _____

DEFERRAL AGREEMENT | 5

EXHIBIT 2, PAGE 36

**EXHIBIT 3**

# Caduceus Physicians Medical Group

**Post-Petition Payments to Vierergruppe (Property Manager of Romanov Group, LLC)**
as of March 12, 2025

| Period | DEFERRAL AGREEMENT | | | Payment Date | Rent Paid | Other Payments to Vierergruppe | Note |
|---|---|---|---|---|---|---|---|
| | Minimum Monthly Rent Due | Deferred Minimum Rent | Minimum Monthly Rent Due Less Deferred Minimum Rent | | | | |
| August 2024 | 123,291.00 | 123,291.00 | - | | | | |
| September 2024 | 123,291.00 | 123,291.00 | - | 9/16/2024 | | 94,016.60 | Note 1 |
| October 2024 | 123,291.00 | 97,541.00 | 25,750.00 | 10/8/2024 | | 78,211.90 | Note 2 |
| November 2024 | 123,291.00 | 97,541.00 | 25,750.00 | 11/6/2024 | 25,750.00 | 54,097.30 | Note 3 |
| December 2024 | 123,291.00 | 71,791.00 | 51,500.00 | 12/9/2024 | 51,500.00 | 54,097.30 | Note 4 |
| January 2025 | 123,291.00 | 71,791.00 | 51,500.00 | 1/7/2025 | 51,500.00 | 54,097.30 | Note 5 |
| February 2025 | 123,291.00 | 20,291.00 | 103,000.00 | 2/6/2025 | 51,500.00 | 54,097.30 | Note 6 |
| | | | | | 206,000.00 | 388,617.70 | |

**Note 1:**

| | | | |
|---|---|---|---|
| Sep 16 | VIERERGRUPPE MANWEB PMTS QG24PB CADUCEUS PHYSICIANS ME | 2,946.84 | PDQ |
| Sep 16 | VIERERGRUPPE MANWEB PMTS RG24PB CADUCEUS PHYSICIANS ME | 91,069.76 | TI and CAMs |

**Note 2:**

| | | | |
|---|---|---|---|
| Oct 08 | VIERERGRUPPE MANWEB PMTS RZTFTB CADUCEUS PHYSICIANS ME | 1,473.42 | PDQ |
| Oct 08 | VIERERGRUPPE MANWEB PMTS SZTFTB CADUCEUS PHYSICIANS ME | 15,028.82 | TI |
| Oct 08 | VIERERGRUPPE MANWEB PMTS TZTFTB CADUCEUS PHYSICIANS ME | 25,750.00 | Rent |
| Oct 08 | VIERERGRUPPE MANWEB PMTS QZTFTB CADUCEUS PHYSICIANS ME | 30,506.06 | CAMs |
| Oct 09 | VIERERGRUPPE MANWEB PMTS 32XJTB CADUCEUS PHYSICIANS ME | 10,112.69 | BIM |
| Oct 09 | VIERERGRUPPE MANWEB PMTS 22XJTB CADUCEUS PHYSICIANS ME | 21,061.00 | PDQ |

**Note 3:**

| | | | |
|---|---|---|---|
| Nov 06 | VIERERGRUPPE MANWEB PMTS YSYVYB CADUCEUS PHYSICIANS ME | 8,562.42 | PDQ |
| Nov 06 | VIERERGRUPPE MANWEB PMTS ZSYVYB CADUCEUS PHYSICIANS ME | 71,284.88 | Rent, TI, CAMs |

EXHIBIT 3, PAGE 37

# Caduceus Physicians Medical Group

**Post-Petition Payments to Vierergruppe (Property Manager of Romanov Group, LLC)**

as of March 12, 2025

Note 4:

| Date | Description | Amount | |
|---|---|---|---|
| | ... | 8,562.42 | PDQ |
| Dec 09 | VIERERGRUPPE MANWWEB PMTS 5LFS33C CADUCEUS PHYSICIANS ME | 45,534.88 | TI and CAMs |
| Dec 09 | VIERERGRUPPE MANWWEB PMTS 7LFS33C CADUCEUS PHYSICIANS ME | 51,500.00 | Rent |
| Dec 09 | VIERERGRUPPE MANWWEB PMTS 6LFS33C CADUCEUS PHYSICIANS ME | | |

Note 5:

| Date | Description | Amount | |
|---|---|---|---|
| Jan 07 | VIERERGRUPPE MANWWEB PMTS WT9G8C CADUCEUS PHYSICIANS ME | 8,562.42 | PDQ |
| Jan 07 | VIERERGRUPPE MANWWEB PMTS X7BG8C CADUCEUS PHYSICIANS ME | 15,028.82 | TI |
| Jan 07 | VIERERGRUPPE MANWWEB PMTS W7BG8C CADUCEUS PHYSICIANS ME | 30,506.06 | CAMs |
| Jan 07 | VIERERGRUPPE MANWWEB PMTS Y7BG8C CADUCEUS PHYSICIANS ME | 51,500.00 | Rent |

Note 6:

| Date | Description | Amount | |
|---|---|---|---|
| Feb 06 | VIERERGRUPPE MANWWEB PMTS ZVB7FC CADUCEUS PHYSICIANS ME | 8,562.42 | PDQ |
| Feb 06 | VIERERGRUPPE MANWWEB PMTS 2WB7FC CADUCEUS PHYSICIANS ME | 15,028.82 | TI |
| Feb 06 | VIERERGRUPPE MANWWEB PMTS 1WB7FC CADUCEUS PHYSICIANS ME | 30,506.06 | CAMs |
| Feb 06 | VIERERGRUPPE MANWWEB PMTS 0WB7FC CADUCEUS PHYSICIANS ME | 51,500.00 | Rent |

EXHIBIT 3, PAGE 38

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ORDER: AUTHORIZING SALE OF CERTAIN TANGIBLE AND INTANGIBLE ASSETS ("PURCHASED ASSETS"), USED IN CONNECTION WITH DEBTORS' MEDICAL PRACTICES; (A) OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; (C) SUBJECT TO OVERBID; (D) FOR DETERMINATION OF GOOD FAITH PURCHASER UNDER 11 U.S.C. §363(M); (E) FOR WAIVER OF 14-DAY STAY; AND (F) AMENDING BID PROCEDURES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF HOWARD B. GROBSTEIN IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On  **March 14, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

⊠ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**: On  **March 14, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEBTOR**
CADUCEUS MEDICAL SERVICES LLC
18200 YORBA LINDA BLVD STE 111
YORBA LINDA, CA 92886-4043

**DEBTOR / CREDITOR / POC ADDRESS**
CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL CORPORATION
18200 YORBA LINDA BLVD STE 111
YORBA LINDA, CA 92886-4043

**DEBTOR'S CHIEF RESTRUCTURING OFFICER**
HOWARD GROBSTEIN
GROBSTEIN TEEPLE LLP
23832 ROCKFIELD BLVD, STE 245
LAKE FOREST, CA 92630-2884

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on  March 14, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY:**
HONORABLE THEODOR C. ALBERT
UNITED STATES BANKRUPTCY COURT
411 WEST FOURTH STREET, SUITE 5097
SANTA ANA, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 14, 2025 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:
   - **INTERESTED PARTY COURTESY NEF:** Samuel Mushegh Boyamian samuel@marguliesfaithlaw.com, Angela@MarguliesFaithLaw.com; Vicky@MarguliesFaithLaw.com; Amber@MarguliesFaithLaw.com
   - ***ATTORNEY FOR SECURED CREDITOR BMO BANK NATIONAL ASSOCIATION:*** Christopher Crowell ccrowell@hrhlaw.com
   - **ATTORNEY FOR DEBTOR CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION:** Aaron E. De Leest on behalf adeleest@marshackhays.com, adeleest@marshackhays.com, alinares@ecf.courtdrive.com
   - **INTERESTED PARTY COURTESY NEF:** Jeremy Faith Jeremy@MarguliesFaithlaw.com, Angela@MarguliesFaithLaw.com; Vicky@MarguliesFaithLaw.com; Amber@MarguliesFaithLaw.com
   - **SPECIAL COUNSEL ARENTFOX SCHIFF LLP:** M Douglas Flahaut df@echoparklegal.com
   - **ATTORNEY FOR DEBTOR CADUCEUS MEDICAL SERVICES LLC and DEBTOR CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION:** Matthew Grimshaw mgrimshaw@marshackhays.com, mgrimshaw@ecf.courtdrive.com; alinares@ecf.courtdrive.com
   - **ATTORNEY FOR PLAINTIFF MACKENZIE WILLIAMS:** Elana R. Levine llevine@alderlaw.com
   - **INTERESTED PARTY COURTESY NEF:** Marc A Lieberman marc.lieberman@flpllp.com, addy@flpllp.com, andrea@flpllp.com
   - **ATTORNEY FOR US TRUSTEE:** Queenie K Ng queenie.k.ng@usdoj.gov
   - **SPECIAL COUNSEL ARENTFOX SCHIFF LLP:** Aram Ordubegian ordubegian.aram@arentfox.com
   - ***ATTORNEY FOR CREDITOR BATES JOHNSON BUILDING, LTD.: Brett Ramsaur***    brett@ramsaurlaw.com, alecia@ramsaurlaw.com;paralegal@ramsaurlaw.com
   - ***ATTORNEY FOR CREDITOR ROMANOV GROUP, LLC: Jeremy H Rothstein***    jrothstein@gblawllp.com, msingleman@gblawllp.com;mbowes@gblawllp.com
   - **INTERESTED PARTY COURTESY NEF: Andrew Still**    astill@swlaw.com, kcollins@swlaw.com
   - **US TRUSTEE:** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
   - **ATTORNEY FOR DEBTOR CADUCEUS MEDICAL SERVICES LLC and DEBTOR CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION:** Ronghua Sophia Wang sophia.wang@afslaw.com
   - **INTERESTD PARTY COURTESY NEF:** Pamela Kohlman Webster pwebster@buchalter.com, smartin@buchalter.com
   - ***ATTORNEY FOR SECURED CREDITOR DESPIERTA, LLC, ITS SUCCESSORS AND/OR ASSIGNEES***: Reilly D Wilkinson rwilkinson@scheerlawgroup.com, rwilkinson@ecf.courtdrive.com
   - **ATTORNEY FOR DEBTOR CADUCEUS MEDICAL SERVICES LLC and DEBTOR CADUCEUS PHYSICIANS MEDICAL GROUP, A PROFESSIONAL MEDICAL CORPORATION:** David Wood dwood@marshackhays.com, dwood@ecf.courtdrive.com; lbuchananmh@ecf.courtdrive.com; spineda@ecf.courtdrive.com; alinares@ecf.courtdrive.com

4918-4362-5001

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                          **F 9013-3.1.PROOF.SERVICE**